UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 09 CR 383 |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| VICENTE JESUS ZAMBADA-NIEBLA | ) | |
| _____ | ) | |

# MOTION FOR DISCOVERY REGARDING DEFENSE OF PUBLIC AUTHORITY

Defendant, Vicente Jesus Zambada-Niebla, through his counsel of record, hereby moves this court for an order directing the government to produce for inspection, copying and/or photographing each of the items listed below:

1. Any and all documents which would tend to reflect that the United States government gave preferential treatment and was biased towards one drug trafficking organization or cartel over another, including but not limited to any reports or documents in the government's possession, custody, or control which would indicate that benefits of any kind were given to any member of the "Sinaloa Drug Cartel," including but not limited to Humberto Loya-Castro aka "El Licenciado-Perez," for information regarding any other Mexican Drug Trafficking Organization involved in the transportation, exportation, and sales of cocaine and any other controlled substances as defined in Title 21 U.S.C.. This request includes, but is not limited to, any and all information in the possession of the United States government, including but not limited to the Department of Justice OCDETF, CIA, FBI, DEA, ICE, any joint task force, and any and all representatives of the Mexican government;

2. Any information establishing that the "Sinaloa Cartel" or any alleged member of the "Sinaloa Cartel" received any form of benefits or leniency in exchange for providing information which led to the arrest of any individual alleged to be a member of any of the other Mexican Drug Trafficking Organization;

3. Production of complete information relating to the negotiation process which culminated in an agreement by the United States government with Humberto Loya-Castro aka "El Licenciado Perez," who was indicted in the United States District Court for the Southern District of California in

Case Number 95CR0973-JM, to provide information about narcotics trafficking in the United States and/or Mexico. This information includes:

a) the contents of any and all communications, oral or written, made by government representatives to Mr. Loya-Castro, his attorney, and/or any representative(s) soliciting or inquiring about cooperation in the investigation or prosecution of Mexican drug trafficking organizations;

b) the contents of all communications, oral or written, made by Mr. Loya-Castro in response to any communication identified in paragraph (a);

c) the contents of all communications, oral or written made by Mr. Loya-Castro, his attorney, or any representative(s) acting on his behalf, to government representatives inquiring about a possible cooperation arrangement as outlined above;

d) the contents of all communications, oral or written, made by government representatives in response to any communication identified in paragraph (c);

e) the contents of all communications oral or written, made by Mr. Loya-Castro, his attorney, or any representative(s) acting on his behalf, discussing what information the witness could provide;

f) the contents of all communications, oral or written, made by government representatives to Mr. Loya-Castro, his attorney, or any representative(s) acting on his behalf, in response to any communication identified in paragraph (e);

g) the contents of all communications, oral or written, between and among government representatives or between government representatives and Mr. Loya-Castro, his attorney, or any representative(s) discussing the completeness or truthfulness of any information or proffers of information made by Mr. Loya-Castro;

h) the contents of all communications, oral or written, between and among government representatives or between government representatives and Mr. Loya-Castro, his attorney, or any representative(s) acting on his behalf relating to the truthfulness, honesty or credibility;

i) the contents of all communications, oral or written, between government representatives and Mr. Loya-Castro, his attorney, or any representative(s) acting on his behalf, relating to benefits to Mr. Loya-Castro or to other people of concern to the witness in exchange for his cooperation, including requests or demands for benefits made by or on behalf of Mr. Loya-Castro and promises or offers of benefits made by government representatives;

j) the contents of any agreement with Mr. Loya-Castro regarding his cooperation in the investigation or prosecution of narcotics traffickers in the United States and/or Mexico, including all draft or proposed agreements;

k) copies of all reports, correspondence, memoranda, notes, text messages, emails, recorded telephone conversations, surveillance, or any other documents discussing or relating to Mr. Loya-Castro communications with any and all government representatives which would tend to show that Mr. Zambada-Niebla expressed a desire to enter into a cooperation agreement with representatives of the government to provide information about Mexican drug trafficking organizations in return for immunity or any other form of leniency and/or benefits;

l) copies of all reports, correspondence, text messages, surveillance, emails, recorded conversations, or any other form of documentation which would tend to show that government representatives offered to Mr. Zambada-Niebla directly or indirectly through a third person an agreement whereby Mr. Zambada-Niebla would provide information about Mexican drug trafficking organizations in return for immunity and/or any other form of leniency and/or benefits;

m) copies of all reports, correspondence, text messages, surveillance, emails, memoranda, recorded conversations, or any other form of documentation which would tend to show that an agreement was reached between Mr. Zambada-Niebla and/or any representative on Mr. Zambada-Niebla's behalf with government representatives for Mr. Zambada-Niebla to provide information about Mexican drug trafficking organizations in return for immunity and/or any other form of leniency and/or benefits;

3

      n)     copies of all reports, correspondence, text messages, surveillance, emails, memoranda, recorded conversations, or any other form of documentation, which would tend to show that pursuant to any such agreement outlined in paragraph M, Mr. Zambada-Niebla, either directly or indirectly through Mr. Loya-Castro, provided information about Mexican drug trafficking organizations in return for immunity and/or any other form of leniency, and/or benefits;

      o)     the name, address, and telephone number of each person who was present during any conversation with Mr. Loya-Castro or anyone acting on Mr. Loya-Castro's behalf, regarding Mr. Zambada-Niebla entering into a cooperation agreement to provide information about Mexican drug trafficking organization in return for immunity or any other form of leniency and/or benefits;

4.     The names, addresses, and phone numbers of all government representatives, including and not limited to OCDETF, DEA, and ICE, that have communicated with Humberto Loya-Castro aka "El Licenciado Perez" since 1997 to present, regarding Mr. Loya-Castro acting as an informant for the United States government and his activities as an informant;

5.     Any and all surveillance logs of any and all meetings between Mr. Loya-Castro and any and all United States government representatives;

6.     Any and all surveillance logs of any and all meetings between Mr. Zambada-Niebla and any and all United States government representatives

7.     Any and all written or oral documentation, including and not limited to recorded conversations, text messages, emails, surveillance, or any form of communication that was exchanged between Mr. Loya-Castro and government representatives relating to information that was provided by Mr. Loya-Castro to any government representative(s) as a result of his agreement to cooperate in the investigation and/or prosecution of Mexican drug trafficking organizations in the United States and/or Mexico;

8.     All written and recorded statements, including but not limited to investigative reports, rough notes, logs, tape recordings, texts, emails, and any correspondence between any government representatives with Mr. Humberto-Loya Castro, including out-of-

      district materials and documents in the possession of investigating agencies closely connected to the prosecution. This request includes, but is not limited to, the production of any and all materials in possession of foreign law enforcement officials which were obtained as a result of any joint task force and agency cooperation between the United States and Mexico, any joint task force, representatives of the Mexican government, or any other closely aligned agency with the United States government;

9. Any and all information that would tend to establish that government representatives had knowledge that Mr. Loya-Castro continued to engage in narcotics trafficking activities and failed to take any measures to prevent Mr. Loya-Castro from engaging in such activities or charge Mr. Loya-Castro with any crime(s) pursuant to their agreement not to arrest or prosecute him, so long as he provided information against other MDTO's;

10. Production of any plea agreement entered into between the United States government and Mr. Loya-Castro, in any matter where Mr. Loya-Castro was a party, including and not limited to case number 95CR0973-JM (U.S.D.C. S. Dist. of Cal.);

11. Any and all information, evidence, or documentation that tends to indicate that government representatives, including but not limited to the OCDETF, CIA, FBI, DEA, ICE, and any other government representative specifically told Mr. Loya-Castro or any member of the Sinaloa Cartel that they and other members of the Sinaloa Cartel could continue to engage in narcotics trafficking and/or other criminal activity and would not be arrested or prosecuted, and/or given immunity so long as they continued to provide information against other Mexican Drug Trafficking Organizations;

12. Production of complete information, including and not limited to the name of all contacts, dates and locations of meetings, communications, recordings, emails, text messages, or any other form of documentation, between Mr. Loya-Castro and any government representative(s) from 1997 to date;

13. Complete information regarding the date, place, amount, and purpose of each monetary payment made to Mr. Loya-Castro by the United States government or to anyone acting on his behalf, including and not limited to his family or any other third person(s) acting on his behalf, including copies of any and all documents reflecting such payments;

5

14. Production of any "informant files" maintained by OCDETF, DEA, or any other federal, state, or local government agency or law enforcement agency in the United States and Mexico, relating to Mr. Loya-Castro, or any other informant associated with the Sinaloa Cartel who provided information to any United States government representative about other MDTO's pursuant to an agreement not to arrest or prosecute the informant or members of the Sinaloa Cartel. This request includes and is not limited to a copy of the informant's agreement to cooperate with the government, a debriefing report or an outline of what type of cases he or she might produce, the informant's personal and criminal history, the amount of money paid to him or her for information and expenses, and if a defendant is an informant, what he or she might expect at sentencing in return for his or her substantial assistance;

15. Production of the DEA'a Confidential Source Establishment Report contained in the "informant file" aka Form 512, including and not limited to the name, date, place of birth, social security number and address, as well as any and all information the government knows about crime(s) Mr. Loya-Castro has committed;

16. Production of any "informant files" maintained by OCDETF, DEA, or any other federal, state, or local government agency or law enforcement agency in the United States and Mexico, relating to Mr. Zambada-Niebla, or any other informant associated with the Sinaloa Cartel who provided information to any United States government representative about other MDTO's pursuant to an agreement not to arrest or prosecute the informant or members of the Sinaloa Cartel;

17. Production of Mr. Zambada-Niebla's DEA Confidential Source Establishment Report, aka Form 512;

18. Any and all oral or written documentation, photographs, surveillance, memos, text messages, or any other form of communication that would tend to show that government representatives were engaged in negotiations with Mr. Zambada-Niebla, either directly or indirectly, concerning providing him with immunity from prosecution and/or dismissal of any and all pending cases;

19. Production of any and all other documentation, relating to the request outlined in number eight, including and not limited to indictments, transcripts of all proceedings, probation reports, and

6

        all materials relating to dispositions of any such matter(s). This request includes and is not limited to the production of any and all names of government representatives as well as any and all communications between government representatives that resulted in the dismissal of Mr. Loya-Castro's case number 95CR0973-JM (U.S.D.C. S. Dist. of Cal.);

20. Any and all information, including and not limited to written reports, transcripts, audio recordings, notes, logs, surveillance, or any other form of information which would tend to show that government representatives knew that information about drug trafficking activities of other drug trafficking organizations provided to them by Mr. Loya-Castro was being provided to Mr. Loya-Castro by Mr. Zambada-Niebla or any of the leaders of the "Sinaloa Cartel," including and not limited to Joaquin "Chapo" Guzman and Ismael Zambada Garcia;

21. Production of complete information including any and all written statements, surveillance, emails, texts, audio recordings, photographs, emails, and any other form of documentation between any and all government representatives and Mr. Zambada-Niebla or anyone acting on his behalf relating to the events and circumstances surrounding Mr. Zambada-Niebla's willingness to cooperate with the United States government or any of their representatives by providing information about Mexican drug trafficking organizations in the United States and/or Mexico in return for his receiving immunity and/or other benefits or leniency. This information includes:

        a)     the contents of any and all communications, oral or written, made by government representatives to Mr. Zambada-Niebla, Mr. Loya-Castro, or anyone acting on Mr. Zambada-Niebla's behalf, soliciting or inquiring about Mr. Zambada-Niebla's cooperation with government representatives in their investigation or prosecution of narcotics trafficking in the United States and/or Mexico;

        b)     the contents of all communications, oral or written, made by Mr. Zambada-Niebla or any individual acting on Mr. Zambada-Niebla's behalf in response to any communication identified in paragraph (a);

        c)     the contents of all communications, oral or written made by the Mr. Zambada-Niebla, Mr. Loya-Castro, or any other representative(s) acting on Mr.

7

Zambada-Niebla's behalf, inquiring about a possible cooperation arrangement as outlined above;

d) the contents of all communications, oral or written, made by government representatives in response to any communication identified in paragraph (c);

e) the contents of all communications oral or written, made by the Mr. Zambada-Niebla. Mr. Loya-Castro, and/or any other representative acting on Mr. Zambada-Niebla's behalf, discussing what information Mr. Zambada-Niebla could provide with regard to the investigation and/or prosecution of narcotics traffickers in the United States and/or Mexico;

f) the contents of all communications, oral or written, made by government representatives to Mr. Zambada-Niebla or anyone acting on Mr. Zambada-Niebla's behalf in response to any communication identified in paragraph (e);

g) the contents of all communications, oral or written, between government representatives and Mr. Zambada-Niebla, Mr. Loya-Castro, and/or any other representative acting on behalf of Mr. Zambada-Niebla's behalf relating to benefits to Mr. Zambada-Niebla or to other people of concern to Mr. Zambada-Niebla in exchange for his cooperation with government representatives in their investigation and/or prosecution of narcotics trafficking in the United States and/or Mexico, including and not limited to promises or offers of benefits made by government representatives;

h) the contents of any oral or written agreement with Mr. Zambada-Niebla regarding his cooperation in the investigation or prosecution of narcotics traffickers in the United States and/or Mexico, including all drafts, proposed, or signed agreements;

i) copies of all reports, correspondence, memoranda, notes, text messages, emails, recorded telephone conversations, surveillance, or any other documents discussing or relating to Mr. Zambada-Niebla and

8

        any and all government representatives about Mr. Zambada-Niebla entering into a cooperation agreement with the United States government;

    j)     the name, address, and telephone number of each person who was present during any conversation with Mr. Zambada-Niebla, Mr. Loya-Castro, and/or any other representatives acting on behalf of Mr. Zambada-Niebla regarding Mr. Zambada-Niebla's entering into a cooperation agreement with any representative of the United States government;

22. Production of any and all information regarding a meeting that occurred at the Sheraton Hotel ("hotel") in Mexico City on or about March 17, 2009, shortly before Mr. Zambada-Niebla's arrest, between Mr. Zambada-Niebla, Mr. Loya-Castro, and any and all government representatives. This request includes the true names, addresses, and phone numbers of all individuals present at that meeting as well as any and all government representatives who were present at the hotel at the time of the meeting;

23. All written or recorded statements, including but not limited to investigative reports, rough notes, logs, and tape recordings, within the possession, custody, or control of the government and any other agency allied with the prosecution or involved in the prosecution of this case, relating to the events and circumstances which led up to the meeting that took place at the Mexico City hotel referred to above, between any and all government agents and Mr. Zambada-Niebla;

24. All written or recorded statements, including but not limited to investigative reports, rough notes, logs, and tape recordings, within the possession, custody, or control of the government and any other agency allied with the prosecution or involved in the investigation and prosecution of this criminal litigation including any and all communications and correspondence relating to the arrangements for, and other pertinent data surrounding the circumstances which led to the meeting that took place at a Mexico City hotel between Mr. Zambada-Niebla, Mr. Loya-Castro, and government representatives on or about March 17, 2009. This includes statements made to law enforcement agents, informants, un-indicted co-conspirators, co-conspirators, or third parties, regardless of whether the government intends to offer or use such statements at trial as well as out-of-district documents in the possession of investigating agencies closely connected to the prosecution. This request includes, but is not limited to, the

production of any and all documents in possession of foreign law enforcement officials which were obtained as a result of any joint task force investigation and agency cooperation between the United States and Mexico, any joint task force, representatives of the Mexican government, or any other closely aligned agency;

25. Any and all oral or written documentation, including and not limited to audio recordings, logs, notes, surveillance photos, images, or recordings, and any other form of documentation, describing, depicting, and capturing the acts, transactions, and/or occurrences that occurred at the meeting at the hotel on or about March 17, 2009 in Mexico City;

26. Production of any and all information regarding the purpose of the meeting that occurred at the Mexico City hotel on or about March 17, 2009 referred to above;

27. Any information that would tend to show that Mr. Zambada-Niebla provided information either directly or indirectly or through any third party, to government representatives of the United States which indirectly or directly contributed to the arrest of any individual alleged to be a member of any Mexican Drug Trafficking Organization(s);

28. Any information that would tend to show that any high-ranking member of the "Sinaloa Cartel," including and not limited to Joaquin "Chapo" Guzman and/or Ismael Zambada Garcia, provided information to government representatives of the United States either indirectly or directly which indirectly or directly contributed to the arrest of any individual alleged to be a member of any Mexican Drug Trafficking Organization;

29. Any information which would tend to establish that any government representative(s), including and not limited to OCDETF, DEA, ICE, or any joint task force, had information which could have led to the arrest of high-ranking members of the "Sinaloa Cartel," including and not limited to Joaquin "Chapo" Guzman and Ismael Zambada Garcia, but took no measures to arrest those individuals pursuant to an agreement that high-ranking members of the "Sinaloa Cartel" would not be arrested so long as they provided information regarding the activities of other Mexican drug trafficking organizations operating in the United States and/or Mexico;

30. Any information which could tend to establish that OCDETF, DEA, ICE, any joint task force, or any other government agency had knowledge that the leaders of the "Sinaloa Cartel" continued to engage in drug trafficking activity but did nothing to prevent the trafficking or to arrest those leaders

      pursuant to an agreement that no attempt would be made to arrest them, and no information would be given to the Mexican government to enable them to arrest those leaders, so long as they provided information regarding other Mexican drug trafficking organizations;

31. Any oral or written documentation as well as any other form of information which would tend to show that government representatives assured any member of the "Sinaloa Cartel" that they would not share any information regarding drug activities by the "Sinaloa Cartel" or the whereabouts of its leadership with representatives of the Mexican government in return for the "Sinaloa Cartel" providing information regarding drug trafficking by other Mexican drug trafficking organizations;

32. Any oral or written documents, as well as any and all other information which would tend to show when the United States government began the investigation which resulted in the indictment in this case, including but not limited to any and all files, text messages, emails, photographs, and any other form of documentation from the United States Attorney's Office in Washington, D.C.;

33. Any oral or written documents, as well as any and all other information which would tend to show that Mr. Zambada-Niebla was offered immunity and/or dismissal of any indictment, or any other form of leniency and/or benefits by any government representative(s), including but not limited to a member of the United States Attorney's Office in Washington, D.C., for any charge(s) pending against Mr. Zambada-Niebla, including and not limited to the charges in the above-referenced indictment;

34. Any oral or written documents, as well as any and all other information which would tend to show that Mr. Zambada-Niebla provided or offered to provide any information to any government representative regarding narcotics traffickers in the United States and/or Mexico in return for promises of immunity and/or any other form of leniency and benefits by any government representative(s);

35. Any oral or written documents, notes, recordings, emails, surveillance, or any other form of documentation that would tend to show that government representatives of the United States and/or Mexico arrested, captured, or killed any narcotics traffickers in the United States and/or Mexico as a direct or indirect result of any information provided directly or indirectly by Mr. Zambada-Niebla and/or anyone acting on Mr. Zambada-Niebla's behalf, including but not limited to Mr. Loya-Castro;

36. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that would tend to show that the United States government or any agency of the United States government, including and not limited to the OCDETF, DEA, and ICE, made no effort to investigate or arrest high-ranking members of the Sinaloa Cartel, even when they were aware that such members were continuing with their drug trafficking operations in Mexico and the United States, or ever had a policy not to arrest such members, so long as they provided information directly or indirectly to any government representative(s) regarding narcotics trafficking activities of other Mexican drug trafficking organizations;

37. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that would tend to show that the United States government or any agency of the United States government, including and not limited to OCDETF, DEA, and ICE, ever had a policy which in any way, favored the Sinaloa Cartel over any other Mexican drug trafficking organization(s);

38. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that would tend to show that the United States government or any agency of the United States government, including and not limited to OCDETF, DEA, and ICE, did not share information or ever have a policy of not sharing information with the Mexican government or any of their representatives as it related to the drug trafficking activities of the Sinaloa Cartel in Mexico or the whereabouts of high-ranking leaders of the Sinaloa Cartel in Mexico including and not limited to Joaquin "Chapo" Guzman and Ismael Zambada Garcia;

39. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that would tend to indicate that OCDETF, DEA, ICE, or any other federal agency had a policy of permitting crimes to occur, including and not limited to drug trafficking and murder, in order to further investigations and prosecutions of Mexican DTO's;

40. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that would tend to indicate that OCDETF, DEA, ICE, or any other federal agency informed the leadership of the Sinaloa Cartel when Mexican government agencies or any other United States federal agency were conducting investigations in areas where the leaders of the Sinaloa Cartel frequented, so that such leaders, including "Chapo" and Ismael Zambada-Niebla could take steps to avoid apprehension, arrest, or prosecution.

41. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that would tend to indicate that OCDETF, DEA, ICE, or any other federal agency specifically told leaders and/or members of the Sinaloa Cartel, who were acting as informants for the United States government, that they could continue to smuggle illegal drugs into the United States without being arrest or prosecuted, and would be given immunity so long as they provided information against rival drug cartels;

42. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation including but not limited to the Joint Assessment Report ("JAT"), regarding the so-called "House of Death" murders, committed in Juarez, Mexico in 2003 by informants of the United States government with the prior knowledge of agents of the United State government, that would tend to indicate that OCDETF, DEA, ICE, or any other federal agency ever permitted crimes to occur, including and not limited to drug trafficking and murder, in order to protect the identity of its informants, so as to continue to collect information regarding major drug leaders and their organizations;

43. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, bilateral agreements, treaties, or any other form of documentation establishing the rules, regulations, and limitations regarding the authority of United States government representatives, including and not limited to OCDETF, DEA, FBI, ICE, CIA, and any other governmental agency, to investigate and conduct operations in Mexico (e.g. regarding what activities and investigations by the United States government in Mexico are permissible and which ones are not permissible);

44. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, bilateral agreements, treaties, or any other form of documentation which sets out any and all requirements regarding the sharing of information by United States government representatives conducting investigations, operations, and activities in Mexico with representatives of the Mexican government;

45. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that the United States government ever had a written or unwritten policy to the effect that the principle objective of the "war on drugs" was to dismantle and destroy selected drug trafficking organizations and that it was not to prevent narcotics from being smuggled into the United States or to end their consumption of illicit drugs, and if so, that pursuant to that policy, the United States government or its representatives knowingly permitted narcotics to be smuggled into the

13

United States in return for receiving information from cartel leaders and/or members against rival cartels;

46. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that pursuant to the above-referenced policy or for any other reason, United States government representatives, including and not limited to the Department of Justice, entered into an agreement with the leadership of the Sinaloa Cartel to not arrest or prosecute members of the Sinaloa Cartel and allowed them to continue their drug trafficking operations in the United States and Mexico, in return for being provided with information regarding rival drug cartels;

47. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that the United States government, including and not limited the Department of Justice, pursued strategies known as the "Kingpin Strategy" or the "Divide and Conquer Strategy," in its efforts to defeat drug trafficking cartels and that the essence of those strategies was to permit one or more drug trafficking organizations to continue with their drug trafficking activities in the United States in return for providing information and assistance against rival drug trafficking organizations;

48. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, wiretaps, correspondence, or any other form of documentation regarding the operation known as "Operation Fast & Furious," including but not limited to congressional reports, which would tend to indicate that OCDETF, DEA, ICE, and FBI knowingly permitted and/or actively assisted in the transfer of weapons purchased in the United States to leaders and/or members of the Sinaloa Cartel who were acting as informants for OCDETF, DEA, ICE, and FBI. This request includes a list of any names of the members and leaders of the Sinaloa Cartel who were provided with the weapons and those members of the DEA and/or FBI that facilitated in any way, shape, or form, the giving of such weapons;

49. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that the weapons transferred from the United States to Mexico pursuant to "Fast & Furious" were used by any of members of the Sinaloa Cartel who were acting as informants for the United States to murder citizens and law enforcement in Mexico;

50. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that United States government representatives in charge of "Fast & Furious" knew that the weapons being transferred to

14

       drug traffickers in Mexico were likely going to be used to murder citizens and law enforcement officers in Mexico and that government representatives specifically acknowledged that such murders were to be considered justified in order to further the objectives of "Fast & Furious;"

51. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that government representatives deliberately and specifically decided to, or had a policy, not to share information regarding "Fast & Furious" with the Mexican government, which effectively prevented the Mexican government from taking action to protect its citizens from the obvious and anticipated dangers of extensive violence caused by the policy allowing Mexican drug traffickers to have access to the weapons which were brought to Mexico;

52. Any and all oral or written documents, notes, recordings, emails, text messages, surveillance, or any other form of documentation that relates to representatives of the United States government having prior knowledge of violent acts, including murders of citizens and law enforcement officers, that were being planned by MDTO's, but took no measures to inform the Mexican government or targeted individuals of the acts being planned in order to protect members and leaders of any MDTO's, including and not limited to the Sinaloa Cartel, who were acting as informants for the United States government from being exposed as informants or for any other reason;

53. Any and all oral or written documents, notes, recordings, emails, text messages, diplomatic cables, correspondence, or any other form of documentation indicating that the United States Department of Justice officials or any other federal agency deliberately withheld information from or misled Congress or any congressional committee assigned to overseeing the Department of Justice or any other federal agency regarding "Operation Fast & Furious";

54. Any and all oral or written documents, notes, or reports prepared by the United States Congress or any of its committee's relating to the investigation of "Operation Fast & Furious."

Dated: July 29, 2011                             Respectfully Submitted,
                                                        /s/ Alvin S. Michaelson
                                                        ALVIN. S. MICHAELSON
                                                        1901 Avenue of the Stars, Suite 615
                                                        Los Angeles, California 90067-6098
                                                        (310) 278-4984
                                                        Michaelsonlaw@justice.com

<u>CERTIFICATE OF SERVICE</u>

       The undersigned counsel for defendant Vicente Jesus Zambada-Niebla certifies in accordance with Fed. R. Crim P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electronic Case Filing (ECF), the attached Motion for Discovery Re The Defense of Public Authority was, on July 29, 2011, served pursuant to the district court's ECF system as to ECF filers:

Thomas D. Shakeshaft
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604

John R. DeLeon
Law Offices of John R. DeLeon
53 West Jackson Boulevard, Suite 1430
Chicago, Illinois 60604

                                              <u>/s/ Alvin S. Michaelson</u>
                                              ALVIN. S. MICHAELSON
                                              1901 Avenue of the Stars, Suite 615
                                              Los Angeles, California 90067-6098
                                              (310) 278-4984
                                              Michaelsonlaw@justice.com