UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 09 CR 383-3 |
| | ) | |
| JESUS VICENTE ZAMBADA-NIEBLA | ) | Judge Ruben Castillo |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION REQUIRING THE BUREAU OF PRISONS TO ALLOW DEFENDANT OUTDOOR EXERCISE**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby responds to defendant Jesus Vicente Zambada-Niebla's motion to require the Bureau of Prisons ("BOP") to allow him outdoor recreation.

**INTRODUCTION**

Defendant Jesus Vicente Zambada-Niebla has filed a motion asking the Court to require the Bureau of Prisons to allow defendant Zambada-Niebla outdoor recreation. (Motion at 1). Defendant filed the instant motion on September 1, 2011, several months after defendant's counsel first addressed with the Court a series of complaints regarding aspects of defendant's incarceration at the BOP's Chicago Metropolitan Correctional Center ("MCC"). (R.80). Beginning in June 2011, the undersigned conferred with personnel at the MCC to address the issues raised by defendant. Those cooperative efforts resulted, it appears, with rectifying a number of defendant's complaints, including interaction with BOP personnel, communication with other inmates in the Special Housing Unit ("SHU"), the delivery of meals, delivery of mail, delivery of books and other materials, attorney visits, telephone calls, medical evaluations, increased amounts of exercise, replacement of eyeglasses, and increased access to commissary items. *Compare* R.80 (June 27, 2011 Letter from

1

Defense Counsel to the Court) *with* R.83 (Letter from Warden Responding to Counsel's Letter) and Ex. A hereto (Affidavit from Warden Catherine L. Linaweaver discussing same).

Of the issues raised in defense counsel's June 27, 2011, letter, and addressed with the Court at hearings on August 3 and September 8, 2011, the remaining issue appears to be that of defendant's access to outdoor, as opposed to out-of-cell, recreation. Defendant concedes that he is offered recreation opportunities within the MCC. (Motion at 2). The Warden confirms that defendant, as well as all other inmates confined to the SHU, are provided five hours of out-of-cell recreation per week, in a dedicated recreation area with exercise equipment. (Ex. A at ¶ 7). It is defendant's lack of access to outdoor recreation, however, that forms the basis of defendant's instant motion, and which defendant alleges rises to constitutional proportions.

At the outset, the United States asserts that no entity of the United States government, not the U.S Attorney's Office for the Northern District of Illinois ("USAO NDIL"), nor the Drug Enforcement Administration ("DEA"), nor the United States Marshals Service ("USMS"), nor the BOP, is seeking to impose any punitive measure on defendant Zambada-Niebla. *See* Ex. A at ¶ 4. Indeed, in consultation with BOP officials, the undersigned have endeavored to alleviate each of defendant Zambada-Niebla's concerns related to his pre-trial detention (and have done more, including arranging for a visa for defendant's wife to visit him in Chicago, as discussed below). However, as is detailed below, outdoor recreation at the MCC in Chicago, together with a limited number of other urban pre-trial detention facilities in the United States constructed in the early 1970s, presents unique challenges in balancing an inmate's wish to recreate outdoors with significant concerns related to inmate security, escape risk, facility issues and personnel and budgetary constraints. In balancing those competing factors, the Warden states explicitly that she

wishes she could accommodate defendant Zambada's desire for outdoor recreation (again, as opposed to out-of-cell recreation), but must balance that desire with several other factors, specifically including defendant Zambada-Niebla's personal security. (Ex. A at ¶ 7-11). The MCC has accommodated defendant's requests to the best of its abilities, consistent with its obligations to defendant, other inmates, employees, and the public at large. The conditions of his confinement do not violate the Constitution. therefore, defendant's motion should be denied.

## BACKGROUND

*Procedural History*

On February 18, 2010, defendant was extradited from Mexico to the United States to face charges pending in this district and in the United States District Court for the District of Columbia. On February 23, 2010, defendant appeared before the Court and entered a plea of not guilty to the two counts of the superseding indictment with which he is charged in this district. (R.25). The second superseding indictment in this district alleges that from approximately May 2005 to approximately December 1, 2008, defendant, as a high-level member of the Sinaloa Cartel, was involved in a conspiracy to import tons of cocaine and multi-kilogram quantities of heroin into the United States from Mexico, for further distribution in the United States. R.75. The forfeiture allegation returned by the grand jury alleges that the estimated proceeds of defendant's narcotics distribution organization arising just out of the Chicago-based conspiracy between May 2005 and December 2008 were approximately $1.4 billion ($1,373,415,000). *Id.*

*Defendant's Housing in the Special Housing Unit ("SHU") at the MCC.*

Upon defendant's arrival in Chicago, defendant was housed in the SHU of the MCC. As is reflected in the affidavit of the Warden of the MCC, defendant Zambada-Niebla was placed in the

SHU based on a number of factors, including but not limited to, his alleged membership in the Sinaloa Cartel; the fact that his father, Ismael Zambada-Garcia ("Mayo Zambada"), is alleged to be a leader, together with Joaquin Guzman-Loera ("Chapo Guzman"), of that criminal organization; and publicly-available information related to the resources available to the Sinaloa Cartel. Ex. A at ¶ 3. Indeed, defendant's counsel themselves acknowledge in their recent filings that defendant was among the leadership of the Sinaloa Cartel, that Chapo Guzman and defendant's father headed the organization, and that the Sinaloa Cartel was involved in "criminal activities, including and not limited to their smuggling of tons of illegal narcotics into the United States." (R.94 at 2-3, 10; R.95 at 2-3, 7). Such activities give rise, on a relative scale, to virtually limitless resources for a criminal organization.

Moreover, defendant's counsel themselves acknowledge the danger attendant to high-level traffickers in Mexico. Defendant's counsel, in a related filing, argue that defendant "placed himself at grave risk by traveling from his secure location to Mexico City, providing information about rival and extremely powerful and dangerous cartels." (R.95 at 8). Defendant's counsel continues, "All of this put him at risk of retribution by rival cartels." *Id.* As the Warden notes, "it is physically and logistically impossible to protect Mr. Zambada from an assassination attempt if he were allowed on our rooftop." (Ex. A ¶ 8). Indeed, defense counsel themselves informed the government that defendant has been the subject of assassination attempts in Mexico since at least the early 1990s.

Thus, there can be little dispute that defendant's conditions of confinement require significant evaluation, both for his own security and for the security of the community as a flight risk and escape candidate. In various filings, both parties acknowledge as much. However, the physical structure of the MCC only permits outdoor recreation on its roof, surrounded by unsecured high-rise

4

buildings. *Id.* As a result, outdoor recreation for defendant is not feasible given the design, location and resources of the MCC. *Id*.

### *Defendant's Current Motion and the September 8, 2011 Status Hearing*

On September 1, 2011, defendant Zambada-Niebla filed the current motion, asking the Court to require the BOP to allow defendant outdoor recreation, arguing that defendant's lack of outdoor recreation "violate[s] due process, the Eighth Amendment ban on cruel and usual punishment, as well as international human rights and fundamental norms of human decency." (Motion at 1). At the hearing before the Court on September 8, 2011, the Court asked the government whether it "want[ed] time to respond to the motion that's been filed." (Tr. at 13). The government responded that the government would respond in writing to defendant's motion, but expressed its opinion that Seventh Circuit case law did not support the allegation that defendant's lack of outdoor recreation rose to a constitutional violation**.** *Id.* The Court expressed additional concerns regarding the duration of defendant's pre-trial detention, and responsibility for it, and a concern regarding defendant's continued housing in the SHU related to the potential continuation of the scheduled February 2012 trial date in this case. *Id.* at 15.

As explained below, the government has been working diligently to alleviate defendant's concerns. The duration of defendant's pre-trial detention is a function of good-faith discussions between the government and defendant, reported to the Court, to which no party objected. The declaration from the Warden of the MCC explains the difficulty of providing defendant with outdoor recreation, noting the physical limitations, security concerns and budgetary and personnel constraints faced by the MCC. The Warden also notes that an order requiring the MCC to provide outdoor, as opposed to out-of-cell, recreation to defendant would likely require the MCC to provide

outdoor recreaton for all inmates in the SHU, resulting in a significant personnel and budgetary burden on the MCC.

## DISCUSSION

### I. THE GOVERNMENT HAS ACCOMMODATED EVERY REQUEST MADE BY DEFENDANT, CONSISTENT WITH BOP's POLICIES, RESOURCES AND JUDGMENT.

As detailed in the declaration of Warden Linaweaver of the MCC, BOP has accommodated the vast majority of the issues raised by defendant, including interaction with BOP personnel, communication with other inmates in the SHU, the delivery of meals, delivery of mail, delivery of books and other materials, attorney visits, telephone calls, medical evaluations, increased amounts of exercise, replacement of eyeglasses, and increased access to commissary items. *Compare* R.80 (June 27, 2011 Letter from Defense Counsel to the Court) *with* R.83 (Letter from Warden Responding to Counsel's Letter) and Ex. A hereto (Affidavit from Warden Catherine L. Linaweaver discussing same). In addition to the MCC's response to defendant's day-to-day needs, earlier this year the U.S. Attorney's Office and DEA also arranged to obtain a visa from the U.S. State Department, and a separate license from the Treasury Department's Office of Foreign Asset Control ("OFAC"), to permit defendant's wife to travel to Chicago for a multiple-day visit with defendant. Thus, the government has not been oblivious to "fundamental norms of human decency," as defendant alleges. (Motion at 1).

Nonetheless, as the Warden describes, significant security and institutional issues are involved in accommodating defendant's request for outdoor recreation. The Warden notes, in particular, defendant's status as an alleged member of a significant criminal organization with attendant risks both to defendant's security from nearby buildings and that of the institution should

defendant's organization contemplate an escape. Moreover, the Warden notes the budgetary and personnel strains on the MCC if defendant were afforded outdoor recreation, as it would require similar treatment of other inmates in the SHU.

The government notes, moreover, that while defendant's lack of access to outdoor recreation is regrettable, given the MCC's physical structure, urban location, and budgetary and personnel constraints, certain of defendant's claims are exaggerated. For example, defendant's claim that he is "kept isolated in every possible way" ignores defendant's attorney visits. Defendant receives attorney visits on average at least three times a week, for several hours at a time. (Ex. A at ¶ 12). The Warden further notes that such frequency is decidedly above not only the average number of attorney visits for an inmate, but many times the number of visits the average inmate receives. *Id.* Defendant is not deprived of human interaction.

**II.     THE DURATION OF DEFENDANT'S PRE-TRIAL DETENTION IS NOT PROPERLY ATTRIBUTED AS "FAULT" TO EITHER PARTY**

In his motion, defendant mentions in passing the duration of his pre-trial detention, noting an "an unconscionable 18-month period." (Motion at 2). The government respectfully submits that the duration of defendant's pre-trial detention is not susceptible to an allocation of "blame" to either party or the Court, but instead is a function of discussions between the government and defendant, reported to the Court, to which no party objected.

In a number of filings, first related to discovery issues and now in the current motion, defendant has intimated that the duration of delay in this case is attributable to the government. Such a claim is disingenuous. As defense counsel knows, for the vast majority of the period of defendant's detention in the United States, defense counsel and the government were engaged in discussions involving the resolution of defendant's case in advance of trial. At various points, those

discussions broke down, and various filings ensued, only to be followed by defense counsel resurrecting discussions with the government. As the government wrote to defense counsel in March 2011:

> From May 2010, until September 2010, we engaged in lengthy discussions regarding your client's potential cooperation. Only after you first ended those discussions, on September 29, 2010, did the government receive your expansive discovery demand, to which we responded point-by-point on November 8, 2010.
>
> In conjunction with the status hearing on November 10, 2010, the parties held a meeting. The government arrived at the meeting prepared to discuss, demand-by-demand, the proper scope of your discovery requests, and was prepared thereafter to address points of disagreement with the Court and then commence discovery. Instead, defense counsel immediately returned the discussion to the topic of cooperation, and we agreed to put discovery discussions on hold (resulting in our agreement to vacate the original trial date and our mutual representations to the Court requesting further continuances at the status hearings on December 20, 2010, and January 26, 2011). We take issue with statements in your letter such as "the government has known since the inception of this case that it would be necessary to obtain discovery from various government agencies, yet raises that as an excuse for failing to provide discovery that should have been turned over long ago." Such a complaint is disingenuous both in light of our discussions (reflected in the record) and your attempt to dramatically expand the scope of discovery beyond that which formed the basis for the indictment in this district's case (to which we continue to object, but will discuss with you and then litigate if necessary). While this office does not wish to unnecessarily extend Mr. Zambada's pre-trial detention and will proceed to expeditiously produce appropriate additional discovery and respond to pre-trial motions, neither will we accept before the Court a misleading allocation of blame for the length of that detention or the progress of discovery that was based on good faith discussions with defense counsel regarding Mr. Zambada's potential cooperation and an agreement to suspend further discussions about discovery while discussions about Mr. Zambada's potential cooperation were occurring.

Discussions between the government and defense counsel continued largely unabated between May 2010 and June 2011. As noted, the government does not seek to allocate blame to defendant or his counsel for engaging in good-faith discussions with the government. But neither should the Court be left with the impression that the government has been prolonging defendant's pre-trial detention.

### III. THE CONDITIONS OF DEFENDANT'S PRE-TRIAL DETENTION, AND THE ABSENCE OF OUTDOOR RECREATION, ARE NOT UNCONSTITUTIONAL.

#### A. The Seventh Circuit Has Not Recognized a Constitutional Right to Outdoor, as Opposed to Out-of-Cell, Recreation.

Defendant Zambada-Niebla alleges that his lack of outdoor recreation constitutes a violation of due process and would constitute cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution. Defendant makes this argument by purporting to analyze Supreme Court and Seventh Circuit precedent, but on at least five occasions inserts the term "outdoor recreation" where the cases discuss "out-of-cell recreation" in the constitutional analysis (*see* Motion at 6-9).

Defendant argues that the "Seventh Circuit has established a guideline that *outdoor* exercise privileges cannot be denied longer than 90 days" and that "prisoners held in segregation longer than 90 days must be give at least five hours of *outdoor* exercise weekly." (Motion at 6-7 (emphasis added)). Defendant cites *Davenport v. DeRobertis*, 844 F.2d 1310, 1315-16 (7th Cir. 1988), for these propositions. In fact, what the court addressed was out-of-cell exercise as being required by the Constitution. Indeed, Judge Posner, the author of *Davenport,* addressed the distinction more precisely in *Anderson v. Romero,* 72 F.3d 518, 527-28, (7th Cir. 1995), in which the Court noted:

> The complaint also alleges that Anderson was denied yard privileges for "several months" and that this denial, regardless of its motivation, constituted cruel and unusual punishment in violation of the Eighth Amendment. . . . We offer a few uncontroversial observations for what limited guidance they may provide the district court. To deny a prisoner all opportunity for exercise outside his cell would, the cases suggest, violate the Eight Amendment unless the prisoner posed an acute security risk if allowed out of his cell for even a short time. *Davenport v. DeRobertis,* 844 F.2d 1310, 1314-16 (7th Cir. 1988); *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980); *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979). Prisoners are entitled to reasonable medical care, and exercise is now regarded in many quarters as an indispensable component of preventative medicine. But cases that purport to recognize a right to outdoor exercise, such as *Allen v. Sakai*, 40 F.3d 1001, 1003-04

9

> (1994), amended, 48 F.3d 1082 (9th Cir. 1995) and *Spain v. Procunier*, *supra*, involve special circumstances, such as that the prisoners were confined to their cells almost 24 hours a day and were not offered alternative indoor exercise facilities (*Allen*), or the only alternative offered to the prisoners was exercise in the corridor outside their cells rather than in an indoor exercise facility and the lack of outdoor exercise was merely one of a number of circumstances that in the aggregate constitute the infliction of cruel and unusual punishment. *Wilkerson v. Maggio*, 703 F.2d at 199-20 (5th Cir. 1983), held that an hour a day of indoor exercise satisfied the constitutional minimum.

*Id; see also Winger v. Pierce,* 325 Fed. Appx. 435, 436 (7th Cir. 2009) (unpublished order) (noting that prisoner-plaintiff "equates 'lack of yard privileges' with 'lack of exercise.' If that is so, then it is difficult to see how even nine months' deprivation could be deemed consistent with the eighth amendment . . . . Yet perhaps the prison offered [prisoner] an opportunity adequate indoor exercise, or perhaps there are good penological reasons for the sort of restrictions to which [prisoner] was subjected.").

Defendant also mis-cites the Court's opinion in *Watts v. Ramos*, 948 F.Supp 739 (N.D.Ill. 1996) for the proposition that *outdoor* recreation, as opposed to out-of-cell recreation, is constitutionally required. In its opinion in *Watts*, the Court discussed precedents identifying how failing to afford an inmate out-of-cell exercise may rise to a constitutional violation. *Id.* at 744-45 (citing cases). But neither the Court nor the cases it cited mandated *outdoor*, as opposed to out-of-cell, exercise, and the Court found "no confusion in the case law regarding whether *some* out-of-cell recreation time is necessary under the Eighth Amendment," i*d.* at 744, not outdoor recreation as defendant contends.

10

### B.  Constitutional Analysis

Zambada-Niebla argues that MCC officials' failure to give him access to outdoor exercise amounts to a constitutional violation. (Motion at 1). Zambada-Niebla asks this Court to order the BOP to remove defendant from the SHU and allow him "in the general population [to allow] him at least five hours [of] outdoor exercise weekly." (Motion at 10-11).  The Eighth Amendment of the U.S. Constitution applies to prisoners who have been convicted, *Whitley v. Albers*, 475 U.S. 312, 327 (1986), while the Fifth and Fourteenth Amendments, which guarantee due process before one can be deprived of life, liberty or property applies to pre-trial detainees who challenge their conditions-of-confinement. *Bell v. Wolfish*, 441 U.S. 520, 536 (1979).

### C.  Test for Pretrial Detainee Challenges to Confinement

Pre-trial detainees are "unconvicted individuals" awaiting trial or other proceedings who are being held because they could not, or were not allowed to, post bail. *Wolfish v. Levi*, 573 F.2d 118, 122 n.6 (2nd Cir. 1978). The U.S. Supreme Court's ruling in *Bell v. Wolfish*, 441 U.S. 520 (1979), is likely the most important Supreme Court ruling on detainees during their period of confinement. In *Bell*, the Court focused on whether prison conditions at Manhattan's Metropolitan Correctional Center, specifically its policy of double bunking detainees, constituted a prohibited punishment. *Id.* The Court's holding first abolished the "compelling necessity standard" as it applied to pre-trial detainees, ruling that it failed to find a constitutional basis to support the standard in the Due Process Clause of the Fifth Amendment. *Bell*, 441 U.S. at 532. Furthermore, the Court held that the presumption of innocence doctrine "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun." *Id.* at 533.

After rejecting the innocence-presuming, compelling necessity standard, the Court then held that the proper inquiry is whether the conditions that the pretrial detainee is subjected to "amount to punishment of the detainee." *Id.* at 535. In evaluating these questions, the Court stated that even though prison inmates retain certain constitutional rights, those rights are not necessarily guaranteed. *Id.* at 545. The Court stated that those rights may be burdened, and "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* at 539. In *Bell*, the Court employed a two-part test for identifying unconstitutional punishment at the pre-trial stage of criminal proceedings. First, the court must look for an express intent to punish on the part of the detention facility officials. *Id.* at 538. If the court does not make such a finding, the inquiry then turns to whether the condition or restriction may be rationally related to serving the alternative, non-punitive purpose assigned to it. *Id.* at 538 n.4. In other words, *Bell* allows prison officials to place conditions or restrictions on the constitutional rights of pretrial detainees as long as those conditions or restrictions are "reasonably related to a government objective." *Bell,* 441U.S. at 539. If there is a reasonable relation between the measure and a legitimate governmental purpose the measure will not be found to be punishment, "without more." *Id.*

Prison officials are not required to use the least imposing security measure; they must only refrain from implementing a restriction that appears excessive to the purpose it serves. *Id.* at 559 n.4 (noting that the existence of less restrictive alternatives to body-cavity searches - such as metal detection, more closely monitoring contact visits or banning contact visits - does not render the body cavity search policy unreasonable). Significantly, the *Bell* majority expressly discouraged courts from skeptically questioning challenged restrictions. *Id.* at 547. In fact, in applying the above-test,

12

courts were commanded to afford administrators "wide-ranging deference" in implementing policies to maintain institutional security." *Id.*

In *Block v. Rutherford*, the Supreme Court made it clear that the *Bell* test was to be applied in strong deference to prison administrators. *Block*, 468 U.S. at 584. In reversing a Ninth Circuit case which held that detainees were punished unconstitutionally (upon being denied contact family visits and subjected to shakedown searches of cells in their absence), the *Block* Court encouraged lower courts to refrain from second-guessing correctional officials about alleged excessive practices. *Id.* at 582. The Supreme Court held that absent proof of intent to punish, a detainee must prove the challenged conditions are so exaggerated and excessive as to warrant an inference of intent. *Id.* at 584 (citing *Bell*, 441 U.S. at 538). The Court echoed *Bell*'s demand that lower courts ordinarily defer to the "expert judgement" of corrections officials when considering the "excessiveness" of security measures. *Id.* at 584. Like *Bell*, the *Block* Court found that the challenged practices constituted restrictions that were reasonably related to maintaining security. The Court further noted that the district court improperly substituted its judgment for that of the administrators in determining whether the policy was excessively intrusive. *Id.* So long as a policy "reasonably relates to legitimate governmental objectives," an inference of punishment will not be drawn. *Id.*

    **D.**    **The Application of the *Bell* Test to Defendant's Case**

        **1.**    **Mr. Zambada-Niebla Has Failed to Show MCC Officials Have an Express Intent to Punish Him by Denying Him Outdoor Exercise.**

It is undisputed that Mr. Zambada-Niebla has gone without outdoor exercise during his approximate 18-month confinement in the MCC's SHU. However, Zambada-Niebla has failed to show that MCC prison officials have an "express intent to punish" him by denying him access to outdoor exercise. See *Bell*, 441 U.S. 520, 538 (1979)(in identifying unconstitutional punishment

13

at the pre-trial stage of criminal proceedings, the court must first look for an express intent to punish). In fact, nowhere in his pleading does Zambada-Niebla even allege this to be the case, although he does aver that his conditions of confinement are "punitive."

The Warden of the MCC has stated expressly that there is no intent to punish Mr. Zambada-Niebla. She notes that the decision to house the defendant in the SHU is for "security reasons and not intended to be punitive." (Ex. A ¶ 4). The Warden states that MCC officials have determined that the MCC's obligation to provide personal security for defendant himself and the institution's staff, as well as the resources available to defendant's alleged criminal organization, warrant defendant's confinement in the MCC's SHU (a byproduct of which is no outdoor exercise privileges). In reaching this conclusion, MCC officials weighed the fact that Zambada-Niebla is alleged to be a high-ranking member of the Sinaloa Cartel, headed by his father, with access to significant assets, and also for defendant's personal security, reflecting, among other things, defendant's own filings noting the threats to him in Mexico.

  **2. Zambada-Niebla's Confinement in the MCC SHU, Without Access to Outdoor Exercise, Is Reasonably-related to MCC Security Concerns**.

With no evidence that MCC officials intend to punish Zambada-Niebla by prohibiting outdoor recreation, the inquiry turns to whether this restriction is rationally related to serving the alternative, non-punitive purpose assigned to it. *Bell,* 411 U.S. at 538 n.4. In Zambada-Niebla's case, the MCC's objective is to maintain Zambada-Niebla's security and the security of MCC staff and the institution as a whole. Given the fact that there is a reasonable relationship between Zambada-Niebla being confined in MCC's SHU and Zambada-Niebla's security and the security of the MCC staff and institution, this Court should not find Zambada-Niebla's lack of outdoor exercise to be a punishment. *See Bell*, 411 U.S. at 539. In fact, if MCC officials were to release Zambada-

14

Niebla into the general population and he were to be attacked, or killed, or should they allow him access to the roof with its unfettered sightlines from nearby buildings, MCC officials would most certainly be exposed to a possible Fifth and Fourteenth Amendment Due Process challenge for not taking reasonable measures to guarantee his safety.

### 3. Deference Should Be Given to MCC Officials

In applying the *Bell* test, this Court should afford MCC prison administrators "wide-ranging deference" in implementing policies to maintain institutional security" without second guessing their "expert judgement" as to the security measures implemented. *Block,* 468 U.S. at 582-585. Five times a week, Zambada-Niebla is provided an opportunity to participate in recreation in a cell other than his own, and one specifically designated for recreation. This type of recreational opportunity has been held to meet constitutional standards in situations such as Zambada-Niebla's where security issues are created by providing outdoor recreation. *Anderson,* 72 F.3d at 527 (citing with approval *Wilkerson v. Maggio,* 703 F.2d 909, 912 (5th Cir. 1983), and holding an hour a day of indoor exercise satisfied the constitutional minimum)).

**IV.     CONCLUSION**

In challenging his current lack of access to outdoor exercise, Zambada-Niebla has failed to meet the two-prong test employed by the U.S. Supreme Court in *Bell*, 441 U.S. 520 (1979). Therefore, this Court should deny his request for relief.

Dated: September 16, 2011

                                                        Respectfully submitted,

                                                        PATRICK J. FITZGERALD
                                                        United States Attorney


By:      /s/ Thomas D. Shakeshaft
            THOMAS D. SHAKESHAFT
            ANDREW C. PORTER
            MICHAEL J. FERRARA
            MARC KRICKBAUM
            Assistant United States Attorneys
            219 S. Dearborn Street
            Chicago, IL 60604
            312-886-0667

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION REQUIRING THE BUREAU OF PRISONS TO ALLOW DEFENDANT OUTDOOR EXERCISE**

was served September 16, 2011, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case filing pursuant to the District Court's Electronic Case Filing (ECF) system as to ECF filers.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: /s/ Thomas D. Shakeshaft
THOMAS D. SHAKESHAFT
ANDREW C. PORTER
MICHAEL J. FERRARA
MARC KRICKBAUM
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, IL 60604
312-886-0667