## DECLARATION OF CATHERINE L. LINAWEAVER

I, Catherine L. Linaweaver, hereby declare and state the following:

1. I am employed by the Federal Bureau of Prisons (BOP) as the Warden at the Metropolitan Correctional Center in Chicago, Illinois (MCC Chicago). I have worked for the BOP for over 21 years and have been the Warden at MCC Chicago since January 2011. As the Warden, I am the Chief Executive Officer of the institution and responsible for the overall operation of the facility. As part of my official duties, I have access to records maintained in the ordinary course of business by the BOP, which includes documents pertaining to inmate Zambada's conditions of confinement.

2. I am providing this declaration with regard to a motion filed on behalf of Jesus Vicente Zambada-Niebla, Register Number 22875-424, wherein he seeks modification of his conditions of confinement. Specifically, Mr. Zambada, through his attorneys, challenges his confinement in the Special Housing Unit (SHU) along with related issues regarding limited use of the telephone, limited access to the institution commissary, non-contact social visiting, and lack of outdoor recreation.

3. Mr. Zambada arrived at MCC Chicago on February 18, 2010. Mr. Zambada was arrested in Mexico and extradited to the United States to stand trial on federal trafficking charges. In the indictment, Mr. Zambada is alleged to be a principal logistical coordinator for the Sinaloa Cartel, an international drug trafficking organization accused of trafficking approximately $1.4 billion in cocaine and heroin from Mexico to the Chicago area between 2005 and 2008. (See Second Superceding Indictment, Court Doc. 75, p. 24). According to briefings I have received by fellow law enforcement, Mr. Zambada is the son of Ismael Zambada, who along with Joaquin "El Chapo" Guzman, head the Sinaloa

Cartel and are also co-defendants in this case although they are still at large. As such, Mr. Zambada has access to unlimited resources, (e.g., Joaquin "El Chapo" Guzman, co-head of the Sinaloa Cartel, is on Forbes list of billionaires), has had numerous death threats made against him dating back to 1992, and according to his own attorneys was attempting to cooperating with the U.S. Drug Enforcement Agency (DEA). Moreover, according to all media accounts, there has been a power struggle among the cartels for years, resulting in thousands of killings in recent years. Therefore, the possibility of an assassination attempt on Mr. Zambada is substantial.

4. All individuals associated with Mr. Zambada's case confined at MCC Chicago are being held in administrative detention in SHU for safety and security reasons. Administrative detention is a non-punitive status of confinement in SHU. BOP policy permits inmates to be placed on administrative detention status in SHU when their presence in the general population poses a serious threat to themselves or others. The decision to place an inmate on administrative detention status is left to the discretion of the Warden. Because of the power and control exerted by the Sinaloa Cartel, I have determined these defendants must remain in SHU. The decision to confine Mr. Zambada, along with his co-defendants, is for security reasons and not intended to be punitive.

5. Specifically, my decision to house Mr. Zambada in SHU is based on the broad publicity his case has received, his access to unlimited outside resources, law enforcement's portrayal of this case as the largest international drug conspiracy case in Chicago's history, and the perception he is currently a cooperating witness, which places not only his life in great danger, but also that of staff who are directly supervising him. Historically, in the BOP, inmates with unlimited resources have attempted to compromise

staff and other inmates which in documented cases has resulted in significant breaches of security. I review Mr. Zambada's placement in SHU on a weekly basis. However, placing Mr. Zambada into the general population continues to create a safety and security risk for not only Mr. Zambada but also for other inmates and staff.

6. Placing inmates on administrative status in SHU until the termination of their trial or until they are designated to another institution is not an uncommon practice at MCC Chicago and other BOP administrative detention facilities. I have reviewed records dating back to 1996, which indicate MCC Chicago has held approximately 120 inmates in SHU on administrative detention status for more than one year. Some of these inmates were held in SHU for more than 4 years.

7. With regard to recreation, all inmates confined in SHU are provided five hours of out-of-cell recreation a week. Recreation is not outdoors, but there is a dedicated area within SHU for recreation which contains an exercise bike and pull-up bar. Inmates in SHU are not provided outdoor recreation primarily because of the design and construction of this facility, making access to outdoor recreation a safety and security risk. MCC Chicago was one of the first pretrial facilities constructed by the BOP and is over thirty-five years old. It has only one outdoor recreation area on the roof of the facility. There are two other federal detention centers with this design – one in San Diego and one in New York. Subsequent detention facilities were designed differently where SHU inmates are afforded some type of outdoor recreation which typically involves a skylight and an area which allows the entry of fresh air.

8. The court has asked us to consider providing Mr. Zambada with some form of outdoor recreation. If we had a facility of a different design, in a different location, and with an

unlimited budget and personnel, I would likely be able to accommodate Mr. Zambada and his attorneys' request to allow him outdoor recreation. However, based on my 21 years of correctional experience, I can honestly say I would not be able to guarantee Mr. Zambada's safety and that of the public if I were forced to allow Mr. Zambada to recreate on our rooftop. Mr. Zambada would make an easy target as he would be the only inmate allowed on the rooftop at the time, and there are numerous high-rise buildings surrounding this facility that neither myself nor fellow law enforcement have any control over. Attacks could easily be staged from those buildings. Further, the likelihood of an attempted escape by any means is very real. As a member of the Sinaloa Cartel, Mr. Zambada has the resources to effectuate such an escape. In fact, the Sinaloa Cartel funded the escape of Joaquin "El Chapo" Guzman in 2001 from a Mexican jail. Mr. Guzman is still at large and his estimated net worth according to Forbes Magazine is over $1 billion. By allowing Mr. Zambada access to our rooftop, I would not only fail to uphold the BOP's mission to protect society by confining offenders in a safe and appropriately secure environment, but I would also risk the lives of staff, the public, and Mr. Zambada himself.

9. Moreover, if we were to allow Mr. Zambada access to the rooftop, we would need to provide all inmates in SHU with access as we cannot give preferential treatment to one inmate. Logistically, there are problems with providing any inmate in SHU with outdoor recreation. Three officers, and a lieutenant, are currently assigned to SHU during the day-shift and two officers are typically on duty during the evening hours. They are responsible for addressing all needs of the inmates such as providing meals, showers, delivering mail, providing access to the telephone, law library, and any other basic

necessities. These staff members are not permitted to leave the unit while on duty. Therefore, in order to provide a SHU inmate access to the roof, it would require additional staff members dedicated to escorting each inmate. MCC Chicago simply does not have enough staff for this task. The institution currently functions on a mission critical roster which is designed to ensure coverage on all floors with a limited number of staff who are available to respond to emergencies.

10. Allowing SHU inmates to recreate outdoors would entail escorting approximately 30 inmates up to our rooftop at various times. In addition, many of the inmates confined in SHU are kept separated from other inmates (i.e., separatee status) or all inmates in general (i.e., "house and recreate alone" status). These considerations create further limitations on the number of inmates who can receive outdoor recreation at any given time to ensure various inmates or groups of inmates do not directly interact. Specifically, we could only accommodate 3 house and recreate alone inmates per day to the rooftop without significantly disrupting recreational opportunities for the general population inmates. Doing so would detrimentally disrupt the orderly running of the institution. Moreover, not only would we need to ensure the inmates did not interact with their separatees on the rooftop, but we would also need to stop all movement throughout the building to avoid any accidental interactions on the elevators. Whenever we stop movement throughout the building, this interrupts not only the current programs that are running, but also causes a delay in all other programs scheduled throughout the day.

11. If we were to attempt to allow Mr. Zambada on the rooftop, specially trained staff would need to be assigned to escort the inmate to the roof. This work would require overtime, as no such positions currently exist on our roster. The estimated total for these additional

staff expenses is approximately $9,200.00 per week; an estimated annual cost of approximately $495,000.00, should he remain at MCC Chicago throughout his trial and sentencing. Lastly, a specially designed area would need to be constructed on the roof to accommodate the security needs presented by Mr. Zambada. The estimated cost for this one-time purchase is approximately $25,000.

12. With regard to Mr. Zambada's other claims regarding his conditions of confinement, I would like to provide the Court with the following information. Defense counsels' claim Mr. Zambada is "kept isolated in every possible way" is unfounded. While it is true he is not allowed a cellmate and cannot recreate with anyone else, he has always been able to communicate with other inmates on the range. The physical structure of the facility prevents us from impeding cell-to-cell communication. Moreover, since July 1, 2011, Mr. Zambada has been allowed to communicate with all MCC Chicago staff and not just a limited number of personnel. In addition, Mr. Zambada's attorneys visit him quite frequently – at least three times a week for several hours at a time. In my experience, this is decidedly above not only the average number of attorney visits, but many times the number of visits the average inmate receives.

13. Defense counsel's claims that Mr. Zambada's mental health is deteriorating without any involvement by our staff is untrue. Our chief psychologist visits Mr. Zambada daily and performs a monthly assessment of his mental health status. The chief psychologist has also provided Mr. Zambada with self-help and exercise books in Spanish, which Mr. Zambada has indicated he enjoys. Finally, Mr. Zambada had a consultation with a contract psychiatrist in May 2011, and has reported to our chief psychologist he has been feeling much better since then.

14. With regard to Mr. Zambada's ability to make telephone calls and have social visitors, our records reveal he has been provided weekly telephone calls. Further, we recently received visiting forms from Mr. Zambada's family members who will be placed on his visiting list once they have been cleared by staff. Mr. Zambada will then be allowed weekly non-contact visits with the possibility of a contact visit every 90 days. It has only been recently that Mr. Zambada has requested to have social visitors.

15. With respect to the commissary, our records reveal Mr. Zambada routinely makes weekly commissary purchases from the approved list, and he is also allowed to make frequent purchases from the general population shopping list.

16. Regarding Mr. Zambada's mail and newspapers, since July 1, 2011, these items are delivered on a daily basis after they have been screened by staff. Although his newspapers arrive at the institution sporadically, since May 2011, Mr. Zambada has received 193 pieces of social mail that must be screened before delivery. Mr. Zambada has received very little legal mail – approximately 4 letters – which were delivered to him within 24 hours of their receipt. I have been informed by mailroom staff defense counsel sent in letters not properly labeled as legal mail. Therefore, pursuant to policy, we treated the mail as general correspondence and screened the letters before they were delivered to Mr. Zambada.

17. Finally, because of Mr. Zambada's security status as a U.S. Marshals pretrial inmate, appointments with outside specialists are logistically challenging. However, he has since had the upper and lower endoscopy and we are awaiting the results of the procedure. In general, he has received quality, essential care at MCC Chicago. Our records indicate he has received routine check-ups for his medical issues in compliance with current practice

guidelines, in addition to having two dental visits where no concerns were noted.

18. It should be noted that Mr. Zambada has not filed any formal or informal grievances regarding any aspect of his incarceration nor has he appealed my decision to house him in SHU. All complaints regarding his conditions of confinement are brought to our attention either by the Court or by Mr. Zambada's attorneys.

I declare under penalty of perjury in accordance with the provisions of 28 U.S.C. § 1746 the above is accurate to the best of my knowledge and belief.

_Catherine L. Linaweaver_            9/16/2011
Catherine L. Linaweaver, Warden      Date
MCC Chicago