UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 09CR383-3 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| JESUS VICENTE ZAMBADA-NIEBLA | ) | |

### DEFENDANT JESUS VICENTE ZAMBADA-NIEBLA'S REPLY MEMORANDUM TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO DISMISS BASED ON IMMUNITY

Defendant, Jesus Vicente Zambada-Niebla, submits the following Reply Memorandum to address arguments raised by the government in its opposition to his motion to dismiss the indictment based on immunity. As set forth below, Mr. Zambada-Niebla contends that, at the very least, discovery should be produced and an evidentiary hearing should be held.

### STATEMENT OF FACTS

Since Mr. Zambada-Niebla filed his motions, the government has produced additional, yet quite limited, discovery and has asserted various factual positions in its responses to the motions. Although there are critical factual disputes that should be resolved at an evidentiary hearing, the information produced by the government substantiates many of the factual assertions submitted by the defense. Given the new information provided by the government, Mr. Zambada-Niebla will again recount the relevant facts and will note those that are undisputed and those that are contested. Much of the factual statement that follows is based on the attached declaration of Fernando X. Gaxiola, which recounts interviews of Humberto Loya-Castro conducted in March and July of 2010.

1

Loya-Castro, also known as "Licenciado Perez," is a high-ranking member of the Sinaloa Cartel. In 1995, a federal grand jury in the Southern District of California returned an indictment against Loya-Castro and several codefendants, including Joaquin Guzman-Loera (charged here), on a drug conspiracy charge. The indictment alleged that Loya-Castro paid "money to Mexican authorities to assure that the drugs were not seized by Mexican law enforcement" and "ensured that if key members of the Guzman organization were arrested, they did not remain in custody by paying money to obtain legal files from the Procuraduria General de la Republico ('PGR') so that he could alter these files." These facts are undisputed.

Also undisputed is the fact that Loya-Castro became a government informant. The government agrees that Loya-Castro began working with United States agents as early as 2000, while the defense maintains that he began working with the government even earlier. The government also appears to concede that its relationship with Loya-Castro was an unusual one; he was a fugitive wanted on an outstanding indictment, yet he was regularly meeting and communicating with United States agents.

The first major area of dispute concerns the terms of the agreement between the government and Loya-Castro. The government has produced documents purportedly signed by Loya-Castro and government agents (including a federal prosecutor), dating back to 2005, which state that no promises were made to Loya-Castro. The government, however, has produced no documentation whatsoever regarding Loya-Castro's dealings and relationship with the government before 2005. The government's assertion that no promises were made conflicts with Loya-Castro's representations to undersigned counsel during the March and July 2010 interviews and common sense.

2

Although the government maintains that no promises were made to Loya-Castro, it does not and cannot deny that this fugitive repeatedly met with government agents over the course of a decade with no attempt to arrest him. Furthermore, it is undisputed that, in 2008, the government dismissed the 1995 indictment against Loya-Castro. And Loya-Castro has informed the defense that the conditions of his informant relationship were that he would relay information from the leadership of the Sinaloa Cartel to government agents regarding rival drug trafficking organizations in exchange for the government's agreement not to pursue prosecutions of the leadership of the cartel. In other words, Loya-Castro continued his role, as alleged in the 1995 indictment, of negotiating with government agents (this time United States agents as opposed to Mexican law enforcement) on behalf of "key members" of the cartel.

The government also appears to agree that DEA Agent Manuel ("Manny") Castanon ultimately became Loya-Castro's main handler. Although there may be a dispute about the exact timing, the parties appear to agree that Loya-Castro began discussions with Castanon and other government agents regarding the use of Mr. Zambada-Niebla, who had already been providing significant information to the government via Loya-Castro, as a direct contact informant. The second major area of dispute concerns the precise nature of the agreement with the government negotiated by Loya-Castro and Mr. Zambada-Niebla. As reflected in recently produced discovery, the government maintains that, in January 2009, Castanon and DEA Agent David Herrod communicated with DEA management, including Assistant Regional Director Carlos Mitchem, Group Special Agent Steven Fraga, and the Tijuana Resident Agent in Charge, as well as the Assistant United States Attorney handling the investigation of Mr. Zambada-Niebla. The government maintains that, as a result of these discussions, it agreed to go forward

3

with an arrangement with Mr. Zambada-Niebla, but that all that was authorized was an "initial assessment interview." Mr. Zambada-Niebla disputes this characterization, and a common-sense view of what transpired confirms that he had been promised immunity.

Specifically, on March 10, 2009, Loya-Castro and Castanon discussed the arrangement with Mr. Zambada-Niebla. According to Castanon's report, he informed Loya-Castro that "arrangements had also been made" on his end, and that a meeting with Mr. Zambada-Niebla was possible for the following week. The meeting was set for March 17, 2009 in Mexico City. On the day of the meeting, Castanon told Loya-Castro that they would have to cancel because a newspaper article indicated a possible leak regarding the meeting. Loya-Castro insisted that the meeting had to take place because Mr. Zambada-Niebla had put himself in danger by traveling to Mexico City. The meeting took place with the DEA agents and Mr. Zambada-Niebla at a hotel. According to Loya-Castro, Castanon told Mr. Zambada-Niebla that he had the same deal as Loya-Castro and that the deal had been approved by the federal prosecutor in Washington, D.C. and high-ranking DEA officials; moreover, Mr. Zambada-Niebla would get full credit for the information he had previously provided. Mr. Zambada-Niebla gave the agents information regarding the location of a high-ranking rival cartel member who was a fugitive. The agents indicated that they would have a more complete meeting after things calmed down, but, a few hours after Mr. Zambada-Niebla left the hotel, he was arrested by Mexican authorities. Mr. Zambada-Niebla has since been extradited to face the indictment in this case.

Loya-Castro is still in contact with Castanon and the DEA on a regular basis and is still providing them with information about rival drug cartels. On or about September 29, 2010, defense counsel served on the government a request for discovery which, inter alia,

requested information relating to the public authority and immunity defenses and which referred to Loya-Castro's relationships with the DEA and other government agencies as well as the role he played on behalf of the Sinaloa Cartel. Shortly afterwards, defense counsel were informed that Loya-Castro wanted to meet with them, and a meeting was scheduled for October 26, 2010 in Mexico City. At the meeting, Loya-Castro stated that Castanon contacted him after the discovery requests were submitted and told him that he could not testify for the defense. Castanon told him that defense counsel were doing a bad job in defending Mr. Zambada-Niebla and if they kept up what they were doing, many people would be exposed and it would cause problems for Loya-Castro and his family, and even defense counsel would be at risk. He also said that Castanon told him that if his and the cartel's relationship with the U.S. government were exposed, it would be not only bad for him, but for the U.S. government. He told defense counsel that Castanon told him to tell the cartel leaders that the lawyers' tactics were bad and could endanger them. Loya-Castro also stated that Castanon told him that he wanted him to meet with the Chicago DEA agents involved in Mr. Zambada-Niebla's case and that Castanon proposed that he come to Chicago to meet with Mr. Zambada-Niebla for the purpose of getting him to change the defense strategy. Loya-Castro stated that because of what Castanon told him he was terrified for the safety of himself and his family if the defense exposed what had been going on and felt that he could not testify as to what had occurred because they would all be in danger.

    Thereafter, defense counsel were informed that Loya-Castro had changed his mind and would testify about what he had previously stated during the interviews conducted in March and July of 2010. In March of 2011, the defense filed its notice of public authority defense, which was the subject of newspaper articles throughout Mexico. Then, on July 29, 2011, the

5

defense filed a series of motions, including motions relating to the defense of public authority and the defense of immunity, which prominently featured Loya-Castro's informant activities.

Shortly after the filings, counsel were informed that Loya-Castro had contacted Mr. Zambada-Niebla's Mexican counsel and had informed them that Castanon had contacted him again and had told him again that he could not testify for the defense. Castanon told Loya-Castro that if he testified and exposed his informant role and the relationship between the U.S. government and the leadership of the cartel it would be bad for him, the government, and the leaders. He stated that Castanon told him to tell the leaders that the American lawyers were doing the wrong thing and should be told to stop. On or about August 18, 2011, counsel were informed that Loya-Castro said that Castanon had contacted him again and told him that the Chicago people involved in this case wanted to meet with him in San Diego on August 30, 2011. He told the lawyers that he was frightened and indicated that he was again fearful of testifying because of what Castanon was telling him and did not want to meet with the government.

On September 9, 2011, the government filed responses to the instant motions, claiming that Loya-Castro disputes some of the allegations made by the defense. The government has produced limited discovery stating that agents have had a series of telephone calls with Loya-Castro, in which he disputed some of the assertions made by the defense. The Court should give no credence to the government's self-serving assertions regarding these alleged calls, as the circumstances surrounding them smack of contrivance, and the calls were unrecorded even though there was ample opportunity to do so. The limited discovery also claims that Loya-Castro is now a "deactivated" informant, although he apparently has consistent contact with the agents and has a signed agreement stating he is an informant until December 18, 2011.

## ARGUMENT

### A. Introduction

The government makes two arguments in opposition to the motion to dismiss the indictment on immunity grounds. *See* Doc. No. 109. First, the government contends that, as a factual matter, Mr. Zambada-Niebla was never promised immunity. *Id.* at 12-22. Second, the government argues that, even if an immunity promise had been made, it is unenforceable and cannot lead to the remedy of dismissal of the indictment. *Id.* at 22-28. The government also asserts that an evidentiary hearing is unnecessary. *Id.* at 28-29. Mr. Zambada-Niebla will address the government's arguments in reverse order. He will first show that, if the Court agrees that there was an agreement, there is nothing unenforceable about that agreement and the required legal remedy is dismissal of the indictment. Mr. Zambada-Niebla will then demonstrate that there are obviously material factual disputes about whether there was an agreement, and therefore discovery should be produced and an evidentiary hearing should be held.

With respect to the factual disputes and the need for discovery and a hearing, Mr. Zambada-Niebla emphasizes that the government's version of the facts confirms much of what he has alleged, including the role that Loya-Castro played as an informant and the meetings that took place, including the one with Mr. Zambada-Nieble just before his arrest; the government only disputes the precise nature of the agreements that were made. The government does not appear to dispute that agents knew that Loya-Castro was in personal contact with leaders of the Sinaloa Cartel but apparently made no effort to follow him or to arrest those leaders. Similarly, a Congressional investigation into Operation Fast and Furious has revealed that most of the weapons went to the Sinaloa Cartel. Nor does the government dispute that the indictment against

7

Loya-Castro was dismissed even though he never made an appearance in the case, even through an attorney, and was a supposed fugitive from justice. In short, given the undisputed facts and surrounding circumstances, the Court should reject the government's efforts to terminate this motion before the production of discovery and an evidentiary hearing to air the facts.

### B. Assuming There Was An Agreement, The Remedy Is Dismissal

The government contends that, even assuming law enforcement agents promised Mr. Zambada-Niebla immunity, such a promise is unenforceable because only an appropriate attorney with the Department of Justice has such power, and therefore the agents did not have the "actual authority" to confer immunity. *See* Doc. No. 109 at 23-26. Mr. Zambada-Niebla contends that, as a factual matter, the immunity promised by the agents was authorized by federal prosecutors and high-level DEA officials. But even if such approval were lacking, the doctrine of equitable immunity clearly allows Mr. Zambada-Niebla to enforce the promises made to him.

Although the Seventh Circuit has not definitively ruled on its applicability, *see United States v. Fuzer*, 18 F.3d 517, 521 (7th Cir. 1994), the equitable immunity doctrine has been widely recognized by other circuits and district courts throughout the country. *See, e.g., Reed v. United States*, 106 F.3d 231, 235 n.5 (8th Cir. 1997) (collecting cases). Under that doctrine, "courts may enforce *informal* grants of transactional immunity where: '(1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.'" *United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir. 1996) (emphasis added) (quoting *Rowe v. Griffin*, 676 F.2d 524, 527-28 (11th Cir. 1982)). In other words, given the doctrine of equitable immunity, the

government is incorrect when it argues that a defendant must show that the person who made the promise had actual authority *and* that he detrimentally relied on the promise. Doc. No. 109 at 23. Instead, a defendant can *either* show that he received a promise of immunity that was made with actual authority, *or* he can attempt to make out an equitable immunity claim.

Here, Mr. Zambada-Niebla contends that the promise of immunity was made with actual authority, as it was authorized by federal prosecutors and high-ranking DEA officials, but, even if it wasn't, he has made out an equitable immunity claim. First, an agreement was made whereby he would cooperate in exchange for dismissal of charges and immunity from prosecution. Second, Mr. Zambada-Niebla performed, as he jeopardized his safety and freedom by meeting with government agents and providing them with information about drug trafficking activity. Third, the information that he provided was related to the drug trafficking charges against him. Thus, under cases like *McHan* and *Rowe*, he has an equitable immunity claim.

The government also maintains that, even if Mr. Zambada-Niebla has a viable immunity claim, dismissal of the indictment is not the appropriate remedy; instead, the only remedy is suppression of evidence, such as the statements and information that Mr. Zambada-Niebla gave. Doc. No. 109 at 26-28. The government, however, has ignored the difference between transactional immunity and use immunity. Indeed, in holding that the remedy in *Rowe* was the complete prohibition of prosecution, rather than merely the suppression of evidence, the Eleventh Circuit explained: "[T]he District Court held that the promise should be enforced, yet inexplicably limited Rowe's immunity to use immunity. This characterization is wrong as a matter of law. The promised immunity was not limited solely to excluding use of Rowe's testimony and evidence derived therefrom in a subsequent prosecution of Rowe; Rowe was told

9

there would be no subsequent prosecution. Thus, Rowe was offered transactional immunity in return for his cooperation . . . ." *Rowe*, 676 F.2d at 526. In other words, "[a]greements to exchange cooperation for transactional immunity are governed by traditional principles of contract law," *McHan*, 101 F.3d at 1034, and therefore the terms of the agreement determine the appropriate remedy. Here, Mr. Zambada-Niebla is contending that the agreement was for transactional immunity/dismissal of charges, and therefore dismissal is the appropriate remedy.

Furthermore, "[a]greements to exchange cooperation for transactional immunity . . . may be express *or implied*. While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be *implied* when the parties' *conduct* manifests their agreement." *McHan*, 101 F.3d at 1034 (emphases added) (citations omitted). At the very least, the conduct of the government – as reflected in the extended course of dealings with Loya-Castro, the dismissal of the indictment against him, and then commencing a similar relationship with Mr. Zambada-Niebla – demonstrate an implied non-prosecution agreement. Moreover, even if the government is correct that there was no immunity agreement in place, the government never denies that the agents at least agreed not to arrest Mr. Zambada-Niebla. The *conduct* of the agents – allowing Mr. Zambada-Niebla, a fugitive, to leave their meeting – certainly manifests this understanding of the arrangement. Yet, the reason why the arrest warrant was able to be executed and Mr. Zambada-Niebla was able to be extradited was because he lived up to his part of the agreement by attending the meeting with the agents. Under these circumstances, the appropriate remedy is dismissal. *Cf. Cook v. United States*, 288 U.S. 102, 120-21 (1933) (holding that *dismissal* was appropriate remedy where United States unlawfully seized foreign vessel under an international treaty).

### C. There Is A Factual Dispute Requiring The Production of Discovery And An Evidentiary Hearing

The first mistake in the government's analysis is that it has improperly narrowed the relevant inquiry. As mentioned above, "[a]greements to exchange cooperation for transactional immunity are governed by traditional principles of contract law, and, therefore, may be express or implied. While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement." *McHan*, 101 F.3d at 1034. Thus, the relevant analysis is not as simple as attaching a few purported documents signed by Loya-Castro and generally declaring that no agreement existed. Instead, a more comprehensive examination of the facts should be undertaken at an evidentiary hearing, after the production of discovery, to determine whether there was either an express *or* implied contract manifested either verbally *or* by the conduct of the parties.

Furthermore, it is important to consider the unusual circumstances of the arrangement agreed to by the government in this case. This is a case involving United States agents acting in a foreign country and negotiating with foreign citizens, who were fugitives. Thus, the government is off the mark in relying on civil cases for the argument that those who deal with the government are expected to know the law, and therefore Mr. Zambada-Niebla should have known that he could only obtain immunity from an official with actual authority. *See* Doc. No. 109 at 26. Not only do the cases cited by the government have nothing to do with immunity agreements in criminal prosecutions, but they do not involve foreign citizens dealing with American officials abroad. The government fails to recognize that for more than 100 years, at least since *Liverpool & G.W. Steam Co. v. Phenix Ins. Co.*, 129 U.S. 397, 445 (1889), it has

11

been well established that "although a person is presumed to know the laws of the country in which he resides, there is no presumption that he knows the laws of a foreign state or country." *United States v. One Zumstein Briefmarken Katalog 1938*, 24 F. Supp. 516, 522 (E.D. Pa. 1938). Moreover, under principles of contract law, which govern cooperation agreements, it is far from clear that United States law governs given that Mr. Zambada-Niebla and Loya-Castro were Mexican citizens who negotiated the agreement in Mexico. *See Nucor v. Aceros y Maquilas de Occidente*, 28 F.3d 572, 582 (7th Cir. 1994) (citing Restatement (Second) of Conflict of Laws).

In any event, even if Mr. Zambada-Niebla should be presumed to have knowledge of American immunity law, and even if it is assumed that there was not a validly authorized immunity agreement, that is not the entirety of the relevant inquiry. Instead, this Court must assess whether the conduct of the parties manifested an implied non-prosecution agreement. As to this issue, an evidentiary hearing is required to resolve the parties' factual disputes, and a plethora of discovery, yet to be produced, should be compelled. The following areas, among others, should be resolved by way of the production of discovery and an evidentiary hearing.

*First*, the documents attached to the government's response establish that Loya-Castro began working with the government as early as 2000. Yet, no discovery whatsoever has been produced regarding his contacts with the government before 2005. Mr. Zambada-Niebla believes that, before 2005, there were hundreds, if not thousands, of telephone calls, emails, and personal meetings between Loya-Castro and the government. There are undoubtedly reports, recordings, and other documentation regarding these contacts, and there are undoubtedly intra-government memoranda discussing the unusual, if not unprecedented, relationship that the government maintained with this fugitive on behalf of the Sinaloa cartel. All of this information

is material to Mr. Zambada-Niebla's claim that, at the very least, there was a course of conduct demonstrating an implied non-prosecution agreement, and therefore it should be produced under Fed. R. Crim. P. 16(a)(1)(E) as items that are "material to preparing the defense . . . ."  Moreover, it is important to emphasize that *Brady v. Maryland*, 373 U.S. 83 (1963) does not only apply to exculpatory evidence to be used at trial or sentencing, but it also applies to pretrial motions.  *See, e.g.*, *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000).

*Second*, the government has produced purported informant agreements signed by Loya-Castro beginning in 2005 (no agreements before 2005 have been produced), but, with the exception of a few recent reports, has produced no documentation concerning the contacts and course of conduct between him and United States agents from 2005-2011.  The course of conduct between Loya-Castro and government agents over these years provides the context for an actual or implied agreement with Mr. Zambada-Niebla.  The government has produced virtually nothing, and there is undoubtedly a large volume of material in its possession that documents this relationship.  Moreover, Mr. Zambada-Niebla maintains that there were various side agreements and oral promises made to Loya-Castro and the individuals on whose behalf he was negotiating.  This would not be the first time that a side agreement or oral promise was made to an informant, *see, e.g.*, *Peavy v. United States*, 31 F.3d 1341 (6th Cir. 1994); *United States v. Beard*, 761 F.2d 1477 (11th Cir. 1985); *United States v. Joseph*, 533 F.2d 282 (5th Cir. 1976), and it would hardly be surprising given the unusual aspect of this cooperation arrangement.

*Third*, the government has produced the order dismissing the 1995 case against Loya-Castro and the brief motion underlying the dismissal.  Yet, the government has produced no other documentation concerning the course of conduct leading to the dismissal.  Undoubtedly,

there are reports, emails, and other documentation reflecting how the dismissal came about which are relevant to Mr. Zambada-Niebla's claim that, at the very least, there was a course of conduct here that established an implied non-prosecution agreement. Mr. Zambada-Niebla contends that, in the years preceding his arrest, he gave information to the government via Loya-Castro about rival organizations, yet no discovery regarding these contacts has been produced. Moreover, the government has produced purported agreements signed by Loya-Castro after the charges against him were dismissed in 2008. Given that Loya-Castro had already obtained a dismissal, there must have been some agreement underlying the relationship. Because the government has produced virtually no documentation concerning the 10-year arrangement, it has undermined Mr. Zambada-Niebla's ability to present the context and course of conduct of the parties.

*Fourth*, with respect to the events leading up to Mr. Zambada-Niebla's direct cooperation with the government, all that has been produced are a couple of reports documenting his meeting with agents in Mexico City and his subsequent arrest by Mexican authorities. The reports reflect that various communications and discussions with federal prosecutors and high-ranking officials within the DEA led to this unusual meeting with Mr. Zambada-Niebla. Yet, no emails, reports, or other documentation concerning these communications have been produced. Nor has the government produced any documentation reflecting communications between the United States agents and Mexican authorities concerning Mr. Zambada-Niebla's arrest.

*Fifth*, since the time of Mr. Zambada-Niebla's arrest, Loya-Castro has continued to communicate with United States agents and has even had various communications with them regarding Mr. Zambada-Niebla's defense strategy. While the government has produced some reports of recent contacts with Loya-Castro since the time the defense filed its immunity motions,

it has not produced any reports of the numerous other contacts with Loya-Castro while this case has been pending. Indeed, the reports produced thus far include references to communications with Loya-Castro in October of 2010, but reports of those contacts have not been produced.

In sum, Mr. Zambada-Niebla has contended that, at the very least, there is an extensive course of conduct over a more than 10-year period demonstrating an implied non-prosecution agreement. The government possesses a wealth of material relevant to that course of conduct but has only produced a tiny sampling of that material, and it improperly desires to limit the universe of pertinent documents to the mere few that it believes supports its position. Even though the government may disagree with Mr. Zambada-Niebla's defense, it must turn over those documents that are material to it, and it cannot limit its production to the documents that support its version. Accordingly, this Court should order the production of discovery material to Mr. Zambada-Niebla's immunity defense. At the very least, the Court should order the production of this discovery for an in camera review. After the production of this discovery, the Court should hold an evidentiary hearing where Loya-Castro and government agents will testify.

Respectfully submitted,

Dated: October 24, 2011

/s/Edward S. Panzer
EDWARD S. PANZER
GEORGE L. SANTANGELO
111 Broadway, Suite 1100
New York, NY 10006
(212) 269-4488
panzer2@rcn.com
glslegal@yahoo.com
ALVIN S. MICHAELSON
1901 Avenue of the Stars, Suite 615
Los Angeles, CA 90067-6018
(310) 300-1101
alvinlaw@gmail.com

15

**CERTIFICATE OF SERVICE**

The undersigned counsel for defendant Vicente Jesus Zambada-Niebla certifies in accordance with Fed. R. Crim P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electronic Case Filing (ECF), the attached Reply Memorandum was, on October 24, 2011, served pursuant to the district court's ECF system as to ECF filers:

Thomas D. Shakeshaft
Assistant U.S. Attorney
United States Attorney's Office, N.D. Ill.
219 S. Dearborn Street
Chicago, IL 60604

Counsel for the Government

Gal Pissetzky
Pissetzky & Berliner
53 West Jackson Boulevard
Suite 1403
Chicago, IL 60604
(312) 566-9900
Email: gpissetzky@comcast.net

Counsel for Tomas Arevalo-Renteria

    /s/ Edward S. Panzer
EDWARD S. PANZER
111 Broadway, Suite 1000
New York, New York 10006
(212) 514-5335
Panzer2@rcn.com