UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 09CR383-3 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| JESUS VICENTE ZAMBADA-NIEBLA | ) | |

**DEFENDANT JESUS VICENTE ZAMBADA-NIEBLA'S
SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF HIS PRETRIAL MOTIONS**

Defendant, Jesus Vicente Zambada-Niebla, submits the following Supplemental Memorandum in support of his pretrial motions. At the October 27, 2011 status conference, counsel advised the Court that the defense intended to argue in support of the previously filed motions to dismiss the indictment on immunity grounds, to permit the defense of public authority, and for discovery in support of those motions, that Humberto Loya-Castro was not merely an "informant" as the government had argued in its papers, but was, in fact, an agent of the Sinaloa Cartel authorized to negotiate contracts with the United States such as the ones the defense alleges were entered into in this case. *See* October 27, 2011 Transcript at 12-13. Counsel stated that the Government's argument that any purported agreement made with Mr. Zambada-Niebla could not be enforced because he did not have personal contact with Government officials was, inter alia, negated by the fact that Loya-Castro had the requisite contacts with United States officials and the fact that when he made those contacts, he was acting in the capacity as an authorized agent of the Sinaloa Cartel (not as an informant) dealing with authorized agents of the Government. Counsel indicated at the hearing that the defense would be submitting an additional pleading in support of this contention.

1

**ARGUMENT**

Mr. Zambada-Niebla respectfully contends that all of the direct and circumstantial evidence heretofore submitted by the defense clearly indicates that Loya-Castro was not an "informant" in the traditional sense of that status in the Government's interactions with individuals who provide information to them, and was never really treated as such except occasionally in the Government's own self-serving records.

When Loya-Castro met with the Government originally some years after his federal indictment in San Diego, he told the agents he was meeting with the permission of "Chapo" Guzman, the leader of the Sinaloa cartel, and he would only provide information concerning rival drug cartels; he would not provide information about the Sinaloa cartel. He repeated this several times over the many years of his relationship with United States agents. Government agents were aware that Loya-Castro was a major figure in the Sinaloa cartel organization, but were willing to accept the offer to work with the Sinaloa Cartel to go after the rival cartels. It was clear to the Government from the beginning that Loya-Castro was not acting as an informant since he would not pass on secrets about the only organization he was involved in, and he did not offer to infiltrate any other criminal organization.

It is undeniable that even at the earliest days of his relationship with the United States Government, the agents knew that Loya-Castro was a high ranking member of the Sinaloa cartel and was acting in that capacity as an agent, "consigliere," and liaison of the Sinaloa cartel leaders, Chapo Guzman and Ismael "Mayo" Zambada, and was authorized to enter into contracts on their behalf and to negotiate benefits to be obtained on their behalf under any agreement. The San Diego indictment charged Loya-Castro with acting on behalf of the leadership of the cartel in

meeting and compromising Mexican government officials. Loya-Castro told the agents that nothing could be accomplished without the approval and participation of Mayo and Chapo. An agreement was ultimately reached between the United States and Loya-Castro on behalf of the Sinaloa Cartel that the cartel would supply information about rival cartel leaders and their associates to the Government in return for carte blanche for the Sinaloa cartel to continue their narcotics trafficking business in the United States and Mexico without interference and in return for immunity and protection from arrest from United States and Mexican authorities.

In essence, the United States Government entered into a conspiracy with one of the largest drug cartels in the world. It is undisputed that Government agents knew that Loya-Castro was receiving the information about other cartels from Chapo, Mayo, and Mr. Zambada-Niebla, in reliance on that agreement. The Government has acknowledged that agents knew that Loya-Castro was meeting on a regular, if not daily, basis with Chapo, Mayo, and other leaders of the cartel, going back and forth from meetings with the Government agents for approximately 10 years. Yet the DEA and other Government agents somehow never used him to locate Chapo or Mayo – two of the most wanted people in the world – who were and still are under indictment in numerous jurisdictions and were the subject of several United States extradition requests in Mexico. Moreover, Loya-Castro sat in on meetings with DEA agents in which they discussed DEA operations and in which they alerted him when Mexican authorities were conducting investigations which could endanger the cartel's leaders. These kind of interactions belie the Government's claim that Loya-Castro was simply an "informant" and lend substantial support for the claim that the Sinaloa cartel, through Loya-Castro and the Government, were involved in a joint enterprise under the agreement they had entered.

The evidence also indicates that no effort was made by Government agents to alert the Mexican authorities to the goings and comings of Loya-Castro and the leaders of the cartel so they could track him even as late as August and September of this year, when Loya-Castro supposedly told Agent Castanon in a phone conversation that he was going to meet with Chapo. It is inexplicable that this was not done unless, as the defense has alleged, there was an agreement in place. An agreement of this magnitude had to be approved by high-level United States Government officials. The agreement was intended to and did achieve the goals it was intended to achieve, i.e. many of the leaders of the rival cartels and their associates were either arrested or killed because of information given by Chapo, Mayo, Mr. Zambada-Niebla, and others under the agreement which was a joint goal of the Sinaloa cartel leaders and the United States Government. Also, the leaders of the Sinaloa cartel were able to continue their narcotics trafficking business without interference by the Government and were protected from arrest. Indeed, all parties knew that if Chapo and Mayo were arrested, the United States Government's ability to get the information they needed and wanted would end so there was a mutual interest in their being free and continuing their business so they could continue to provide information

As set forth in defense papers previously submitted, this tactic and these kind of agreements were not new. As Robert Bonner, who was head of the DEA from 1990-1993, said in an article in Foreign Affairs Magazine previously submitted, this was the exact technique used by the United States Government in Colombia to capture and kill the notorious Pablo Escobar, i.e. granting other cartels carte blanche to continue exporting narcotics into the United States in return for information about Escobar and his organization. In fact, Mr. Bonner opined in the article that it would be a good tactic to be used in Mexico.

Similarly, Loya-Castro, acting as an agent of the Sinaloa cartel and the defendant, entered into the agreement with the Government that resulted in the meeting in the hotel room in Mexico City. That meeting also could not have taken place without prior negotiations between Loya-Castro in his capacity as agent for the cartel and Mr. Zambada-Niebla and Government agents and their superiors in Mexico and Washington, DC. The agreement with Mr. Zambada-Niebla was made by the Government through Loya- Castro, who agents knew was authorized by the cartel to enter into the agreement, and was accepted by Mr. Zambada-Niebla through Loya-Castro, and by Mr. Zambada-Niebla personally at the hotel.[1] It is important to note that the government has acknowledged that the agents were concerned that Mr. Zambada-Niebla would be arrested by Mexican authorities and attempted to warn him not to come to the meeting through Loya-Castro. At the meeting, Mr. Zambada-Niebla provided information requested by the agents, and it is acknowledged that the arrangement would have continued but for his arrest by Mexican authorities. It is also acknowledged by the Government that agents allowed Mr. Zambada-Niebla – who was under indictment in the United States, the subject of an extradition

---

[1] The government incorrectly suggests that no immunity agreement is valid unless each and every person receiving immunity actually meets with and agrees with an authorized government representative. For example, a corporate organization, through its representatives, can negotiate immunity applicable to as many officers, employees, or other representatives as the agreement is intended to cover. *See, e.g.*, *United States v. Korean Air Lines Co.*, 505 F. Supp. 2d 91 (D.D.C. 2007) (immunity agreement where all but a few select corporate employees covered). Moreover, a party can be a third party beneficiary of an immunity agreement where the parties so intend. *See, e.g.*, *United States v. El-Sadig*, 133 F. Supp. 2d 600 (N.D. Ohio 2001) (defendant was intended third party beneficiary of immunity agreement between State Department attorney and member of Saudi royal family). Both in an organizational and individual setting, the immunity agreement does not need to be in writing and can be inferred from oral conversations and course of conduct. *See, e.g.*, *United States v. Minnesota Mining and Mfg.*, 428 F. Supp. 707 (D. Minn. 1976) (company and officer deemed to have immunity in Watergate prosecutions from analysis of totality of circumstances of dealings with government).

request, and under investigation in this case – to leave the meeting at the hotel without the agents alerting the Mexican authorities. Arrangements were made by the agents to meet with him again. There is no logical reason, and certainly none has been provided by the Government, for this to have occurred if there was not an agreement in place as has been alleged by Mr Zambada-Niebla.

It is instructive in determining the true status of Loya-Castro as an agent rather than informant that while his San Diego case was dismissed in 2008, he still was listed as an "informant" in Government records through December 2011 and signed "informant" agreements confirming that he continued to meet with agents and talk to them on a regular basis to the present time. Indeed, there is nothing to indicate that anything has changed in the relationship between the Sinaloa cartel leaders and the Government. There is nothing to indicate that the agreement brokered by Loya-Castro and the United States outlined above is not still in effect.

## CONCLUSION

What the defense is alleging in this case is exactly what Mr. Bonner, the former head of the DEA, said the United States did in Colombia. Mr. Bonner's statements have recently been confirmed by Phil Jordan, the former DEA head of intelligence in El Paso, in an interview with CBS news reporter Sharyl Attkisson on October 26, 2011. Bonner said the tactic worked in Colombia, believed it would work in Mexico, and Jordan concurred in his comments. What the defense is alleging was Government policy in Colombia and is now Government policy in Mexico. As Mr. Bonner says, the object was not to stop the flow of drugs into the United States, implying that is a hopeless cause, but to put targeted cartels out of business. That was the same objective underlying the agreement that was entered into in this case, and both sides attained their objective, i.e., the dismantling of rival cartels and the inroads into their drug business.

It is important to note that the Government did not admit then that it had such a policy and had made such agreements in Colombia, and it is no surprise that it does not want to admit it now. Such agreements permit tons of narcotics to come into the United States, which is the antithesis of the stated objective on the War on Drugs, and the government does not want to admit that it continues to allow that to happen. But, more importantly, in the context of this case, the Government doesn't want to admit it entered into the agreements alleged by the defense and confirmed by Loya-Castro because it would jeopardize this case. Loya-Castro says it happened, and all the circumstantial evidence supports that conclusion. Perhaps someday the Government will admit the agreements that were entered into in this case, as Mr. Bonner admitted some 20 years after the Colombian agreements. In the meantime, the best way to resolve the dispute in this case and to make sure that justice is done is to have an evidentiary hearing with Loya-Castro and the agents involved and to produce the relevant files and other discovery for the Court's and the defense's examination to make sure that all of the facts are known now.

Respectfully submitted,

Dated: November 9, 2011

/s/Edward S. Panzer
EDWARD S. PANZER
GEORGE L. SANTANGELO
111 Broadway, Suite 1100
New York, NY 10006
(212) 269-4488
panzer2@rcn.com
glslegal@yahoo.com

ALVIN S. MICHAELSON
1901 Avenue of the Stars, Suite 615
Los Angeles, CA 90067-6018
(310) 300-1101
alvinlaw@gmail.com

**CERTIFICATE OF SERVICE**

      The undersigned counsel for defendant Vicente Jesus Zambada-Niebla certifies in accordance with Fed. R. Crim P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electronic Case Filing (ECF), the attached Supplemental Memorandum was, on November 9, 2011, served pursuant to the district court's ECF system as to ECF filers:

Thomas D. Shakeshaft
Assistant U.S. Attorney
United States Attorney's Office, N.D. Ill.
219 S. Dearborn Street
Chicago, IL 60604

Counsel for the Government

Gal Pissetzky
Pissetzky & Berliner
53 West Jackson Boulevard
Suite 1403
Chicago, IL 60604
(312) 566-9900
Email: gpissetzky@comcast.net

Counsel for Tomas Arevalo-Renteria

                /s/ Edward S. Panzer
                EDWARD S. PANZER
                111 Broadway, Suite 1000
                New York, New York 10006
                (212) 514-5335
                Panzer2@rcn.com