UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 383-3 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| JESUS VICENTE ZAMBADA-NIEBLA, | ) | |
|   a/k/a "Vicente Zambada-Niebla," | ) | |
|   a/k/a "Vicente Zambada," | ) | |
|   a/k/a "Mayito," | ) | |
|   a/k/a "30" | ) | |

**GOVERNMENT'S SUBMISSION REGARDING DISCOVERY RELATED TO
DEFENDANT ZAMBADA-NIEBLA'S IMMUNITY MOTION
AND PUBLIC AUTHORITY DEFENSE**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby submits material requested in the Court's Order, dated November 16, 2011, in which the Court requested "the reports, affidavits, and any other appropriate evidentiary support in opposition to Zambada-Niebla's motion."

**I.      INTRODUCTION**

Defendant Zambada-Niebla has alleged an "agreement" between the United States government and the leadership of the Sinaloa Cartel by which the United States government "conferred immunity on [Zambada-Niebla]." R.95 at 1. Defendant further alleges that American officials "specifically" told defendant "that he would receive immunity . . . as an agreement with [defendant] personally and approved at the highest levels of the government." R. 95 at 3.

No evidence exists to support defendant's claim. The government's exhaustive discovery review has revealed no such agreements. Furthermore, as demonstrated by the affidavits of DEA Special Agent Manuel Castanon – who met for approximately 30 minutes with defendant in a hotel room in Mexico City in March 2009; Patrick Hearn – the attorney who was handling an indictment of the defendant from the United States District Court for the District of Columbia; and Julius Rothstein – Mr. Hearn's supervisor; no promises of immunity or dismissal of an indictment were authorized to be made or made to defendant at the time of his meeting with agents of the United States Government in March 2009.

In addition to those three affidavits, the government has submitted certain documents concerning the affirmative defenses. Some of the documents are filed under seal for both the Court and the parties to review; others are filed *in camera* for Court review only. The government files as much of this information as publicly as possible to give the defense an opportunity to respond, but the investigative sensitivity of certain documents, as well as well-grounded invocations of privilege, require that certain of the documents be filed *in camera* in a sealed appendix that accompanies this public filing.

Both the affidavits and the documents make clear that no promises of immunity or dismissal were authorized or made to defendant. Therefore, the government renews its request that defendant's public authority defense and motion to dismiss be denied without need of a hearing.

## II.  DEFENDANT'S AFFIRMATIVE DEFENSES AND MOTION TO DISMISS.

Defendant Zambada-Niebla has alleged that (a) a Sinaloa Cartel member who was a cooperating source for the DEA provided the United States government with information about rival drug cartels, and, in exchange, the United States gave the Sinaloa Cartel "carte blanche" "to continue their narcotics trafficking business in the United States and Mexico without interference," and gave Cartel members "immunity and protection from arrest from the United States and Mexican authorities," R. 135 at 3; and (b) American officials "specifically" told defendant "that he would receive immunity, not only under [the CS]'s prior agreement, but as an agreement with [defendant] personally and approved at the highest levels of the government." R. 95 at 3.  Defendant's discovery demands request materials related to all investigations and prosecutions of the Sinaloa Cartel in the United States.  *See* R. 89 at 3 ¶ 15 (demanding statements of any member or associate of the Sinaloa Cartel); *Id.* at 5 ¶ 28 (demanding all documents relating to the Sinaloa Cartel).  Defendant seems to allege that these documents constitute *Brady* material, without making any requisite showing of their relevance.

As the Court requested, the government now submits its response and accompanying documents to inform the Court and demonstrate the infirmity of defendant's allegations.  Simply put, no evidence exists to support defendant's grandiose claims.

3

### A. Zambada-Niebla's Claimed Immunity

In March 2009, defendant was under indictment for federal narcotics offenses charged in Washington, D.C. in an indictment returned in 2003 (the "Washington Indictment")).[1] The Washington Indictment was returned by the Department of Justice's Narcotic and Dangerous Drug Section ("NDDS").

Through a DEA cooperating source ("CS"),[2] DEA agent Manuel Castanon and defendant planned to meet in Mexico City on March 18, 2009. *See* Affidavit of Manuel Castanon, Public Appendix, Exhibit A, at ¶ 9. It was to be "a standard initial meeting to explore potential cooperation." *Id.* ¶ 8. Ultimately, after Agent Castanon arrived in Mexico City, a DEA supervisor canceled the meeting. *Id.* ¶ 10.

Thereafter, Agent Castanon met the CS and told the CS that the meeting had been cancelled by Agent Castanon's superiors. *Id.* ¶ 12. The CS became visibly nervous and reported that he/she needed to speak with the defendant. *Id.* As the CS left the meeting, Agent Castanon reminded the CS that DEA agents could not meet with the defendant without

---

[1] At the time, and through defendant's arrest by Mexican authorities in March 2009, the Washington Indictment was the only case pending against defendant in the United States. Only following defendant's arrest in Mexico on an existing provisional arrest warrant emanating from the Washington Indictment was defendant indicted in the current case. On April 23, 2009, defendant was charged in the Northern District of Illinois on two narcotics trafficking counts. A superseding indictment was returned on August 6, 2009, and a second superseding indictment was returned on April 5, 2011.

[2] The CS was previously identified by the defendant in this litigation, but the government will refer to the individual hereto as "CS."

4

proper approvals. *Id.* Approximately 15 minutes later, the CS returned to Agent Castanon's hotel – with the defendant. *Id.* ¶ 13. Agent Castanon told the defendant that DEA agents could not meet with the defendant until the necessary approvals had been obtained from DEA management. *Id.* ¶ 14. Defendant said he understood, but he told Agent Castanon that he was serious about cooperation and wanted to do anything he could to reach an agreement with the United States government. *Id.* Agent Castanon explained the cooperation process and that the ultimate decision about what sort of deal he would get would come from prosecutors, not Agent Castanon. *Id.* Agent Castanon made no promises or guarantees about what any sort of deal would look like. *Id.* The meeting lasted approximately 30 minutes.

Agent Castanon's affidavit makes clear that he did not promise the defendant anything – much less immunity or dismissal of the Washington indictment. *Id.* ¶ 17. He was not authorized to do so. *Id.* Indeed, Agent Castanon was not even authorized to meet with the defendant on March 18, 2009. *Id.* Even before he was barred from meeting defendant, Agent Castanon was tasked only to have an initial meeting with defendant, to attempt to obtain admissions about as much of his criminal conduct as possible, to explore what types of information he could provide, to listen as much as possible, and not to promise him anything. *Id.* ¶¶ 8, 17.

Agent Castanon's account is corroborated by two NDDS prosecutors involved in Zambada-Niebla's case at NDDS: the line prosecutor, Patrick Hearn; and the then-Deputy Chief and head of the litigation section at NDDS, Julius Rothstein. Their affidavits are

5

attached hereto, *see* Public Appendix Exs. B and C, respectively. The affidavits explain that no agreement between the U.S. government and Zambada-Niebla was ever contemplated, sought, or approved.

As Patrick Hearn explains, "I am certain that at no point during my time as the lead Trial Attorney for the District of Columbia case did I ever promise Zambada-Niebla immunity or a dismissal of the indictment against him in the District of Columbia case. Nor did I ever authorize any agent or other person to do so." Hearn Aff., Public Appx. Ex. B ¶ 10. Both Hearn and Rothstein explain that an agreement of the type alleged by Zambada-Niebla would have required the approval of at least the Chief of NDDS, and in the case of immunity, from at least a Deputy Assistant Attorney General of the United States and likely an Assistant Attorney General. Hearn Aff., Public Appx. Ex. B ¶ 10; Rothstein Aff., Ex. C ¶ 10. Each states that no such approval was sought or obtained.

Indeed, Patrick Hearn notes that after Zambada-Niebla was arrested in Mexico, he had contact with several lawyers in relation to Zambada-Niebla's case, including Fernando Gaxiola, and "not once [does he] recall having any discussions during that time with anyone about immunity or dismissal of the indictment for Zambada-Niebla." Hearn Aff. ¶ 19. Indeed, Hearn states that he received multiple e-mails from Gaxiola related to Zambada-Niebla, as well as at least one phone conversation, and the issue of immunity was never discussed. *Id.* ¶¶ 20-27.

6

Moreover, Hearn had multiple conversations with a San Diego attorney, Jan Ronis, who was representing Zambada-Niebla at the time, as well as a meeting to discuss Zambada-Niebla's case and potential plea agreement. As Hearn notes, no discussion of an alleged immunity agreement was raised, and the conversation with Ronis progressed to the point of discussing Zambada-Niebla's potential Guidelines range. Hearn Aff. ¶¶ 28-29.

**B.     Documents Related to Zambada-Niebla.**

As a discovery matter, the undersigned prosecutors sought and obtained documents related to DEA's planned meeting with defendant Zambada-Niebla in March 2009, and all correspondence surrounding the authorization for that meeting.

Thus, the U.S. Attorney's Office for this district is now in possession of thousands of e-mails emanating from DEA agents and prosecutors at NDDS, and will, should the Court so request, deliver them to the Court for *in camera* inspection. Because those documents are voluminous, the government has attempted to distill the relevant documents for the Court's consideration.

On March 4, 2009, DEA Special Agent Stephen Fraga, the case agent on the Washington Indictment, e-mailed the NDDS prosecutor handling defendant Zambada-Niebla's case, Patrick Hearn. (*See* Under Seal/*In camera* Appendix Ex. A). In that e-mail, Agent Fraga informed prosecutor Hearn of defendant Zambada-Niebla's interest in meeting with U.S. agents. *Id.* There was no indication that defendant believed that he had been

7

granted immunity years earlier. *Id.* Hearn responded and gave tentative approval to DEA's attempts to have defendant Zambada-Niebla cooperate with the U.S. government. *Id*.

Following this March 4-5 correspondence between Hearn and Fraga, the next e-mails related to the defendant discuss travel plans among the agents and then the fact of defendant's arrest by Mexican authorities. *See* Under Seal/*In camera* Appendix Ex. B. Internal NDDS correspondence at that point relates largely to producing an extradition request for Zambada-Niebla, but contains no discussion of a pre-existing agreement with NDDS, DEA, or any other U.S. governmental entity. *See* Under Seal/*In camera* Appendix Ex. C.

There are also later emails concerning communications with defense lawyers for Zambada-Niebla – some of which are referenced in Mr. Hearn's affidavit. But nowhere in those communications are there any discussions by any of the defendant's lawyers about an agreement for immunity or dismissal of the indictment. Rather, the comunications with and concerning defense counsel involve plea negotiations and setting up meetings to further defendant's cooperation. *See* Hearn Aff. ¶¶ 21-29 and exhibits attached thereto. Indeed, the correspondence among NDDS lawyers is silent regarding the alleged approval of any agreement by representatives of the U.S government empowered to enter into such an agreement. In sum, the documents reviewed by the undersigned reflect no consideration of the agreement that Zambada-Niebla now alleges.

B.   **Documents Related to the CS.**

Defendant's theory to support his affirmative defense of public authority and his motion to dismiss on an alleged grant of immunity rests on the premise that, as part of his cooperation with the U.S. government, the CS obtained information from the leadership of the Sinaloa Cartel "about rival cartel leaders and their associates" and supplied that information to the U.S. government "in return for carte blanche for the Sinaloa Cartel to continue their narcotics trafficking business in the United States and Mexico without interference and in return for immunity and protection from arrest from the United States and Mexican authorities." R.135 at 3. The government addressed several of the factual and legal infirmities with defendant's allegations in its response to that motion (R. 109), and it will not repeat those here. As a matter of discovery, however, the undersigned prosecutors undertook a targeted, yet comprehensive, review of files in search of discoverable material to defendant's allegations.

In conducting its search for discovery related to defendant's claims, the undersigned prosecutors undertook to obtain and review all files related to the CS in the possession of the U.S. government. Defendant repeatedly suggests that an immunity agreement of the magnitude defendant alleges "had to be approved by high-level United States officials." R.135 at 3. The government agrees. Such an immunity agreement, and particularly one involving fugitives who are among the leadership of one of the largest, most violent criminal organizations in the world, would have to be approved by, at a minimum, the Attorney

9

General of the United States or his designee, or a Presidentially-appointed United States Attorney. The undersigned prosecutors' review of the documents surrounding the CS's cooperation demonstrates that no such documents exist. That is because no such agreement existed, or was even contemplated.

The U.S. Attorney's Office for this district is in possession of the documents related to the CS's cooperation and will, should the Court so request, deliver them to the Court for *in camera* inspection. However, because those documents are voluminous, the government has attempted to distill the relevant documents for the Court's consideration based on certain considerations. First, as the Seventh Circuit has noted, "at all events immunity is not bestowed lightly (or quickly)." *In re United States,* 398 F.3d 615, 618 (7th Cir. 2005). Thus, as the defense concedes, an alleged "agreement of this magnitude had to be approved by high-level United States officials." R.135 at 3. A reasonable deduction from those principles is that the absence of *any* discussion about such an agreement is powerful evidence of the absence of such an agreement. It is the government's intent to provide to the Court (if it so desires) every high-level document in which such an agreement would logically have been discussed or evaluated, to satisfy the Court that no such agreement existed, and to forestall an unnecessary "fishing expedition" by the defense. *See United States v. Bagley*, 473 U.S. 667, 675 (1985); *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003) (defense requests would have sent prosecutors on an open-ended fishing expedition); *United States*

10

*v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997). In addition, the government provides this summary to guide the Court's review.

The documents obtained from both the Southern District of California and DEA offices in Mexico reflect that as of early 2005, DEA had been periodically receiving information from the CS regarding drug trafficking in Mexico. At some point early in 2005, this information was brought to the attention of the U.S. Attorney's Office in San Diego for review. On March 11, 2005, the U.S. Attorney's Office in San Diego circulated an internal memorandum regarding the status of the CS's cooperation. Attached as Under Seal/*In camera* Appendix Ex. D.[3] In that document (without waiving the privileges identified in fn. 3), the U.S. Attorney's Office evaluated the usefulness of the CS's information. The United States Attorney's Office in San Diego eventually approved the use of the CS as a cooperating defendant under the terms of a cooperation agreement, submitted in draft form with this memorandum but executed by the CS on June 3, 2005. R.109 Ex. A. In that cooperation agreement, the CS acknowledged the following:

---

[3] These and similar materials are protected by the deliberative process privilege because they are "memoranda and discussions within the Executive Branch leading up to the formulation of an official position," *United States v. Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004). The privilege extends to communications within the United States Attorney's Office. *See, e.g.*, *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) (per curiam) (holding, "the United States Attorney is not answerable to a judge for the deliberations among his staff"); *Zingsheim*, 384 F.3d at 872 (holding that "except with extraordinary justification a judge may not inquire why or how the United States Attorney decided to file a [particular] motion"). The documents were also prepared in anticipation of litigation and reflect attorney work product.

> At no point during my above-noted cooperation has any U.S. law enforcement officer, or any other representative or individual associated with the U.S. government, promised me that I would receive any benefit in exchange for my cooperation. Specifically, no promise or representations have been made to me regarding the federal drug charges pending against me. Nor have I been promised any financial compensation in exchange for my cooperation. . . .
>
> I wish to continue to cooperate with U.S. law enforcement officers by providing them with information about individuals involved in narcotics trafficking and money laundering. I understand that I will not be promised any benefits (either related to my pending case or monetary) for my ongoing cooperation. . . .
>
> I understand that the prosecutor handling the case against me will be given the full details of my cooperative efforts and that he may, in his sole discretion, decide whether I will receive any benefit, reduction in sentence, or any other favorable recommendation by the U.S. Attorney's Office regarding my cooperative efforts."

*Id.*

Thereafter, DEA sought and obtained permission to use the CS as a cooperating fugitive defendant from the Sensitive Activities Review Committee. *See SGS-92-X003 v. United States*, 85 Fed.Cl. 678, 689 (Fed. Cl. 2009). "In conjunction with its objective of reducing the flow of drugs into the United States, DEA established the Sensitive Activities Review Committee ('SARC') to review activities that DEA viewed as warranting special attention, including drug-related money laundering activities and operations utilizing Attorney General exemptions." *Id.* at 689. In August 2005, the SARC authorized the continued cooperation of the CS, pursuant to, among other things, the cooperation agreement with the U.S. Attorney's Office in San Diego. *See* Under Seal/*In camera* Appendix Ex. E. The SARC Committee noted that the United States Attorney's Office in San Diego did not

decline to dismiss its indictment against the CS and that the potential benefit to the CS for cooperation would be determined in the future. *Id.* at 4.[4]

After the SARC approval process and the United States Attorney's Office authorized working with the CS, Agent Castanon began to work with the CS. *See* Castanon Affidavit at ¶ 21. On an approximately monthly basis following the SARC approval of the CS's cooperation, DEA's Regional Director for the Mexico-Central America Division reported to DEA Headquarters on the progress of the cooperation. *See* Under Seal/*In camera* Appendix Ex. F. At no point in these reports is there any reference to an immunity agreement or anything resembling an immunity agreement – either for the CS or for members of the Sinaloa Cartel such as the defendant.

On September 10, 2008, DEA's Regional Director for the Mexico-Central America Division sent an internal memorandum to the U.S. Attorney for the S.D. California formally addressing the value of the CS's cooperation and requesting the dismissal of the indictment against the CS. *See* Under Seal/*In camera* Appendix Ex. G. The request makes no mention

---

[4] It is the government's position that the SARC approval committee minutes contain no Rule 16 material as to defendant Zambada-Niebla, nor *Brady* material, in that the document does not support defendant's theory of an immunity agreement between the United States and either the CS or the alleged extension to the Sinaloa Cartel. Thus, the government does not believe this document, which contains sensitive investigative information and is not exculpatory, is discoverable. The government submits it to the Court to aid the Court in examining the basis for the government's conclusion that these reports contain no *Brady* material.

of a pre-existing agreement or any discussion of immunity either to the CS or the membership of the Sinaloa Cartel.

On September 19, 2008, the U.S. Attorney's Office in San Diego addressed DEA's request regarding the CS in an internal memorandum. *See* Under Seal/*In camera* Appendix Ex. H. The memorandum reflects an analysis of the strength of the case against the CS and the value of the CS's cooperation. *Id.* Significantly, the U.S. Attorney's Office makes no mention of a pre-existing agreement, any discussion of immunity, and no mention of the benefits conferred on the CS extending to any person other than the CS. Nor is there a mention of any agreement with the Sinaloa Cartel. Indeed, there is no mention at all of any conduct outside of the CS's then pending indictment in San Diego.

As noted in the government's response to defendant's motion, on December 4, 2008, the U.S. Attorney for the Southern District of California, in its exercise of discretion, moved to dismiss the pending criminal charges against the CS. (R. 109, Ex. C). On December 4, 2008, U.S. District Judge Jeffrey T. Miller entered an order dismissing the indictment as to the CS. (R. 109, Ex. D). The dismissal, which was without prejudice, was a result of an application by the U.S. Attorney, not pursuant to an order granting immunity to the CS. *Id.* The charges against Chapo Guzman remained, and remain, pending in the Southern District of California. Likewise, the Washington indictment against defendant remained pending in the District of Columbia.

14

On December 8, 2008, the U.S. Attorney informed DEA of its decision to accept DEA's request, again making no mention of the type of agreement defendant alleges. *See* Under Seal/*In camera* Appendix Ex. I.

Conspicuously absent from *any* document related to the disposition of the CS's case is *any* mention of the core allegation made by defendant, namely that the CS was the recipient of an immunity agreement from the U.S. government rather than the straightforward cooperation agreement to which he was a party. Moreover, there is no mention in any document related to the disposition of the CS's case that even alludes to the government extending such an agreement to him or to any other member of the Sinaloa Cartel.

As additional evidentiary support for that conclusion, the government submits the affidavit of DEA Special Agent Manuel Castanon, who was the handling agent for the CS and who was present for the meeting with defendant Zambada-Niebla on March 18, 2009. (Public Appendix, Ex. A). Agent Castanon states affirmatively that he made no promises either to the CS or to defendant about the ultimate disposition of their cases, and that "the ultimate decision about what sort of deal [defendant] would get would come from prosecutors, not me." *Id.* ¶ 14.

## **CONCLUSION**

The government has spent a significant amount of time traveling the country, talking to witnesses, and reviewing documents in order to investigate defendant's claims of immunity and public authority. Not one witness or document supports defendant's breathtaking claim that the United States government conferred defendant (and other members of the Sinaloa Cartel) immunity from prosecution. The affidavits submitted by the government at the Court's request support that position.

Therefore, given the absence of any evidence in support of his claims, the government respectfully requests that the Court deny defendant's pre-trial "public authority" motions.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY: */s/ Thomas D. Shakeshaft*
THOMAS D. SHAKESHAFT
ANDREW C. PORTER
MICHAEL J. FERRARA
MARC L. KRICKBAUM
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, IL 60604
312-886-0667