UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 09 CR 383-3 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| JESUS VICENTE ZAMBADA-NIEBLA, | ) | |
| a/k/a "Vicente Zambada-Niebla," | ) | |
| a/k/a "Vicente Zambada," | ) | |
| a/k/a "Mayito," | ) | |
| a/k/a "30" | ) | |
| TOMAS AREVALO-RENTERIA | ) | |

## PUBLIC APPENDIX

Exhibit A –    Manuel Castanon affidavit (Exhibits 2 through 8 of the
               Castanon affidavit are filed under seal)

Exhibit B –    Patrick Hearn affidavit

Exhibit C –    Julius Rothstein affidavit

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 09 CR 383-3 |
| JESUS VICENTE ZAMBADA-NIEBLA, | ) | |
| a/k/a "Vicente Zambada-Niebla," | ) | Judge Ruben Castillo |
| a/k/a "Vicente Zambada," | ) | |
| a/k/a "Mayito," | ) | |
| a/k/a "30" | ) | |

## AFFIDAVIT OF MANUEL CASTANON

I, Manuel Castanon, being duly sworn, declare and state the following:

### I.    Experience and Training

1.     I am employed by the United States Drug Enforcement Administration, and have been since July 1999. Since September 2011, I have been a Group Supervisor in the San Diego Field Division. Prior to that, I was a Special Agent. I began my career at DEA based in San Diego, California. In 2003, I transferred to the Arellano Felix Organization Task Force, which was a San Diego-based interagency group focused on enforcement action against the AFO cartel. In March 2005, I transferred to Hermosillo, Sonora Mexico. I was there until December 2007, when I transferred to DEA's Tijuana office. I returned to San Diego in August 2011. During my time at DEA, I have been involved in multiple seizures of narcotics; surveillance; Title III wiretaps; debriefings of cooperating defendants; debriefings of other sources of information; and all the other usual sources of investigation.

1

2.     Prior to my time at DEA, I worked at the United States Border Patrol as a Border Patrol Agent from December 1994 to July 1999. I worked in a variety of capacities to secure the border, including through surveillance, interdiction efforts, and working with partners from other agencies. For a time while I was there in approximately 1997, I was a Spanish Instructor at the U.S. Border Patrol Academy. In addition, from approximately late 1998 until I left the Border Patrol to go to DEA in approximately July 1999, I was an agent training instructor at the Border Patrol.

3.     I graduated from San Diego State University in 1994. I majored in Criminal Justice Administration.

## II.     <u>Vicente Zambada-Niebla</u>

4.     On March 17, 2009, I met for approximately 30 minutes in a hotel room in Mexico City with Vicente Zambada-Niebla and two other individuals – DEA agent David Herrod and a cooperating source ("CS") with whom I had worked since 2005. In the meeting on March 17, 2009, I did all of the talking on behalf of DEA. Agent Herrod does not speak Spanish.

5.     The meeting with Zambada-Niebla had its origins in a contact I had with the CS on January 30, 2009, in Mexico City. During that meeting with the CS, I believe Agent Herrod and Assistant Regional Director Carlos Mitchem were also present. The CS told me that he/she had been instructed to meet with Zambada-Niebla by Joaquin Guzman-Loera. The CS had been told by Guzman-Loera that Ismael Zambada-Garcia was interested in having his son, Zambada-Niebla, cooperate with the DEA in order to

2

work off his pending charges in the United States. The CS told me that he/she had then met with Zambada-Niebla to discuss the possibility of Zambada-Niebla approaching DEA to cooperate. Around that time, I learned that Zambada-Niebla had been indicted in the United States District Court in the District of Columbia. I told the CS at the time that we would look into the possibility of meeting with Zambada-Niebla. I also told the CS that we could not make any promises about what Zambada-Niebla's cooperation might be worth.

6. As I recall, we did not immediately follow up on this information from the CS, in large measure because of other issues that occupied both my and Agent Herrod's time in the month of February 2009.

7. In approximately early March 2009, I recall reaching out to Steve Fraga, who I understood was the DEA Agent handling the Zambada-Niebla case in the District of Columbia. I called Agent Fraga because this was not my case, nor was Zambada-Niebla my defendant. I did not want to interfere with anyone else's investigation, and intended to take my direction from the District of Columbia. I recall that Agent Herrod and I spoke to Agent Fraga and told him that Zambada-Niebla was possibly interested in cooperating with DEA. I understood that Agent Fraga was going to reach out to the Assistant United States Attorney handling the Zambada-Niebla case and then get back to us. In fact, Agent Fraga did get back to us. He advised that the AUSA was interested in hearing what Zambada-Niebla had to offer and that the AUSA authorized Agent Fraga to participate in an initial assessment interview of Zambada-Niebla. I understood that both

3

the AUSA and Agent Fraga of the District of Columbia wanted us not to make any promises to Zambada-Niebla but instead wanted us to listen to what he had to say. Thereafter, I contacted my boss, the Resident Agent in Charge of the Tijuana office. Agent Herrod also contacted his supervisors. Ultimately, DEA management authorized an initial meeting between agents, the CS, and Zambada-Niebla to determine what information he could provide.

8.     Based on my conversations with Agent Fraga and DEA management, I understood that we were tasked with attempting to set up such a meeting with Zambada-Niebla and have a standard initial meeting to explore potential cooperation. By that I mean that – as is common in initial encounters with potential cooperating defendants – we were to attempt to obtain admissions about as much of his criminal conduct as possible, explore what types of information he could provide about the criminal conduct of others, not make any promises to him, and attempt to do as little talking and as much listening as possible.

9.     On March 10, 2009, I had a conversation with the CS about the proposed meeting. We discussed various meeting locations, but I insisted that any meeting must take place in Mexico City. The CS stated that he/she would contact Zambada-Niebla and confirm the meeting. Subsequently, the CS confirmed that Zambada-Niebla had agreed to the meeting. On March 15, 2009, I contacted the CS and reconfirmed the meeting in Mexico City. We agreed to conduct the meeting on March 18, 2009.

4

10.     On March 17, 2009, at approximately 3:00 p.m., I arrived in Mexico City with Agent Herrod.  We then met with Agent Fraga (who I believe was with another agent) and DEA agents operating out of Mexico City.  During that meeting, we were asked by one of the supervisors in Mexico City whether we had seen a newspaper article recently published in the Mexican newspaper "El Porvenir" about United States DEA agents traveling to Mexico to meet with high level Mexican traffickers.  I advised that I had not seen the article.  The supervisor then conferred with David Gaddis, the Regional Director of the Mexico City office.  A few minutes later, Gaddis directed us to cancel the meeting.

11.     Thereafter, I called the CS and told him/her that the meeting had been canceled.  The CS asked to meet me to discuss the matter in person.  I agreed, and we made arrangements to meet the CS at the hotel in Mexico City, where I was staying.

12.     At approximately 11 p.m., Agent Herrod and I met the CS in the hotel lobby.  We escorted the CS to Agent Herrod's hotel room.  I showed the CS the newspaper article and told him we could not meet Zambada-Niebla at that time and the meeting was cancelled until further notice.  The CS became visibly nervous and advised that he/she felt that the meeting needed to take place because he/she was personally responsible for Zambada-Niebla.  The CS added that he/she had committed to Zambada-Niebla and Ismael Zambada-Garcia that the meeting would take place and seemed nervous about failing to live up to that commitment.  I reiterated that the meeting could not take place without proper approvals.  The CS then said that he/she needed to meet

5

with Zambada-Niebla and inform him of the change of plans. Prior to the CS departing, I reminded the CS that we could not meet with Zambada-Niebla without proper approvals. At approximately 12:15 a.m., the CS left the hotel. The CS said that he/she would return in approximately 20 minutes. Agent Herrod went to the lobby to wait for the CS.

13. At approximately 12:30 a.m., Agent Herrod returned to the hotel room. He was accompanied by the CS and Zambada-Niebla. Agent Herrod told me that the CS had returned to the hotel with Zambada-Niebla. Agent Herrod said that rather than getting into a discussion in the public lobby (and given that Agent Herrod does not speak Spanish), Agent Herrod went to the elevator followed by the CS and Zambada-Niebla.

14. Agent Herrod and I then searched the CS and Zambada-Niebla for weapons and removed their cell phones. I then told Zambada-Niebla, in Spanish, that DEA could not meet with him until further approvals had been obtained from DEA management. I then discussed the newspaper article with him. Zambada-Niebla told me he had driven from Guadalajara and no one knew about the meeting other than his father, the CS, and Guzman-Loera. I then said that regardless of whether the article had anything to do with the meeting, we could not meet with him. Zambada-Niebla said that he understood but that he just wanted to tell me in person that he was serious about cooperation and wanted to do anything he could to reach an agreement with the United States government. He discussed his indictment in Washington D.C. and said he was very willing to cooperate with the government in order to have his indictment removed. I explained the cooperation process to Zambada-Niebla – that we would have to sit down with him

6

repeatedly; that we were not allowed to meet with him now; and that the ultimate decision about what sort of deal he would get would come from prosecutors, not me. I told him repeatedly that I could not make him any promises or guarantees about what any sort of deal would look like. I said that it was up to the prosecutors to make such decisions. We then spent some time discussing where we might agree to meet in the future to discuss his potential cooperation. We talked about meeting in a third country or the United States. We were brainstorming, throwing out ideas that we could all consider.

15.     Toward the end of our approximately 30 minute meeting, we returned to the fact that I was not supposed to be meeting with him and that I was going to get in trouble. I was concerned about repercussions within DEA because I knew we were not even supposed to be meeting with Zambada-Niebla. We finished the meeting by talking about possible future locations for a first meeting, if we had one. I told him that I would contact the CS if we did want to meet. I then told Zambada-Niebla and the CS that they should go and the meeting ended.

16.     The next day, I learned that Zambada-Niebla had been arrested early in the morning by the Mexican military. The next day, three other agents and I met Zambada-Niebla at the prison where he was housed. He reiterated his desire to cooperate. He said he did not want to be in Mexico. That was the last time I talked with him.

17.     I understand that Zambada-Niebla has claimed that he was offered immunity and a dismissal of his indictment by the United States government. I never did so. I did not promise him anything. I did not have authority to do so. Indeed, I did not

7

even have authority to meet with him in March 2009. Even before we were barred from meeting with Zambada-Niebla, we were tasked to have an initial meeting with him, to listen, and not to promise him anything. We do not have arrest powers in Mexico. In large part, we are there as an intelligence gathering operation to support investigations in the United States. In that regard, I have several times interviewed cartel members and drug traffickers like Zambada-Niebla in Mexico. It is not like interviewing a fugitive defendant who walks into my office in San Diego. In San Diego, I can arrest the fugitive. In Mexico, I cannot.

### III.   The Cooperating Source

18.    In 2005, when I began to work in Hermosillo, one of my early tasks from my supervisor was to sign up a source of information who I understood had provided information intermittently to DEA and ICE over the years. That source of information was the individual referred to in my affidavit as the "CS." I came to learn that the CS was a fugitive from an indictment filed in 1995 in the Southern District of California. I worked with the United States Attorney's Office in San Diego and DEA headquarters on a SARC, which I understand is a proposal to a committee that deals with matters within DEA that warrant special attention. In this case, the issue was working with a fugitive in a foreign country.

19.    Through much of the early half of 2005, while I was getting the necessary approvals, there was essentially a time out in working with the CS. We needed to get approvals to work with him from prosecutors and from DEA bosses, which was the

8

reason for the SARC process. Toward that end, on June 3, 2005, the CS signed a cooperation agreement with the United States Attorney's Office for the Southern District of California. In that agreement, the CS acknowledged that

> At no point during my above-noted cooperation has any U.S. law enforcement officer, or any other representative or individual associated with the U.S. government, promised me that I would receive any benefit in exchange for my cooperation. Specifically, no promise or representations have been made to me regarding the federal drug charges pending against me. Nor have I been promised any financial compensation in exchange for my cooperation.

A copy of that agreement is attached to this Affidavit as Exhibit 1. The agreement further provided:

> I wish to continue to cooperate with U.S. law enforcement officers by providing them with information about individuals involved in narcotics trafficking and money laundering. I understand that I will not be promised any benefits (either related to my pending case or monetary) for my ongoing cooperation. . . . I understand that the prosecutor handling the case against me will be given the full details of my cooperative efforts and that he may, in his sole discretion, decide whether I will receive any benefit, reduction in sentence, or any other favorable recommendation by the U.S. Attorney's Office regarding my cooperative efforts.

That agreement was consistent with my subsequent conversations with the CS, in which I never made him/her promises about what benefits he/she would receive. I always told the CS that the ultimate decision about the CS's case was up to the prosecutors at the U.S. Attorney's Office.

20.    In approximately August 2005, the SARC was approved. In approving the SARC, the committee that considered our recommendation stated the following:

> Presently, the United States Attorney's Office, Southern District of California, in concurrence with the DEA San Diego Field Division has declined to dismiss the indictment against the proposed CS due to statue of limitation issues related to his

9

1996 indictment. If dismissed, circumstances would not allow for the reinstatement of charged against the proposed CS. However, the proposed CS has signed a Proffer Letter as provided by the United States Attorney's Office for the Southern District of California. The proposed CS is not presently represented by Counsel and is acting under his own free will and volition. Pending successful outcome of this proposed activity, the San Diego Field Division, in cooperation and coordination with the United States Attorney's Office for the Southern District of California will revisit the legal issues pending against the proposed CS. It is understood that the prosecutor handling the case against the proposed CS will be given the full details of his cooperative efforts and the subsequent result(s) and that he may, in his sole discretion, decide whether the proposed CS is to receive any benefit, reduction in sentence, or any other favorable recommendation by the United States Attorney's Office regarding his cooperative efforts.

21.     Thereafter, with the cooperation letter and SARC approval, I began to work with the CS. Over the years, the CS's cooperation resulted in the seizure of several significant loads of narcotics and precursor chemicals. The CS's cooperation also resulted in other real-time intelligence that was very useful to the United States Government.

22.     In 2008, my supervisors at DEA recommended to the United States Attorney's Office that the indictment against the CS be dismissed. That recommendation had my support. I was in favor of dismissal of the indictment because of the extraordinary cooperation the CS had provided for many years and because the CS was not an operational drug dealer (as opposed to someone like Zambada-Niebla, who I would have viewed differently). Ultimately, I knew that it was my the decision of my boss, David Gaddis, to recommend dismissal of the indictment and it was the United States Attorney's Office's decision to move to dismiss the indictment.

23. I considered our request very unusual. It was the only time I had ever been involved in asking for dismissal of an indictment against a cooperating defendant.

24. After the dismissal, the CS continued to provide information to me. I continued to work with him/her.

25. More recently, I have had conversations with the CS about the events of March 2009. For instance, in October 2010, I had a telephone conversation with the CS in which we discussed the March 2009 meeting. During that call, the CS stated that a litigation "strategy" of claiming that Zambada-Niebla was offered immunity or dismissal of his indictment would fail because everyone, including Zambada-Garcia and Guzman-Loera, knew that Zambada-Niebla did not have any sort of agreement with the U.S. government prior to his arrest. The CS reiterated his/her understanding that the planned meeting in Mexico City with DEA agents was merely going to be a preliminary meeting to explore the feasibility of Zambada-Niebla's potential cooperation. A copy of the DEA report concerning that conversation is attached to this affidavit as Exhibit 2.

26. On August 14, 2011, I received a telephone call from the CS, who told me that he/she wanted to talk to me in order to advise me that he/she did not agree with statements made by Zambada-Niebla's attorneys reported in the media. The CS told me that he/she was willing to meet with prosecutors and tell the truth about things. The CS reiterated that there was never any deal or promises made to Zambada-Niebla. The CS said that he/she was willing to travel to the United States to meet with United States

11

prosecutors handling the case. A copy of the DEA report concerning that conversation is attached to this affidavit as Exhibit 3.

27.    On August 16, 2011, I received a telephone call from the CS. We again discussed a possible meeting between the CS and United States prosecutors. The CS said that he/she wanted personally to tell prosecutors that the claims being made by Zambada-Niebla's lawyers were false. The CS assured me that he/she would only tell the truth. We agreed to meet with the United States prosecutors on or about August 29, 2011, in order to discuss the events of March 2009 and the CS's cooperation with DEA. A copy of the DEA report concerning that conversation is attached to this affidavit as Exhibit 4.

28.    On August 24, 2011, I received a telephone call from the CS. The CS advised me that he/she had met with a Mexican lawyer on August 23, 2011, in Mexico. That lawyer was described to me as an intermediary between Ismael Zambada-Garcia and the lawyers representing Zambada-Niebla. The CS said that he/she had told the Mexican lawyer that he/she was planning to meet with me and United States prosecutors. The Mexican attorney advised the CS to cancel the meeting. According to the CS, the Mexican attorney feared that the CS would say something to jeopardize Zambada-Niebla's defense strategy. The CS told me that he repeatedly told the Mexican attorney that he/she would not lie for them. The CS also said that he/she had told the Mexican attorney that Zambada-Niebla had chosen a bad defense strategy because it was not based on the truth. The CS said that the Mexican attorney told the CS to be careful because if Zambada-Niebla's defense failed the CS could be blamed. The CS therefore reported to

me that the CS now feared he could encounter problems if the defense found out the CS had met with United States prosecutors. The CS then said that he/she was still willing to meet with prosecutors if there was a way for the CS's statements to be kept secret or confidential. The CS stated that he/she would talk to any prosecutor or judge as long as his/her identity and statements could be protected. I told the CS I would talk with the prosecutors and get back to the CS. A copy of the DEA report concerning that conversation is attached to this affidavit as Exhibit 5.

29. On August 25, 2011, I called the CS. There was no answer. A few minutes later, the CS called me back. The CS advised me that he/she was very concerned that any statements that he/she might make to prosecutors would hurt Zambada-Niebla's defense and the CS would be blamed. The CS said that he/she has told Zambada-Niebla's attorneys that he/she will only tell the truth but fears that Zambada-Garcia will be upset if the CS talks to prosecutors without defense attorneys' permission. I told the CS that it was ultimately the CS's decision whether to meet with prosecutors and whether to tell the defense attorneys anything. The CS thanked me and said that he/she appreciated the fact that the DEA and I were the only ones who seemed concerned about the CS's well being. A copy of the DEA report concerning that conversation is attached to this affidavit as Exhibit 6.

30. On August 26, 2011, I called the CS. There was no answer. A few minutes later the CS called me back. The CS advised that the CS was still very concerned that any statements the CS made to prosecutors would hurt Zambada-Niebla's defense. The

13

CS said that the CS was concerned that Zambada-Niebla's defense lawyers would blame the CS and tell Zambada-Garcia it was the CS's fault for anything that caused them to lose the case. As a result, the CS said that he/she was postponing the meeting with prosecutors. The CS apologized for any inconveniences, but said that he/she could not risk losing the trust placed in him/her by Guzman-Loera, Zambada-Garcia, and the defense attorneys. The CS advised that he/she had pledged to try and help Zambada-Niebla's case, though the CS made clear that this did not mean that he/she would lie about things to help Zambada-Niebla. The CS then said that he/she had previously attended a meeting with Zambada-Niebla's Mexican and American defense lawyers. During the meeting, the CS had been told the defense would not divulge the CS's identity, but wanted to know the extent of the CS's cooperation with the DEA. The CS said he/she was frustrated because in his/her opinion the defense strategy was poor in that the CS knew that the U.S. government would be able to prove there was never any agreement with Zambada-Niebla. A copy of the DEA report concerning that conversation is attached to this affidavit as Exhibit 7.

31.     I had two other conversations with the CS on August 30, 2011, and September 1, 2011. In large measure, those conversations were to talk to the CS about the concerns prosecutors and I had for his safety. Copies of the DEA reports concerning those conversations are attached to this affidavit as Exhibit 8.

FURTHER AFFIANT SAYETH NOT.

_____
MANUEL CASTANON

# EXHIBIT 1

## AGREEMENT

1.    My name is Humberto Loya-Castro and I understand that I am charged with federal drug charges in the United States. I have refused to surrender myself to the appropriate authorities in Mexico and/or the United States to face those charges. In 2000, I met with United States law enforcement officials in Mexico and offered to provide information about individuals involved in narcotics trafficking and money laundering activities. Since the first meeting, I have voluntarily met with U.S. law enforcement officers on multiple occasions. My most recent meeting with U.S. law enforcement officers was in January 2005. The purpose of those meetings was to provide information about individuals involved in narcotics trafficking and money laundering. At no point during my above-noted cooperation has any U.S. law enforcement officer, or any other representative or individual associated with the U.S. government, promised me that I would receive any benefit in exchange for my cooperation. Specifically, no promise or representations have been made to me regarding the federal drug charges currently pending against me. Nor have I been promised any financial compensation in exchange for my cooperation

2.    I wish to continue to cooperate with U.S. law enforcement officers by providing them with information about individuals involved in narcotics trafficking and money laundering. I understand that I will not be promised any benefits (either related to my pending case or monetary) for my ongoing cooperation.

3.    I understand that the prosecutor handling the case against me will be given the full details of my cooperative efforts and that he may, in his sole discretion, decide whether I will receive any benefit, reduction in sentence, or any other favorable recommendation by the U.S. Attorney's Office regarding my cooperative efforts.

4.    By signing this agreement, I certify that I have read and understand all of the terms of this agreement. I further certify that I have been given an opportunity to consult with an attorney prior to signing this agreement.

Dated: 3/junio/2005

_____
Humberto Loya-Castro

_____
Todd W. Robinson
Assistant U. S. Attorney

_____
Witness to Signature

_____
Witness to Signature

**UNDER SEAL**

**EXHIBIT 2**

**UNDER SEAL**

**EXHIBIT 3**

**UNDER SEAL**

**EXHIBIT 4**

**UNDER SEAL**

**EXHIBIT 5**

**UNDER SEAL**

**EXHIBIT 6**

**UNDER SEAL**

**EXHIBIT 7**

# UNDER SEAL

# EXHIBIT 8

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 09 CR 383-3 |
| JESUS VICENTE ZAMBADA-NIEBLA, | ) | |
|    a/k/a "Vicente Zambada-Niebla," | ) | Judge Ruben Castillo |
|    a/k/a "Vicente Zambada," | ) | |
|    a/k/a "Mayito," | ) | |
|    a/k/a "30" | ) | |

## AFFIDAVIT OF PATRICK H. HEARN

I, Patrick Hearn, being duly sworn, declare and state the following:

### I.    Experience and Training

1.    In May 1987, I received a Juris Doctor degree from the University of Kansas School of Law and was admitted to the Bar of the State of Kansas in September 1987. From May 1988 to June 1991, I was employed as a Municipal Prosecutor with the municipality of Olathe, Kansas. From June 1991 to April 1992, I was employed as an Attorney-Advisor with the Regional Counsel's Office of the United States Department of Housing and Urban Development in Kansas City, Kansas. From April 1992 to January 2002, I was employed as an Assistant District Attorney with the Johnson County, Kansas, District Attorney's Office located in Olathe, Johnson County, Kansas. For nine years I was in the Drug Unit specializing in drug prosecutions. In my final two years, I was the Chief of the Drug Unit.

1

2.      From February 2002 to December 2009, I was a Trial Attorney with the United States Department of Justice, Criminal Division, Narcotic and Dangerous Drug Section ("NDDS"). As a Trial Attorney, my duties were to prosecute individuals charged with criminal violations of the laws of the United States. Most of my work at NDDS was in the area of federal narcotics statutes, including: Title 21, United States Code, Section 963, conspiracy to import a controlled substance into the United States and to manufacture and distribute a controlled substance knowing and intending such controlled substance would be imported into the United States; Title 21, United States Code, Section 952, importation of a controlled substance into the United States; Title 21, United States Code, Section 959, manufacture and distribution of a controlled substance knowing and intending such controlled substance will be imported into the United States; Title 18, United States Code, Section 2, aiding and abetting the commission of an offense against the United States.

3.      Currently, I am a Trial Attorney with the United States Department of Justice, Civil Division, Consumer Protection Branch.

II.     **United States v. Vincente Zambada-Niebla, 03 CR 034**

4.      During my time at NDDS, I was the lead Trial Attorney in the matter of *United States v. Vincente Zambada - Niebla*, 03 CR 034, currently pending in the United States District Court for the District of Columbia (the "District of Columbia case"). That case arose out of an investigation into a conspiracy to manufacture, import, and distribute thousands of kilograms of cocaine into the United States between approximately 1992

2

and January 28, 2003. Three defendants were indicted in the District of Columbia case --

Vincente Zambada-Niebla, Javier Torres-Felix, and Ismael Zambada-Garcia. On or about

January 28, 2003, arrest warrants were issued against Zambada-Niebla, Torres-Felix, and

Zambada-Garcia by order of Honorable Deborah A. Robinson, United States Magistrate

Judge of the United States District Court for the District of Columbia.

5.     Torres-Felix was previously extradited to the United States to face the

charges in the District of Columbia case.

6.     Ismael Zambada-Garcia remained a fugitive in the District of Columbia

case during my time as a Trial Attorney at NDDS.

7.     I understand that Vincente Zambada-Niebla was arrested by the

Government of Mexico in approximately March 2009. At the time of his arrest in March

2009, I understood that the only federal indictment then pending against Zambada-Niebla

was the District of Columbia case on which I worked.

8.     I worked on the extradition paperwork necessary to extradite Zambada-

Niebla to the United States to face charges in the District of Columbia case. At the same

time, I understood that federal prosecutors from Chicago submitted their own extradition

package in order to extradite Zambada-Niebla to face charges in Chicago. I understand

that he was extradited to the United States sometime after I left NDDS. I further

understand that he is facing federal drug trafficking charges in Chicago.

3

### III.    The Claim of Immunity

9.    I understand that Zambada-Niebla has made a claim in the Chicago litigation that he was provided immunity by unnamed United States government officials. I also have been told that Zambada-Niebla has made a claim in the Chicago litigation that unnamed United States government officials agreed to dismiss the indictment pending against him in the District of Columbia.

10.    I am certain that at no point during my time as the lead Trial Attorney for the District of Columbia case did I ever promise Zambada-Niebla immunity or a dismissal of the indictment against him in the District of Columbia case. Nor did I ever authorize any agent or other person to do so.

11.    There are several reasons why I am certain that I did not authorize either immunity or dismissal of the Zambada-Niebla indictment.

12.    First, as a Trial Attorney, I had no such authority. To provide immunity for any individual, I understood that I would need three levels of approvals from my bosses at NDDS Ron McNeil (who was my direct deputy); Julius Rothstein (who was the head of litigation at NDDS); and Paul O'Brien (who was the chief of NDDS). In addition, I understood that I would also need to receive approvals from a Deputy Attorney General at Main Justice. For dismissal of an indictment, I understood that I would need approvals from my three bosses at NDDS – Ron McNeil, Julius Rothstein, and Paul O'Brien. I never sought nor received such approvals regarding Zambada-Niebla.

4

13.   Second, even if I had such authority, I would not have used it in relation to Zambada-Niebla. I believed him a significant drug trafficker and an important member of the Sinaloa Cartel.

14.   The only thing I did authorize relative to Zambada-Niebla was that the case agent, Steve Fraga, go to Mexico in March 2009 in an attempt to interview Zambada-Niebla and elicit admissions from him.

## IV.   The Planned Interview of Zambada-Niebla in Mexico City

15.   On about March 4, 2009, I received an email from Steve Fraga, my case agent in the District of Columbia case. He informed me of an apparent opportunity to interview Zambada-Niebla in Mexico. He informed me that DEA agents in Mexico were working with a cooperating source who had been indicted by the United States Attorney's Office in San Diego. According to Agent Fraga's email, the cooperating source had apparently been very effective, and the indictment against the cooperating source had been dismissed. Agent Fraga told me that the cooperating source had provided information leading to a 23 ton cocaine seizure, other seizures related to the Vicente Carrillo-Fuentes drug trafficking organization, and information relating to Arturo Beltran-Leyva's drug trafficking organization. Agent Fraga told me that his understanding was that "Mayo" (Ismael Zambada-Garcia) wanted his son, Zambada-Niebla, out of the drug trafficking business and wanted to try to work out a deal with Zambada-Niebla whereby he would cooperate with the United States Government. Agent Fraga recommended an initial "sit down" meeting with Zambada-Niebla. Agent Fraga proposed setting up a

5

meeting which would be consensually recorded in order to lock Zambada-Niebla into his indictment.

16. I told Agent Fraga that if Zambada-Niebla wanted to cooperate to clear the case against him it was fine with me; meaning, that if he wanted to resolve the case by admitting his guilt and agreeing to plead guilty the government would be interested in talking with him and figuring out how he could cooperate.

17. I do not recall if I shared this development with my supervisors. It would have been my practice to do so. In any event, I understood that I had authorized Agent Fraga to go and meet with Zambada-Niebla and talk with him, nothing more.

18. I believe Agent Fraga thereafter went to Mexico City on around March 18, 2009, to have an initial meeting with Zambada-Niebla. I do not know whether Agent Fraga ultimately met with him or not. I recall Agent Fraga advising me on March 18, 2009, that Zambada-Niebla had been arrested by the Mexican government.

19. After Zambada-Niebla was arrested, I recall spending a significant amount of time working on his extradition package. Not once do I recall having any discussions during that time with anyone about immunity or dismissal of the indictment for Zambada-Niebla. Of course, had he been immunized or had his indictment dismissed, there would have been no reason for me to prepare paperwork for Zambada-Niebla's extradition from Mexico to the District of Columbia.

## V.    Post-Arrest Discussions with Zambada-Niebla's lawyers

20.    During the Spring and Summer of 2009, I had several contacts with lawyers who said they represented Zambada-Niebla. At no point did any of them claim that the United States Government had immunized Zambada-Niebla or agreed to withdraw its indictment against him.

21.    On April 3, 2009, I received an email from a "Fernando X. Gaxiola" from the email address "fernando@tucsonlawoffice.com." The subject of his email was "Vicente Zambada Niebla." The text of the email was as follows:

> I am advised by client that there is an interest in communicating on this case with the agents in Mexico. The agents, I am told, desire to discuss some issues regarding extradition and related issues, but they need me to establish contact with you. I have twice left messages in your voice mail without results. Please call me at 520 xxx xxxx or 520 xxx xxxx. The latter number is my cell and it is on 24/7. Gracias.

A copy of that e-mail is attached to this Affidavit as Exhibit A.

22.    At some point thereafter, I believe I had a brief telephone call with Mr. Gaxiola. I recall generally that we discussed his client's cooperation and he also said that his client's wife had been contacted by DEA agents but the agents told her that Mr. Gaxiola needed to speak with the prosecutor first.

23.    I then checked with DEA agents, who reported to me that the cooperating source from San Diego had spoken with Zambada-Niebla's wife to give her my name and number because the family had asked the cooperating source to assist in obtaining a contact name and number for the prosecutor handling Zambada-Niebla's case. The

agents told me that Zambada-Niebla's wife had requested my name and number so that Zambada-Niebla's attorneys could discuss possible cooperation and extradition to the United States with me.

24.     On April 6, 2009, I received an email from "Legal Assistant" at the email address: "LegalAssistant@TucsonLawOffice.com" Fernando X. Gaxiola was "cc"'d on the email. The Subject line was "Engagement letter Vicente Zambada Niebla.pdf." The text was as follows:

> Mr. Hearn -- Attached is the letter of engagement signed by Vicente Zambada Niebla, which we received this weekend. OFAC had requested this letter as part of our license application; we faxed it over to them this morning. Thank you, Tannya.

A copy of that email is attached to this Affidavit as Exhibit B.

25.     The next day, I received another email from the same "Legal Assistant" email address, again copying Mr. Gaxiola. It stated:

> Mr. Hearn -- This morning I spoke with OFAC regarding our application for a license to work with Mr. Vicente Zambada Niebla and they informed me that the processing of the application would take another 45-60 days. Is there any way that you could help us expedite the issuance of this license so that we can more adequately represent Mr. Zambada Niebla in his dealings with the U.S. Attorney's Office and the DEA? Or, do you have any suggestions of steps we can take to push this through the system sooner? Any help would be much appreciated. Thank you, Tannya.

A copy of that email is attached to this Affidavit as Exhibit C. I do not believe I responded to this email.

26.     On April 13, 2009, I received another email from the same "Legal Assistant" email address, again copying Mr. Gaxiola. It stated:

8

> Mr. Hearn -- For your information: attached is the letter we sent today to OFAC with the engagement letter signed by Vicente Zambada Niebla. This same documentation had been sent previously to OFAC via fax, but today we were finally able to send the original. Please feel free to contact me with any questions. Best, Tannya.

A copy of that email is attached to this Affidavit as Exhibit D. I do not believe I responded to this email.

     27.    On April 20, 2009, I received an email from "Fernando X. Gaxiola." It said:

> I expect to meet with Mr. Zambada Niebla soon to discuss the issues surrounding his extradition. His family is under the belief that there is an interest by the US government in expediting his extradition. I have explained to the family that there has been no response to my communications from you, your office or the DEA agents that originally contacted him in Mexico. At their request I am again trying to confirm, or deny, that there is an interest in an expedited process on the part of the United States. Give me a call at my cell at 520 xxx xxxx or respond by email if there is any interest. Your continued non-response, of course, means that there is no such interest. Gracias.

A copy of that email is attached to this Affidavit as Exhibit E. I do not believe I responded to this email.

    28.    On May 29, 2009, I received an email from Jan Ronis. It said:

> Dear Mr. Hearn, I have called you a couple of times regarding the above individual. Mr. Zambada has asked me to represent him in the above matter in which you are the Assistant United States Attorney assigned to the case for prosecution. As you know, Mr. Zambada is presently in custody in Mexico City awaiting extradition proceedings. I would like to speak with you about the matter, specifically to explore whether any resolution could be discussed prior to any ruling on the extradition request. I have attached to this letter a document signed by my client indicating that he has retained me as well as attorney Gretchen von Helms as his attorneys in this matter. I would appreciate you calling me at your earliest convenience. Jan Edward Ronis.

A copy of that email is attached to this Affidavit as Exhibit F.

29.     Thereafter I had a telephone conversation with Mr. Ronis, and we thereafter made plans to meet. In June 2009, Agent Fraga and I met with Mr. Ronis at my offices in Washington D.C. The purpose of the meeting was to meet each other and begin plea negotiations. Mr. Ronis said that Zambada-Niebla was interested in cooperating and waiving extradition. I also recall that Mr. Ronis gave us his view of the applicable Guidelines. We did not ultimately finish our negotiations prior to Zambada-Niebla's extradition. The matter had become complicated by the indictment of Zambada-Niebla in Chicago, which meant that two separate charges had to be dealt with rather than just one.

FURTHER AFFIANT SAYETH NOT.

PATRICK HEARN

Subscribed to and sworn to before
me on November 30, 2011



LaShaun V. Holmes
Notary Public, District of Columbia
My Commission Expires 3/31/2014

10

# EXHIBIT A

**Williamson, Heather (USAILN)**

| | |
|---|---|
| **From:** | Fernando X Gaxiola [fernando@tucsonlawoffice.com] |
| **Sent:** | Friday, April 03, 2009 3:08 PM |
| **To:** | Hearn, Patrick |
| **Subject:** | Vicente Zambada Niebla |

I am advised by client that there is an interest in communicating on this case with the agents in Mexico. The agents, I am told, desire to discuss some issues regarding extradition and related issues, but they need me to establish contact with you.

I have twice left messages in your voice mail without results. Please call me at 520 ▓▓, ▓▓▓ or 520 ▓▓ ▓▓▓. The latter number is my cell and it is on 24/7.

Gracias

1

# **EXHIBIT B**

**Williamson, Heather (USAILN)**

| | |
|---|---|
| **From:** | Legal Assistant [LegalAssistant@TucsonLawOffice.com] |
| **Sent:** | Monday, April 06, 2009 11:24 AM |
| **To:** | Hearn, Patrick |
| **Cc:** | Fernando X Gaxiola |
| **Subject:** | Vicente Zambada Niebla -- Signed Letter of Engagement |
| **Attachments:** | Engagement letter Vicente ZAMBADA NIEBLA.pdf |

Mr. Hearn –

Attached is the letter of engagement signed by Vicente Zambada Niebla, which we received this weekend.  OFAC had requested this letter as part of our license application; we faxed it over to them this morning.

Thank you,
Tannya

LAW OF FERNANDO X. GAXIOLA
3710 S. PARK AVE, STE 702
TUCSON, AZ 85713
(520) ███████

1

# EXHIBIT C

**Williamson, Heather (USAILN)**

| | |
|---|---|
| **From:** | Legal Assistant [LegalAssistant@TucsonLawOffice.com] |
| **Sent:** | Tuesday, April 07, 2009 11:37 AM |
| **To:** | Hearn, Patrick |
| **Cc:** | Fernando X Gaxiola |
| **Subject:** | OFAC License application re: CR 03-034 Vicente ZAMBADA NIEBLA |

Mr. Hearn –

This morning I spoke with OFAC regarding our application for a license to work with Mr. Vicente Zambada Niebla and they informed me that the processing of the application would take another 45-60 days.

Is there any way that you could help us expedite the issuance of this license so that we can more adequately represent Mr. Zambada Niebla in his dealings with the US Attorney's Office and the DEA? Or, do you have any suggestions of steps we can take to push this through the system sooner?

Any help would be much appreciated.

Thank you,
Tannya

LAW OF FERNANDO X. GAXIOLA
3710 S. PARK AVE, STE 702
TUCSON, AZ 85713
(520)█████████

---

**From:** Legal Assistant
**Sent:** Monday, March 23, 2009 12:16 PM
**To:** 'patrick.hearn@usdoj.gov'; 'paul.laymon@usdoj.gov'
**Subject:** OFAC License application re: CR 03-034

Mr. Hearn and Mr. Laymon,

For your information, attached is an application for an OFAC License completed and submitted today by Mr. Fernando X. Gaxiola to represent Vicente Zambada Nieblas in CR 03-034. Please contact our office with questions.

Thank you,

Tannya

1

# EXHIBIT D

**Williamson, Heather (USAILN)**

| | |
|---|---|
| **From:** | Legal Assistant [LegalAssistant@TucsonLawOffice.com] |
| **Sent:** | Monday, April 13, 2009 4:02 PM |
| **To:** | Hearn, Patrick |
| **Cc:** | Fernando X Gaxiola |
| **Subject:** | Additional documentation for OFAC License Application re: Zambada Niebla |
| **Attachments:** | OFAC Application Apr 13 2009 -- Additional docs.pdf |

Mr. Hearn –

For your information: attached is the letter we sent today to OFAC with the engagement letter signed by Vicente Zambada Niebla. This same documentation had been sent previously to OFAC via fax, but today we were finally able to send the original.

Please feel free to contact me with any questions.

Best,
Tannya

LAW OF FERNANDO X. GAXIOLA
3710 S. PARK AVE, STE 702
TUCSON, AZ 85713
(520)▮▮▮▮▮▮▮

1

# **EXHIBIT E**

**Williamson, Heather (USAILN)**

| | |
|---|---|
| **From:** | Fernando X Gaxiola [fernando@tucsonlawoffice.com] |
| **Sent:** | Monday, April 20, 2009 1:47 PM |
| **To:** | Hearn, Patrick |
| **Subject:** | Vicente Zambada Niebla |


     I expect to meet with Mr. Zambada Niebla soon to discuss the issues surrounding his extradition. His family is under the belief that there is an interest by the US government in expediting his extradition. I have explained to the family that there has been no response to my communications from you, your office or the DEA agents that originally contacted him in Mexico.

     At their request I am again trying to confirm, or deny, that there is an interest in an expedited process on the part of the United States.

     Give me a call at my cell at 520 ████████ or respond by email if there is any interest.  Your continued non-response, of course, means that there is no such interest.

     Gracias

# **EXHIBIT F**

**Williamson, Heather (USAILN)**

| | |
|---|---|
| **From:** | Jan Ronis [Jan@ronisandronis.com] |
| **Sent:** | Friday, May 29, 2009 3:41 PM |
| **To:** | Hearn, Patrick |
| **Subject:** | FW: Vincente Zambada |
| **Attachments:** | ZAMBADA-NIEBLA LTR.pdf |

Dear Mr. Hearn,

I have called you a couple of times regarding the above individual. Mr. Zambada has asked me to represent him in the above matter in which you are the Assistant United States Attorney assigned to the case for prosecution. As you know Mr. Zambada is presently in custody in Mexico City awaiting extradition proceedings. I would like to speak with you about the matter, specifically to explore whether any resolution could be discussed prior to any ruling on the extradition request. I have attached to this letter a document signed by my client indicating that he has retained me as well as attorney Gretchen von Helms as his attorneys in the matter. I would appreciate you calling me at your earliest convenience.

Jan Edward Ronis

<<ZAMBADA-NIEBLA LTR.pdf>>

1

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 09 CR 383-3 |
| JESUS VICENTE ZAMBADA-NIEBLA, | ) | |
| a/k/a "Vicente Zambada-Niebla," | ) | Judge Ruben Castillo |
| a/k/a "Vicente Zambada," | ) | |
| a/k/a "Mayito," | ) | |
| a/k/a "30" | ) | |

## DECLARATION OF JULIUS ROTHSTEIN

I, Julius Rothstein, declare and state the following:

### I.    Experience and Training

1.    I am a 1990 graduate of the University of Virginia, and a 1993 graduate of

the Marshall-Wythe School of Law at the College of William and Mary. I entered private

practice after graduating from law school. In 1994, I was appointed an Assistant

Commonwealth's Attorney for the Fairfax (Virginia) Commonwealth's Attorney's

Office. In 1999, I was appointed an Assistant United States Attorney for the District of

Columbia. As an AUSA, I served in the following units: Special Proceedings, Felony

Trial, Grand Jury, Narcotics, and Organized Crime and Narcotics Trafficking. In 2000-

2001, I was detailed as an Associate White House Counsel, in the Office of White House

Counsel. Upon my return to the U.S. Attorney's Office, I assumed a position as a Senior

Assistant United States Attorney in the Organized Crime Narcotics Trafficking Section,

prosecuting the most violent drugs gangs in Washington, D.C.

1

2.      I joined the Narcotics and Dangerous Drugs Section ("NDDS") of the Criminal Division in 2006.  I was assigned to the Special Operations Division as a Trial Attorney.     My  duties  included  coordinating  multi-jurisdictional  and  international narcotics trafficking investigations.

3.      In 2007, I was promoted to Deputy Chief for Litigation at NDDS.  In that position, I supervised 19 Trial Attorneys, and among other duties, I oversaw all litigation matters in the Narcotics and Dangerous Drugs Section.

4.      In March 2011, I joined the Executive Office of the Organized Crime Drug Enforcement Task Forces (OCDETF) in the U.S. Department of Justice.  I was assigned as the first Chief Counsel of the OCDETF Fusion Center.

## II.    United States v. Vincente Zambada-Niebla, 03 CR 034

5.      During my time at NDDS, one of the cases I oversaw as Deputy Chief for Litigation was *United States v. Vincente Zambada - Niebla*, 03 CR 034, which is currently pending in the United States District Court for the District of Columbia (the "District of Columbia case").  Patrick Hearn was the Trial Attorney assigned to the case until he left NDDS in late 2009.  As I recall, three defendants were indicted in the District of Columbia case -- Vincente Zambada-Niebla, Javier Torres-Felix, and Ismael Zambada-Garcia.

6.      I  understand  that  Vincente  Zambada-Niebla  was  arrested  by  the Government of Mexico in approximately March 2009.  At the time of his arrest in March 2009, I understood that the only federal indictment then pending against Zambada-Niebla

2

was the District of Columbia case on which I worked. Later in 2009, I believe Zambada-Niebla was indicted out of the Northern District of Illinois.

7.    I understand that Zambada-Niebla has made a claim in the Chicago litigation that he was provided immunity by unnamed United States government officials. I also understand that Zambada-Niebla has made a claim in the Chicago litigation that unnamed United States government officials agreed to dismiss the indictment pending against him in the District of Columbia.

8.    I am certain that at no point during my time as the head of litigation at NDDS did I ever authorize the granting of immunity to Zambada-Niebla or the dismissal of the indictment against him in the District of Columbia case. Nor could I have.

9.    To provide immunity for any individual or to dismiss an indictment against an individual, there would need to be several levels of approvals. The process would start with a recommendation from the Trial Attorney handling the case. The Trial Attorney could either raise the issue with me directly or raise the issue through his or her immediate assistant deputy chief. Had such a recommendation come to me and I approved it, I would have needed to pass the request to my boss, Paul O'Brien, who was at the time the Chief of NDDS. We would also have needed approvals from the Deputy Assistant Attorney General and, I believe, the Assistant Attorney General.

10.    In the Zambada-Niebla matter, Patrick Hearn did not ever propose to me offering immunity or dismissing the indictment against Zambada-Niebla in exchange for his cooperation. Nor did his immediate assistant deputy at the time, Ron McNeil, ever

raise the issue with me. Had they ever raised the issue of granting immunity or a dismissal of the indictment in the context of setting up an interview with Zambada-Niebla in Mexico, I would have rejected it. Instead, I would have followed the section's standard approach for such interviews. In addition to other details, the defendant would have to agree to surrender himself; he would have to admit his crimes; he would have to admit that he would plead guilty; and then he would have to cooperate pursuant to a formal written cooperation plea agreement in an effort to possibly earn a sentencing reduction -- not immunity or a dismissal of an indictment.

FURTHER DECLARANT SAYETH NOT.

JULIUS ROTHSTEIN

DATE: <u>December 1, 2011</u>

4