1

1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3    UNITED STATES OF AMERICA,                )
                                              )
4                    Plaintiff,               )
                                              )
5        vs.                                  )  No. 09 CR 383-3
                                              )
6    JESUS VICENTE ZAMBADA-NIEBLA, also       )
     known as Vicente Zambada-Niebla,         )
7    also known as Vicente Zambada,           )
     also known as Mayito,                    )
8    also known as 30,                        )  Chicago, Illinois
                                              )  April 3, 2013
9                    Defendant.               )  11:30 o'clock a.m.

10                   TRANSCRIPT OF PROCEEDINGS -
11                        Change of Plea
          BEFORE THE HONORABLE RUBEN CASTILLO
12

13   APPEARANCES:

14   For the Government:      HON. GARY S. SHAPIRO
                              Acting United States Attorney
15                            219 South Dearborn Street, Suite 500
                              Chicago, Illinois  60604
16                            (312) 353-5300
                              BY:  MR. THOMAS D. SHAKESHAFT
17                                 MR. MICHAEL J. FERRARA

18   For the Defendant:       MR. EDWARD S. PANZER
                              111 Broadway
19                            New York, New York  10006
                              (212) 514-5335
20
                              MR. GEORGE L. SANTANGELO
21                            111 Broadway
                              New York, New York  10006
22                            (212) 269-4488

23                            MR. ALVIN S. MICHAELSON
                              1901 Avenue of the Stars, #615
24                            Los Angeles, California  90067
                              (310) 278-4984

25

1

APPEARANCES (Continued):

2

3    For the Defendant:     MR. FERNANDO X. GAXIOLA
                                3710 South 6th Avenue, Suite 3

4                                Tucson, Arizona  85713
                                (520) 628-7898

5

6    Official Interpreter:   Mr. José Piña

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23               COLLEEN M. CONWAY, CSR, RMR, CRR
                  Official Court Reporter

24        219 South Dearborn Street, Room 2144-A
                 Chicago, Illinois  60604

25                 (312) 435-5594
           *colleen_conway@ilnd.uscourts.gov*

```
1              (Proceedings heard in locked courtroom:)
2              THE CLERK:  09 CR 383, United States versus Jesus
3    Zambada-Niebla.
4              THE COURT:  Good morning.
5              (Defendant enters.)
6              MR. SANTANGELO:  Good morning, Your Honor.
7              MR. PANZER:  Good morning, Your Honor.
8              MR. SHAKESHAFT:  Good morning, Your Honor.
9              Tom Shakeshaft and Mike Ferrara on behalf of the
10   United States.
11             MR. PANZER:  Edward S. Panzer, Michael Santangelo,
12   Alvin Michaelson, and Fernando Gaxiola for the defendant, Your
13   Honor.
14             THE COURT:  Okay.  And we're proceeding by way of a
15   written plea agreement?
16             MR. SHAKESHAFT:  We are, Your Honor.
17             MR. PANZER:  Yes.
18             THE COURT:  Let's swear in our interpreter.
19             (Interpreter duly sworn.)
20             THE INTERPRETER:  For the record, Your Honor, José
21   Piña, P-i-n-a, official court interpreter.
22             THE COURT:  Okay.  Thank you, Mr. Piña, for being
23   here.
24             Mr. Zambada-Niebla, the Court understands it's your
25   intention to change your previous "not guilty" plea to one of
```

1    "guilty" pursuant to a plea agreement that your four attorneys
2    have negotiated with the government.

3           This plea agreement, which is 23 pages long, will
4    then govern both your plea as well as your potential sentence
5    by this Court.

6           Before I can accept your change of plea, I need to
7    determine that you're competent to plead at this time; that you
8    have had the assistance of counsel; that you understand your
9    rights to proceed to trial; that you understand the nature of
10   the charge you're pleading guilty to, as well as the potential
11   penalty; that your plea is voluntary; and, finally, that there
12   is a factual basis for your plea.

13          In order to make all these determinations, I need to
14   place you under oath and ask you questions about this matter;
15   but before I do that, I want you to know that at any point if
16   you have any question, you can ask me any question you might
17   have and I will try and answer it for you.  Or you can ask me
18   to stop these proceedings so that you can speak privately to
19   your attorneys.

20          Second, I need to warn you that any false answers to
21   questions that I pose to you could subject you to additional
22   charges for what are known as the crimes of perjury or a false
23   statement and could needlessly aggravate your sentence.  So
24   that's not something I would suggest that you do.

25          Finally, when we talk about the facts of this case,

1     you're going to be waiving your constitutional right not to

2     testify against yourself, and some of your answers may be

3     incriminating, and certainly you will have to admit your guilt

4     here in open court before I could ever accept your plea.

5                 Do you understand what I have told you so far?

6                 THE DEFENDANT (through interpreter):  Yes, Your

7     Honor.

8                 THE COURT:  Okay.  Then we will swear you in.

9                 THE CLERK:  Raise your right hand.

10         (Defendant duly sworn through interpreter.)

11                THE COURT:  Mr. Zambada-Niebla, how far did you go in

12    school?

13                THE DEFENDANT (through interpreter):  Through prep.

14                THE COURT:  And did you -- were you ever employed --

15    outside of whatever you did for your family, did you ever hold

16    any type of job?

17                THE DEFENDANT (through interpreter):  Yes, Your

18    Honor.

19                THE COURT:  What type of work did you do, sir?

20                THE DEFENDANT (through interpreter):  Farming and

21    cattle raising, and I worked at a company belonging to my

22    mother.

23                THE COURT:  Okay.  Are you in good health at this

24    time?

25                THE DEFENDANT (through interpreter):  Yes, Your

1    Honor.

2            THE COURT:  Have you taken any drugs or alcoholic

3    beverages within the last 24 hours?

4            THE DEFENDANT (through interpreter):  No, Your Honor.

5            THE COURT:  Have you taken any type of medicine,

6    prescription medicine or otherwise, within the last 24 hours?

7            THE DEFENDANT (through interpreter):  No, Your Honor.

8            THE COURT:  Have you ever been under the care of a

9    doctor or in a hospital for the treatment of a mental

10   condition?

11           THE DEFENDANT (through interpreter):  No, Your Honor.

12           THE COURT:  Counsel for Mr. Zambada-Niebla, do any of

13   you have any doubt as to whether or not Mr. Zambada-Niebla is

14   competent?

15           MR. PANZER:  We've spoken to him numerous times.  I

16   don't know how many.  25, 50.  As far as we're concerned, I'm

17   concerned, he's competent, Your Honor.

18           THE COURT:  Okay.  And, Mr. Shakeshaft, during the

19   government's intensive investigation of Mr. Zambada-Niebla,

20   have you uncovered any evidence to indicate there is any

21   question as to his competence?

22           MR. SHAKESHAFT:  We have not, Your Honor.

23           THE COURT:  Then the Court finds that

24   Mr. Zambada-Niebla is fully competent to proceed with a change

25   of plea.

1          Now, Mr. Zambada-Niebla, you've had four attorneys

2    representing you actively in this case.  Have you had enough

3    time to talk to all of them?

4          THE DEFENDANT (through interpreter):  Yes, Your

5    Honor.

6          THE COURT:  Have you told your attorneys everything

7    you know about this case?

8          THE DEFENDANT (through interpreter):  Yes, Your

9    Honor.

10          THE COURT:  Are you satisfied with the advice and

11    efforts of your attorneys on your behalf?

12          THE DEFENDANT (through interpreter):  Completely,

13    Your Honor.

14          THE COURT:  Okay.  I am now going to change topics

15    and talk about the charge to which you are pleading guilty to.

16          The third superseding indictment charges you with

17    conspiracy to possess with intent to distribute and to

18    distribute controlled substances in violation of federal law,

19    namely, cocaine.

20          The plea agreement indicates that you would plead

21    guilty to one of those charges, namely, Count 1, which charges

22    you with conspiracy to distribute controlled substances.

23          Do you understand that that's what you're pleading

24    guilty to?

25          THE DEFENDANT (through interpreter):  Yes, Your

1    Honor.

2             THE COURT:  With regard to that charge, I am now

3    going to explain to you the maximum penalties that could apply

4    to that charge.  Because of the quantity of cocaine that will

5    be taken into account, the maximum sentence is life

6    imprisonment.  There is a mandatory minimum sentence of 10

7    years pursuant to federal law.

8             Do you understand that those are the penalties that

9    you would face in pleading guilty to this charge?

10            THE DEFENDANT (through interpreter):  Yes, Your

11   Honor.

12            THE COURT:  This charge also carries a maximum fine

13   of $4 million or twice the gross profits or other proceeds from

14   the offense.

15            Do you understand that?

16            THE DEFENDANT (through interpreter):  Yes, Your

17   Honor.

18            THE COURT:  Finally, I could also -- after your

19   sentence is completed, I could place you on what's called

20   supervised release for anywhere from five years to the rest of

21   your life.

22            Do you understand that?

23            THE DEFENDANT (through interpreter):  Yes, Your

24   Honor.

25            THE COURT:  And that is just what it sounds like.

1    You're released from custody, but your behavior is monitored.
2    And if you commit any violations of the conditions of your
3    supervised release during that period of time, you could be
4    reincarcerated.
5              Do you understand that?
6              THE DEFENDANT (through interpreter):  Yes, Your
7    Honor.
8              THE COURT:  Now, your sentence will also be evaluated
9    under what are known as the advisory sentencing guidelines.
10   These, I am sure, as your attorneys have tried to explain to
11   you, are a series of federal laws that judges look at to
12   determine a potential sentence for you.  They are not
13   mandatory.  They are advisory.  But in the first instance, I
14   would look at your role in this offense, how this offense was
15   carried out.  I would look at the quantity of drugs involved in
16   this case and then I would look at reductions that you would be
17   entitled to under the guidelines, reductions for pleading
18   guilty.  And, finally, I would look at cooperation in
19   determining a fair sentence for you.
20             Right now, because you are not known to have any
21   criminal history points, you're in the lowest criminal history
22   category, which is the last thing the guidelines look at, your
23   prior criminal history, but because the anticipated offense
24   level is 51 under the advisory sentencing guidelines, that
25   results in an advisory sentencing guideline range of life

1   imprisonment.

2         Do you understand that?

3         THE DEFENDANT (through interpreter):  Yes, Your

4   Honor.

5         THE COURT:  Now, importantly in this plea agreement,

6   in paragraph 11, you're agreeing to fully and truthfully

7   cooperate in any matter in which you're called upon to

8   cooperate by a representative of the United States Attorney's

9   Office for the Northern District of Illinois.  This includes

10  complete and truthful information in any investigation and

11  pretrial preparation and complete and truthful testimony in any

12  criminal, civil, or administrative proceeding.

13        You're also agreeing to postpone your sentencing

14  until the conclusion of your cooperation.

15        In return, the government at the time of your

16  sentencing will make known to me the extent of your

17  cooperation.  And if the government determines that you have

18  fully and truthfully cooperated, as required by this agreement,

19  they will file a motion under the advisory sentencing

20  guidelines that would allow me to depart downward from the low

21  end of the applicable guideline range.

22        It says in this agreement, at paragraph 12, that you

23  understand that the decision to depart from the advisory

24  guideline range rests solely with the Court, and it also says

25  that you further understand that the government reserves the

11

1    right to make whatever recommendation it deems appropriate

2    regarding the extent of any downward departure.

3            You will be free, through your attorneys, to

4    recommend to the Court that I impose any sentence within the

5    statutory minimum and maximum penalties.

6            Do you understand all of that?

7            THE DEFENDANT (through interpreter):  Yes, Your

8    Honor.

9            THE COURT:  You also are agreeing, in paragraph 13,

10   not to withdraw your guilty plea or to seek to withdraw your

11   guilty plea because the government fails to make a motion that

12   would allow me to depart from the low end of the advisory

13   sentencing guideline range or under federal law.

14           Now, is this going to be also a potential motion that

15   would allow me to sentence Mr. Zambada-Niebla to less than ten

16   years or not?

17           MR. SHAKESHAFT:  No, Your Honor.

18           THE COURT:  Okay.

19           MR. SHAKESHAFT:  The understanding is that it's -- it

20   was a 5K, but the 5K would not go below the ten-year cap.

21           THE COURT:  Okay.

22           MR. SHAKESHAFT:  Or the ten-year floor.

23           THE COURT:  Okay.  Now, do you understand that,

24   Mr. Zambada-Niebla?

25           THE DEFENDANT (through interpreter):  Yes, Your

1    Honor.

2              THE COURT:  So the lowest potential sentence you

3    could ever get under federal law with your cooperation is ten

4    years.

5              Do you understand that?

6              THE DEFENDANT (through interpreter):  Yes, Your

7    Honor.

8              THE COURT:  And the highest sentence you could ever

9    receive from this Court is a sentence of life imprisonment.

10             Do you understand that?

11             THE DEFENDANT (through interpreter):  Yes, Your

12   Honor.

13             THE COURT:  And I want you to understand that any

14   promises or predictions as to what your sentence will be cannot

15   be accurate or binding.

16             First of all, they cannot be binding because they are

17   not in this plea agreement.  Anything that would bind the

18   government or this Court has to be in this 23-page plea

19   agreement to be a valid, binding promise.

20             Do you understand that?

21             THE DEFENDANT (through interpreter):  Yes, Your

22   Honor.

23             THE COURT:  And any predictions as to what your

24   sentence will be, it's hard to predict because, as I sit here

25   right now, as the person that will be responsible for

1    sentencing you, I don't know what your sentence is going to be

2    because I simply, even at this point, even though I have

3    presided over your case, I don't know enough about you or about

4    the facts of this case, and I won't until I get a report from

5    the Probation Office about you and the facts of this case, and

6    then I hear from the government as to what they have to say

7    about your cooperation and then I hear from your attorneys,

8    whatever they think is important for me to understand and know

9    about you, before I sentence you.

10          Until I have all that information, I don't know what

11   your sentence will be.  Do you understand that?

12          THE DEFENDANT (through interpreter):  Yes, Your

13   Honor.

14          THE COURT:  Do you have any questions about your

15   potential sentence that I might be able to answer for you?

16          THE DEFENDANT (through interpreter):  No, Your Honor.

17          THE COURT:  Okay.  Two other things.  One, I am going

18   to be required to assess you $100 at the time of your

19   sentencing.

20          Secondly, you are agreeing, in paragraph 17, to a

21   forfeiture to the United States of funds in the amount of

22   $1,373,415,000.

23          Do you understand that?

24          THE DEFENDANT (through interpreter):  Yes, Your

25   Honor.

```
1              MR. SANTANGELO:  Your Honor, please?

2              THE COURT:  Yes.

3              MR. SANTANGELO:  One second.

4              THE COURT:  Absolutely.

5         (Counsel conferring.)

6              MR. PANZER:  Judge, I just wanted to raise a

7    technical matter.

8              THE COURT:  Yes.

9              MR. PANZER:  The actual plea agreement says he will

10   not contest the forfeiture.

11             THE COURT:  Okay.

12             MR. PANZER:  That's what the agreement says.  It

13   doesn't -- says he agrees he will not contest.

14             THE COURT:  I got it.  Okay.  And my court reporter

15   reminds me, I don't think I had everybody state their name for

16   the record, so let's do that just individually so that we can

17   get a good record.

18             MR. PANZER:  Edward S. Panzer.

19             THE COURT:  Okay.  Everybody else?

20             MR. MICHAELSON:  Alvin Michaelson, Your Honor.

21             Good morning.

22             THE COURT:  Good morning.

23             MR. SANTANGELO:  George Santangelo.

24             THE COURT:  Good morning.

25             MR. GAXIOLA:  Fernando Gaxiola.
```

1          THE COURT:  Good morning.

2          MR. GAXIOLA:  Good morning.

3          MR. SANTANGELO:  Good morning, Your Honor.

4          THE COURT REPORTER:  Thank you.

5          THE COURT:  Okay.  So what you are doing,

6    Mr. Zambada-Niebla, is agreeing not to contest the forfeiture

7    that the government will seek of $1,373,415,000, and that's

8    specified in paragraph 18 that you will not contest the entry

9    of a forfeiture judgment in that amount.

10          Do you understand that?

11          THE DEFENDANT (through interpreter):  Yes, Your

12   Honor.

13          THE COURT:  Okay.  Finally, one other thing that I

14   did not indicate.

15          After you have been sentenced -- this is paragraph

16   16 -- the government will move to dismiss the remaining count

17   of the third superseding indictment, which I think is Count 2.

18          Do you understand that?  That is part of the

19   agreement.

20          THE DEFENDANT (through interpreter):  Yes, Your

21   Honor.

22          THE COURT:  Okay.  Now what I am going to do is

23   explain your trial rights to you.  Because, Mr. Zambada-Niebla,

24   if you plead guilty here this morning, you are not going to

25   proceed to trial and you need to know what you're giving up in

1    order to make an intelligent and voluntary decision.

2          Under federal law, your trial could proceed in one of

3    two fashions.  It could be a bench trial where I decide if the

4    government has proven your guilt beyond a reasonable doubt, or

5    it could be a jury trial.

6          In order to get a bench trial, that is, where I

7    decide if you're guilty or not guilty, you would have to

8    request a bench trial.  The government would have to agree to

9    let me decide your case, and I also would have to agree that I

10   would be willing to decide your case.  If all three parties,

11   you, the government, and I, do not agree on a bench trial, you

12   do not have an absolute right to a bench trial.

13         Do you understand that?

14         THE DEFENDANT (through interpreter):  Yes, Your

15   Honor.

16         THE COURT:  On the other hand, you do have an

17   absolute right to a jury trial.

18         In a jury trial, what we would do is gather citizens

19   from throughout this federal district to serve on your jury.

20   And what would happen is I would question all of the potential

21   jurors to make sure that they could be fair and impartial in

22   deciding your case in accordance with three basic principles of

23   American criminal law.  The first is that you're presumed to be

24   innocent.  It doesn't matter that the government has secured

25   these charges against you.  The second is that the government

1    has the burden of proving your guilt beyond a reasonable doubt.

2    The third is that you have no burden whatsoever.  You don't

3    have to testify or present a defense case at all, and I would

4    tell the prospective jurors that they could not somehow infer

5    that you were guilty by your failure to present a defense case,

6    including your own testimony.

7          Once I question all the prospective jurors about

8    these principles, and excuse any prospective jurors that I

9    thought were not going to be fair to you, it is at that point

10   that your attorneys would have the right to excuse as many as

11   ten of the remaining jurors for whatever reason you saw fit as

12   long as you didn't discriminate against any one group of

13   jurors.

14         So you get to actively participate, Mr.

15   Zambada-Niebla, in the selection of the jury.  Do you

16   understand that?

17         THE DEFENDANT (through interpreter):  Yes, Your

18   Honor.

19         THE COURT:  Once the jury is selected, we'd then

20   proceed with the more formal aspects of a trial.  The attorneys

21   could give opening statements to the jury, outlining their

22   initial positions.  Then the government would proceed first

23   with the evidence, because they have the burden of proof.  They

24   would call witnesses to the witness stand.  Your attorneys

25   could question or cross-examine the government's witnesses.

1    Your attorneys could also object to any of the government's

2    evidence, and I would rule on those objections by applying the

3    Rules of Evidence.

4           Once the government rested their case, if I determine

5    there was enough evidence to proceed to an actual jury verdict,

6    it is at that point that you have the right, but not the

7    obligation, to proceed with a defense case.  But if you wanted

8    to proceed with a defense case, I would let you use the

9    subpoena power of this court to obtain any witnesses or

10    evidence that might be favorable to your defense.

11           Once the jury had heard all the evidence and the

12    final arguments of the attorneys, I would then instruct them on

13    the law that applied to the case.

14           And importantly, I just want to highlight two jury

15    instructions for you.  One, I would tell the jury that their

16    verdict would have to be unanimous.  That is, all twelve jurors

17    would have to agree before they could find you not guilty or

18    guilty.

19           Secondly, even though you have been charged with

20    other individuals, I would tell the jury that group decisions

21    are not appropriate and, instead, they would have to make an

22    individualized decision as to how the evidence related to your

23    guilt or innocence.

24           Now, Mr. Zambada-Niebla, even if you went to trial

25    and were found guilty by way of a unanimous jury verdict, you

1    would have a right to appeal not only the verdict, but all the

2    rulings that I made before, during, and after the trial.

3                    But if you plead guilty here this morning, there is

4    not going to be a trial for you and you are waiving your rights

5    to a trial.  Do you understand that?

6                    THE DEFENDANT (through interpreter):  Yes, Your

7    Honor.

8                    THE COURT:  Knowing all that I have told you, is it

9    your desire to waive your trial rights in this case?

10                   THE DEFENDANT (through interpreter):  Yes, Your

11   Honor.

12                   THE COURT:  Has anyone forced you in any way to plead

13   guilty?

14                   THE DEFENDANT (through interpreter):  No, Your Honor.

15                   THE COURT:  Has anyone threatened you in any way to

16   get you to plead guilty?

17                   THE DEFENDANT (through interpreter):  No, Your Honor.

18                   THE COURT:  Is your decision to plead guilty entirely

19   voluntary on your part?

20                   THE DEFENDANT (through interpreter):  Yes, Your

21   Honor.

22                   THE COURT:  And you understand that what you are

23   doing here this morning is difficult to take back.  The law

24   makes it difficult to take back a guilty plea that's been

25   freely given in open court.  Do you understand that?

1    THE DEFENDANT (through interpreter):  Yes, Your
2    Honor.
3    THE COURT:  For example, if, once I sentence you, you
4    are unhappy with the sentence, that will not be enough of a
5    reason to seek to take back this guilty plea.
6    Do you understand that?
7    THE DEFENDANT (through interpreter):  Yes, Your
8    Honor.
9    THE COURT:  Now, in reviewing a copy of this plea
10   agreement, in paragraph -- let's see -- 22(b), you're also
11   giving up your rights to certain appellate issues other than
12   the appellate issues that might have been available if you went
13   to trial.  You are also giving up your right to appeal the
14   sentence which is allowed under the advisory sentencing
15   guidelines.
16   If the government files a motion for a downward
17   departure under the sentencing guidelines, you're giving up
18   your right to appeal the sentence that I impose.
19   Do you understand that?
20   THE DEFENDANT (through interpreter):  Yes, Your
21   Honor.
22   THE COURT:  Then sometimes as much as a year after
23   somebody starts serving a sentence, they can bring what's
24   called a collateral attack by filing a motion under federal law
25   with the Court, but, again, you're giving up your right to do

1  that if the government files a motion for a downward departure

2  under the sentencing guidelines.

3          Do you understand that?

4          THE DEFENDANT (through interpreter):  Yes, Your

5  Honor.

6          THE COURT:  But you're not giving up your right to

7  somehow claim that your plea was involuntary or you did not

8  receive effective assistance of counsel in negotiating this

9  plea.

10          Do you understand that?

11          THE DEFENDANT (through interpreter):  Yes, Your

12  Honor.

13          THE COURT:  Now, I have been asking you a lot of

14  questions about this written plea agreement.  I am going to

15  show you, by moving it closer to you, the last page of this

16  plea agreement, which is page 23, and my question, once it gets

17  closer to you, is simply this:  Is that your signature on page

18  23?

19          THE DEFENDANT (through interpreter):  Yes, Your

20  Honor, it is my signature.

21          THE COURT:  And did you sign this document after

22  going over it with your attorneys?

23          THE DEFENDANT (through interpreter):  Yes, Your

24  Honor.

25          THE COURT:  Do you have any question about any aspect

1    of this 23-page plea agreement that I might be able to try and

2    answer for you, Mr. Zambada-Niebla?

3              THE DEFENDANT (through interpreter):  No, Your Honor.

4    I'm in agreement with everything.

5              THE COURT:  Okay.  And apart from this plea

6    agreement, have any promises been made to you to get you to

7    plead guilty?

8              THE DEFENDANT (through interpreter):  No, Your Honor.

9              THE COURT:  And you understand that if somebody made

10   any kind of promise like that, but it's not in this 23-page

11   plea agreement, it's not going to be valid or binding?  Do you

12   understand that?

13             THE DEFENDANT (through interpreter):  Yes, Your

14   Honor.

15             THE COURT:  Okay.  We are now going to get to the

16   facts of this case, and what's going to happen is I am going to

17   ask the government's prosecutor to summarize what the evidence

18   would be on the charge that you are pleading guilty to.

19             Pay close attention to the summary, because at the

20   end of the summary, I am going to ask you if it's accurate or

21   if you wish to disagree with any part of the summary.

22             The government may proceed.  Mr. Shakeshaft.

23             MR. SHAKESHAFT:  Thank you, Your Honor.

24             The evidence would show that beginning no later than

25   in or about May of 2005 and continuing until at least on or

1    about December 1st of 2008, in Chicago, in the Northern

2    District of Illinois, and elsewhere, the defendant, Vicente

3    Zambada-Niebla, who's also known as "Vicente Zambada-Niebla"

4    and "Vicente Zambada," "Mayito," and "30," conspired with

5    Joaquin Guzman-Loera, who's also known as "El Chapo," "Chapo

6    Guzman;" Ismael Zambada-Garcia, also known as "El Mayo," "Mayo

7    Zambada;" Alfredo Guzman-Salazar, who's also known as

8    "Alfredillo;" Alfredo Vasquez-Hernandez, also known as "Alfredo

9    Compadre;" Juan Guzman-Rocha, also known as "Juancho;" German

10   Olivares; Felipe Cabrera-Sarabia; Tomas Arevalo-Renteria; Pedro

11   Flores and Margarito Flores; and with others known and unknown,

12   to knowingly and intentionally possess with intent to

13   distribute and to distribute controlled substances, namely,

14   five kilograms or more of mixtures and substances containing

15   cocaine and one kilogram or more of mixtures and substances

16   containing heroin, in violation of Title 21, United States

17   Code, Section 846.

18         The defendant has -- admits in the plea agreement

19   that he committed the offense that's charged in Count 1 of the

20   indictment.

21         Specifically, the evidence would show that between

22   approximately May 2005 and December 1st of 2008, Defendant

23   Zambada-Niebla was a member of a cocaine and heroin

24   drug-trafficking organization in Mexico commonly known to its

25   members and its associates, and to the public, as the Sinaloa

1  Cartel.

2  During this period, the leaders of the Sinaloa Cartel
3  included Joaquin Guzman-Loera, known to Zambada-Niebla as
4  "Chapo" or "Chapo Guzman," and Zambada-Niebla's father, Ismael
5  Zambada-Garcia, also known as "Mayo" or "Mayo Zambada."

6  The Defendant Zambada-Niebla was a high-level member
7  of the Sinaloa Cartel and of the faction of the cartel
8  controlled by his father, Mayo Zambada.

9  Zambada-Niebla was responsible for many aspects of
10  the cartel's operations, both independently and as a trusted
11  lieutenant for his father.

12  Zambada-Niebla acted, among other things, as a
13  surrogate for his father in sending and receiving messages
14  related to the cartel's operations and as a logistical
15  coordinator for his father.

16  Zambada-Niebla, at times, coordinated deliveries of
17  multi-kilogram quantities of cocaine from Central and South
18  America into Mexico for further distribution into the United
19  States.

20  Zambada-Niebla was also aware of the cartel's
21  distribution of wholesale quantities of heroin in Chicago.  On
22  at least one occasion, defendant facilitated the distribution
23  of wholesale quantities of heroin in Chicago by inquiring about
24  payment for it.

25  Zambada-Niebla was aware of and benefited from

1   deliveries of bulk quantities of United States currency from
2   customers in the United States to the Sinaloa Cartel in Mexico.
3          At other times, Zambada-Niebla assumed the role of
4   coordinator and messenger for his father, knowing of the
5   cartel's business and with the intent to make its purpose --
6   the distribution of narcotics into the United States --
7   succeed.
8          As part of Defendant Zambada-Niebla's participation
9   in the cartel's business, Zambada-Niebla was aware of, and
10  frequently participated directly in, coordinating the cartel's
11  narcotics-trafficking activities.  At times during this period,
12  Zambada-Niebla assisted in coordinating the importation of
13  multi-ton quantities of cocaine from Central and South American
14  countries, including Colombia and Panama, into the interior of
15  Mexico.
16         Zambada-Niebla, at times, facilitated the unloading
17  of multi-ton shipments of cocaine in Mexico, and facilitated
18  the transportation and storage of these shipments within
19  Mexico.
20         Zambada-Niebla subsequently assisted in coordinating
21  the delivery of cocaine to wholesale distributors in Mexico,
22  knowing that these distributors would, in turn, smuggle
23  multi-ton quantities of cocaine, generally in shipments of
24  hundreds of kilos at a time, as well as, on at least one
25  occasion, multi-kilogram quantities of heroin, from Mexico

1    across the United States border, and then into and throughout
2    the United States, including Chicago.

3              On most occasions, the Sinaloa Cartel supplied this
4    cocaine and, on occasion, heroin to the wholesalers on
5    consignment, without payment at the time of delivery.

6              Among the cocaine and heroin distributors of the
7    Sinaloa Cartel were Pedro and Margarito Flores, whom
8    Zambada-Niebla knew distributed multi-ton quantities of cocaine
9    and multi-kilogram quantities of heroin in Chicago and, in
10   turn, sent payment for those drugs to members of the Sinaloa
11   Cartel, including Chapo Guzman, Mayo Zambada, and
12   Zambada-Niebla, among others.

13             Zambada-Niebla was aware, because of his position
14   within the cartel, that the Sinaloa Cartel obtained and then
15   sold multi-ton quantities of cocaine for distribution in the
16   United States on a monthly, if not weekly, basis between 2005
17   and 2008.

18             Zambada-Niebla is aware that Guzman-Loera,
19   Zambada-Garcia, and factions of the Sinaloa Cartel controlled
20   by them, coordinated their narcotics-trafficking activities to
21   import multi-ton quantities of cocaine from Central and South
22   American countries, including Colombia and Panama, to the
23   interior of Mexico, using various means, including, but not
24   limited to, aircraft, private aircraft, submarines and other
25   submersible and semi-submersible vessels, container ships,

1    go-fast boats, fishing vessels, buses, railcars,

2    tractor-trailers, and automobiles.

3           Zambada-Niebla was likewise aware and, at times,

4    directly participated in facilitating the activity of members

5    and associates of the Sinaloa Cartel in transporting and

6    causing to be transported large quantities of cash narcotics

7    proceeds from locations within the United States to locations

8    in Mexico in payment for the narcotics supplied by the Sinaloa

9    Cartel.

10          As part of the cartel's business, Zambada-Niebla was

11   aware that the cartel maintained stash houses or offices in,

12   among many others, Culiacan, Sinaloa, Mexico; Mexicali, Baja

13   California, Mexico; and Ciudad Juarez, Chihuahua, Mexico.

14   These stash houses were used for the storage of drugs, cash,

15   and weapons on behalf of the cartel.

16          Zambada-Niebla is aware that his father has been

17   among the leaders of the Sinaloa Cartel since the 1970s.

18          Zambada-Niebla acknowledges that his principal

19   livelihood was derived from his and his father's sale of

20   controlled substances in the United States.

21          Zambada-Niebla admits that both he and his father, as

22   well as other members of the Sinaloa Cartel, were protected by

23   the ubiquitous presence of weapons.  Zambada-Niebla himself had

24   constant bodyguards who possessed numerous military-caliber

25   weapons.  Zambada-Niebla was likewise aware that his father and

1    Chapo Guzman were similarly protected.

2              Zambada-Niebla also participated, directly and at the

3    direction of Mayo Zambada, in the paying of bribes to Mexican

4    law enforcement to promote the Sinaloa Cartel's

5    narcotics-trafficking business.  On multiple occasions,

6    Zambada-Niebla arranged for the payment of bribes to state --

7    local, state, and federal law enforcement officials in the

8    Mexican government for the purpose of facilitating the Sinaloa

9    Cartel's narcotics-trafficking business.

10             Zambada-Niebla was also aware that the Sinaloa Cartel

11   used violence and made credible threats of violence both to

12   rival cartels and to law enforcement within the Mexican

13   government for the purpose of facilitating the Sinaloa Cartel's

14   narcotics-trafficking business.

15             That is a summary, Your Honor, of what the evidence

16   would show, and the government suggests that that is a factual

17   basis for the plea of guilty.

18             THE COURT:  Okay.  I know, Mr. Zambada-Niebla, that

19   the summary was long.  I also know it was read word for word

20   from the plea agreement.

21             Do you agree with the summary?

22             THE DEFENDANT (through interpreter):  Yes, Your

23   Honor.

24             THE COURT:  Do you wish to disagree with any part of

25   the summary at this point in time?

1    THE DEFENDANT (through interpreter):  No, Your Honor.

2    THE COURT:  And did you participate in the conspiracy

3    that Mr. Shakeshaft outlined here in court to ship five

4    kilograms or more of cocaine and one kilogram or more of heroin

5    to the United States?

6    THE DEFENDANT (through interpreter):  Yes, Your

7    Honor.

8    THE COURT:  And I only have one question left, which

9    is:  What is your plea to Count 1 of the third superseding

10   indictment in this case, guilty or not guilty?

11   THE DEFENDANT (through interpreter):  Guilty, Your

12   Honor.

13   THE COURT:  Since you acknowledge that you are, in

14   fact, guilty, as charged in Count 1, and you have freely waived

15   your trial rights, you have had the assistance of multiple

16   competent and experienced counsel, you know what the maximum

17   possible punishment is, I find that you are knowingly,

18   intelligently, and voluntarily pleading guilty; will accept

19   your plea of guilty to Count 1 of the third superseding

20   indictment.

21   Should we defer the ordering of a presentence

22   investigation?

23   MR. SHAKESHAFT:  That would be our recommendation,

24   Your Honor --

25   THE COURT:  Okay.

1     MR. PANZER:  We join --

2     MR. SHAKESHAFT:  -- in light of the --

3     MR. PANZER:  I'm sorry.  We join in that application.

4     THE COURT:  Okay.

5     MR. SHAKESHAFT:  In light of his agreement to

6 postpone sentencing --

7     THE COURT:  Okay.

8     MR. SHAKESHAFT:  -- until the cooperation is --

9     THE COURT:  We will defer for right now,

10 Mr. Zambada-Niebla, the preparation of this report that will be

11 prepared by a United States Probation officer, but at some

12 point when we get closer to your sentencing, this report is

13 going to be prepared.

14     I would encourage you to cooperate in the preparation

15 of this report, which will be your opportunity to explain to

16 the Court how this all came about, so that I can fashion a fair

17 sentence for you.  And we will defer sentencing.

18     Is there anything else we need to take care of at

19 this time?

20     MR. SHAKESHAFT:  There are a couple of things, Your

21 Honor.

22     THE COURT:  Sure.

23     MR. SHAKESHAFT:  It's my understanding from speaking

24 with counsel that they were planning on making a motion to seal

25 both this plea agreement as well as the proceedings today.

1          THE COURT:  Okay.

2          MR. SHAKESHAFT:  The government does not oppose that

3     at this time.

4          MR. PANZER:  That's true, Your Honor.

5          THE COURT:  Okay.

6          MR. SHAKESHAFT:  And I won't speak for counsel, but I

7     know that Mr. Zambada is aware that at some point in time, this

8     plea agreement as well as this transcript are likely to become

9     public.  But in light of his ongoing cooperation, we don't

10    oppose keeping it or having it sealed at this time, if Your

11    Honor --

12         THE COURT:  Well, right now, I will seal it.  I would

13    not be surprised if there are going to be multiple applications

14    to unseal, but I will await when those are filed.  But for

15    right now, we will seal it --

16         MR. PANZER:  I just want to --

17         THE COURT:  -- in view of safety concerns.

18         MR. SHAKESHAFT:  That's right, Your Honor.

19         MR. PANZER:  That's what I was going to say.

20         THE COURT:  Okay.

21         MR. PANZER:  There are serious safety concerns --

22         THE COURT:  Sure.

23         MR. PANZER:  -- in this case, and --

24         THE COURT:  I appreciate that.

25         MR. PANZER:  -- our application has merit to have it

1     sealed.

2              THE COURT:  Okay.  Anything else?

3         (Counsel conferring.)

4              MR. SHAKESHAFT:  I believe that's it, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              MR. SHAKESHAFT:  Thank you.

7              MR. PANZER:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9         (Proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    C E R T I F I C A T E

2

3

4

5            I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    Change of Plea proceedings had in the above-entitled case

8    before the HONORABLE RUBEN CASTILLO, one of the Judges of said

9    Court, at Chicago, Illinois, on April 3, 2013.

10

11

12        _/s/ Colleen M. Conway, CSR,RMR,CRR_        _04/10/14_

13           Official Court Reporter              Date
             United States District Court
14           Northern District of Illinois
                 Eastern Division
15

16

17

18

19

20

21

22

23

24

25

Colleen M. Conway, Official Court Reporter