UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No.   09 CR 383 |
|              v. | 18 CR 484 |
| VICENTE ZAMBADA NIEBLA | Chief Judge Ruben Castillo |

**GOVERNMENT'S SENTENCING MEMORANDUM AND**
**MOTION TO DEPART FROM THE APPLICABLE GUIDELINE RANGE**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

I.    Introduction ..................................................................................................... 1

II.   Procedural Background .................................................................................... 2

III.  The Offense Conduct ....................................................................................... 4

IV.   Objections to the PSR ..................................................................................... 5

V.    Defendant's Cooperation and the Government's Motion to Depart from the Applicable Guidelines Range ........................................................................... 5

VI.   Analysis of the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a).............. 11

VII.  Government's Sentencing Recommendation.................................................... 20

## TABLE OF AUTHORITIES

### CASES

*United States v. Bautista*, 258 F.3d 602 (7th Cir. 2001) ............................................ 16

*United States v. Guzman Loera,* 09-CR-466 (J. Cogan, EDNY) ................................ 13

*United States v. Pressley*, 345 F.3d 1205 (7th Cir. 2003) ........................................... 16

### STATUTES

18 U.S.C. § 3553(a) ........................................................................................ *passim*

21 U.S.C. § 846 ......................................................................................................... 3

21 U.S.C. § 959 ......................................................................................................... 3

21 U.S.C. § 960 ......................................................................................................... 3

21 U.S.C. § 963 ......................................................................................................... 3

### RULES

Fed. R. Crim. P. 20 ................................................................................................... 3

USSG § 5K1.1 ............................................................................................... 1, 5, 17

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following sentencing memorandum and motion to depart from the applicable Guideline range pursuant to USSG § 5K1.1 and 18 U.S.C. § 3553(a) with respect to defendant Vicente Zambada Niebla.

## I.  <u>Introduction</u>

At the height of his drug trafficking career, Vicente Zambada Niebla conspired with other Sinaloa Cartel leaders to import and distribute ton quantities of illegal drugs into the United States.  As the son of Sinaloa Cartel leader Ismael Zambada Garcia ("Mayo"), the defendant held a unique position within the cartel. Between approximately 1996 and 2008, the defendant oversaw massive shipments of narcotics from Central and South America into Mexico and eventually into the United States, and also oversaw the corresponding transfer of narcotics proceeds back to Mexico. But in addition, he also at times served as a key proxy for his father and was involved in making significant decisions for the cartel, including decisions regarding security and violence.

Yet in the years before his 2009 arrest, the defendant attempted to leave the drug trafficking life into which he had been born. He relocated with his family to Europe and Canada, only to be pulled back to Mexico to live and work under his father's umbrella for safety reasons. Eventually, the defendant reached out to the DEA in an effort to resolve his pending federal criminal case in the U.S. District Court for the District of Columbia and leave his cartel life behind. Shortly thereafter, the

defendant was arrested by Mexican authorities, and approximately one year later, was extradited to the United States on charges arising in this district and in D.C.

After his uncontested extradition, in approximately late 2011, the defendant began cooperating with the government, and his cooperation has been extraordinary. The defendant's cooperation has targeted the leadership of the Sinaloa Cartel and one of its rivals, the Beltran Leyva Organization (the "BLO"), cooperation that culminated in the charging of dozens of high-level targets and hundreds of their associates in indictments throughout the country. Defendant has consistently and truthfully provided information to the government for years, and most recently provided testimony at the trial of Sinaloa Cartel leader Joaquin Guzman Loera ("Chapo") in Brooklyn, New York. As explained in further detail below, the defendant's unrivaled cooperation with the government sufficiently offsets his considerable criminal culpability to such a degree that the government recommends that the Court impose a sentence of 17 years' imprisonment.

## II.   **Procedural Background**

In March 2009, Mexican authorities arrested the defendant, who, at that time, was under indictment in case number 03 CR 34-3 in the U.S. District Court for the District of Columbia, the case underlying the 18 CR 484 case now before this Court (the "D.C. case"). In the D.C. case, defendant was charged with, from 1992 to 2003, conspiring to import and manufacture cocaine knowing it was destined for the United

States, in violation of 21 U.S.C. §§ 959 and 960. R2. 1-0003.[1] Shortly thereafter, in April 2009, the defendant was charged in this District with, from 2005 to 2009, conspiring to possess with intent to distribute and distribute controlled substances (Count One), and conspiracy to import controlled substances into the United States (Count Two), in violation of 21 U.S.C. §§ 846 and 963 (the "Chicago case"). R. 1. Three superseding indictments followed in the Chicago case, each charging the defendant with the same two offenses. R. 7, 75, 157.

Defendant was extradited to Chicago in February 2010, and began cooperating with the government in approximately late 2011. On November 5, 2012, the defendant pled guilty to the D.C. case pursuant to a written plea agreement. Approximately five months later, on April 3, 2013, the defendant pled guilty in the Chicago case to Count One of the Third Superseding Indictment pursuant to a written plea agreement. R. 217, 299. In both the Chicago and D.C. case plea agreements, the defendant agreed to provide fulsome and complete cooperation when called upon by either district, and the government agreed to, in its sole discretion, recommend a lower sentence.

On June 27, 2018, by agreement of the parties and both courts, the defendant withdrew his guilty plea in the D.C. case so that case could be transferred to this District pursuant to Fed. R. Crim. P. 20 for purposes of a consolidated sentencing.

---

[1] Citations to the 09 CR 383 case are referred to as "R." followed by the docket number; citations to the 18 CR 484 case are referred to as "R2.," followed by the docket number.

R2. 1. On November 8, 2018, defendant again pled guilty to the D.C. case, this time in Chicago. R2. 5, 6.

## III. The Offense Conduct

At various times between 1992 and 2008, the defendant worked directly under his father, Ismael Zambada Garcia, and Joaquin Guzman Loera, two leaders of the Sinaloa Cartel, to transport ton quantities of cocaine from Colombia to Mexico, where it was then illegally smuggled into the United States for distribution across the country, including to Chicago and D.C. Defendant served as a top lieutenant and logistical coordinator for his father, and was responsible for many aspects of the cartel's operations.

In particular, the defendant at times coordinated the delivery of multi-hundred and multi-ton kilogram quantities of cocaine from Central and South America, including Colombia and Panama, into Mexico. Once the cocaine was inside Mexico, the defendant then facilitated the unloading, transportation, and storage of these massive amounts of cocaine within Mexico. Defendant subsequently assisted in coordinating the delivery of cocaine to wholesale distributors in Mexico, distributors like Pedro and Margarito Flores, who in turn smuggled multi-ton quantities of cocaine (often in shipments of hundreds of kilograms at a time) and heroin from Mexico into and throughout the United States, including to Chicago and Washington, D.C. Because of his position in the cartel, defendant was aware that the Sinaloa Cartel obtained and then sold multi-ton quantities of cocaine for distribution into the United States on a monthly, if not weekly, basis between 2005 and 2008. Defendant

4

was also fully aware that millions of dollars in narcotics proceeds were transported on behalf of the cartel from the United States and to locations in Mexico, as well as Central and South America.

Defendant further understood that the cartel and its members used various means to ensure the success of its operation, including the use of: (1) sophisticated transportation methods like aircrafts and submarines; (2) stash locations in multiple countries; (3) violence and threats of violence; and (4) bribery of Mexican government officials. And indeed, the defendant ordered acts of violence and participated in the bribery of public officials in Mexico.

## IV. Objections to the PSR

The government concurs with the Guidelines calculations in the defendant's PSR and does not have any objections or suggested corrections to the PSR.

## V. Defendant's Cooperation and the Government's Motion to Depart from the Applicable Guidelines Range

The government submits that the defendant has provided the full and truthful cooperation required by his plea agreements. Accordingly, pursuant to the terms of the plea agreements, the government now respectfully moves this Court, pursuant to USSG § 5K1.1, to depart from the advisory Guidelines range and sentence defendant to 17 years' imprisonment. Defendant has earned a significant sentencing reduction for his extraordinary cooperation.

***Defendant's Cooperation In The Northern District of Illinois***

After first expressing interest in cooperating with the U.S. government in early 2009, the defendant was arrested and then extradited to Chicago. Due to his arrest by Mexican authorities, the defendant was unable to proactively cooperate with the U.S. government, and some time passed in Chicago before the defendant began cooperating. But, since that time, the defendant has continued to provide valuable and extensive historical information about the Sinaloa Cartel and its members, as well as members of the BLO.

At the outset of his cooperation, the defendant was debriefed on a daily and then weekly basis for months, which ███████████████████████████████ ██████████████████████████████ contributed to the government's evidence against, multiple high-level Sinaloa Cartel members and associates, as well as leaders of the BLO. ██ ███████████████████████████ [2] For example, information provided by the defendant in significant part led to the charging of ███████████████████████████, a long-time, high-level Sinaloa narcotics trafficker who was responsible for moving ton quantities of cocaine from Central and South America into Mexico and eventually into the United States ██████ ███████████████████████████████████.

---

[2] Many of the matters that involve information provided by the defendant remain under seal or are otherwise law enforcement sensitive. For this reason, the government cannot fully describe these matters even in this redacted filing. With the agreement of the defendant, the government will provide a more fulsome description of these matters directly to the Court in an under seal, and in some instances *ex parte*, manner.

Since the initial debriefing period, the government has regularly returned to the defendant to debrief him on various other targets and defendants. In total, the defendant has been debriefed well over 100 times. Throughout this debriefing process, the defendant has provided information freely and to the best of his abilities. ███████████████████████████████, the defendant was sent to BOP facilities ███████████████, but still continued his cooperation through frequent telephone proffers and in-person visits by the government. This ongoing cooperation has contributed to, among other things, probable cause findings for search warrants and wiretaps that cited the defendant and his information in support of the applications. It has also led directly and indirectly to the charging of dozens, if not over a hundred, additional defendants. *See* Exhibit B (NDIL Summary).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

Defendant also provided the government with information that, at times, was passed to foreign authorities for enforcement action. For example, the defendant alerted U.S. law enforcement to █████████████████████████████

7

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████ Thus, while no charges have resulted in the U.S. to date from these seizures, the defendant's information nevertheless allowed for the disruption of a major narcotics trafficking route.

In addition to providing information that led to the investigation and indictment of various individuals, the defendant also assisted in the U.S. government's efforts to extradite those defendants to this country. Defendant signed multiple declarations that were submitted to the Government of Mexico as part of successful extradition requests for defendants in this district and others. In this district, the defendant signed multiple declarations in support of NDIL's request to extradite ████████████████████████████████████████ extradition proceedings are ongoing in Mexico.

### *Defendant's Cooperation Outside the Northern District of Illinois*

While the defendant has provided extraordinary cooperation to prosecutors in this district, he has provided as much, if not more, assistance to other prosecutors throughout the country. The defendant's cooperation has aided additional U.S. Attorney's Offices and DOJ components throughout United States, including DOJ's Narcotic and Dangerous Drugs Section (NDDS), the Southern District of California, the Central District of California, the Southern District of New York, the Western

8

District of Texas, the Eastern District of New York, the Department of Justice's Money Laundering and Asset Recovery Section, and DEA's Mexico City Country Office, Mazatlan Residence Office, and the Special Operations Division.

The defendant's cooperation in these various districts has led to the indictment of dozens of Sinaloa Cartel members and associates operating at the highest ranks of the organization. For example, based in part on his cooperation, ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ██ ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ ██ ████████████████████████ For example, the defendant's cooperation led to the indictment of Damaso Lopez Nunez, a close confidant of Guzman Loera and manager of much of his day-to-day activities, including facilitating multi-ton narcotics shipments on behalf of the cartel, managing cartel security forces, and facilitating efforts to corrupt Mexican public officials in furtherance of cartel goals.

In addition, the defendant has provided multiple declarations for high-level cartel members and associates in support of their extradition. *See* Exhibits B, C, D. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ For example, a declaration by the defendant was filed

9

in support of Lopez Nunez's extradition to the United States. Each of these declarations has been or will be made known to the individuals for whom extradition is sought, placing the defendant and his family in increased danger of retaliation.

Significantly, the defendant has also provided cooperation in the form of willingness to testify, and actual testimony at trial, against two of the highest level narco-traffickers that have faced charges in the United States. ████████████

████████████████████████████████ ████████████████

████ ██████████████████ ██ ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

More recently, the defendant provided testimony that assisted in the conviction of Sinaloa Cartel leader Guzman Loera in the Eastern District of New York. *Id.* As this Court knows, Guzman Loera rose through the ranks of the Sinaloa Cartel over the course of more than two decades, to become one of the most feared and prolific narcotics traffickers in the world. Because of the defendant's own involvement in the cartel and his proximity to its leaders, the defendant was in a position to offer testimony on a broad range of topics spanning over 15 years, including not only testimony about the inner workings of the cartel's narcotics trafficking and money laundering efforts, but also his direct knowledge of drug wars

10

against rival cartels, various instances of cartel violence ordered by Guzman Loera against specific individuals, corruption of Mexican government officials in furtherance of cartel objectives, Guzman Loera's trafficking efforts from prison in the 1990s, and his prison escape in 2001. In doing so, the defendant also offered a great deal of testimony that clearly described the criminal culpability of his own father.

## VI.  Analysis of the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a)

*Seriousness of the Offense*

With respect to the seriousness of the offense, as this Court knows, the defendant operated at the highest levels of the narcotics trafficking world. While he was not a primary leader of the Sinaloa Cartel, and was literally born into the position he held, he nonetheless performed a crucial leadership function for the cartel and helped ensure its success as a narcotics trafficking organization.

Defendant's first involvement with the cartel began as a result of the unavailability of his father. Though as a youth the defendant shied away from involvement in his father's business, the defendant was asked by narco-traffickers to pass messages along to his father, who was in hiding and thus inaccessible. And in turn, defendant's father used the defendant as a conduit to communicate with other drug traffickers while he was in hiding. From there, the defendant's involvement grew – to facilitating the importation of large quantities of cocaine from Central and South America into Mexico; to coordinating the distribution of cocaine and heroin to wholesale customers, who in turn distributed the drugs throughout the United

11

States; and to overseeing internal cartel issues, such as security and the cartel's strategy in dealing with its war with rival cartels.

With respect to violence, in *United States v. Guzman Loera* earlier this year, the defendant summarized his own involvement in cartel-related violence:

Q:      Okay. And, Mr. Zambada, have you ever personally killed anyone?

A:      No.

Q:      Okay. Have you ever relayed any orders from someone to die?

A:      Yes. Several times.

Q:      How many times?

A:      I don't know, but there were several times.

Q:      What was going on during the time period that you were relaying orders to kill people?

A:      Well, all of the people that I had mentioned before, and all the people, the hitmen, they would report to me regarding all the information as to what was happening in Culiacan. So I was like the boss to them, there was another boss. And regarding to any decision with respect to killing somebody or any confrontation, I would then get authorization from my dad, and Juancho would get authorization from my Compadre Chapo.

Q:      So the orders that you were relaying to kill people were coming from where?

A:      Meaning in my case? From my dad.

Q:      Have you ever ordered anyone to be abducted or picked up?

A:      Yes, before that I had ordered for Caiman to be kidnapped, which I mentioned before.

12

Q:      Okay. Anyone else?

A:      Well, you know the order at the time was, you know, regarding all of the people that we were looking for, the order was either to kill them or to kidnap them so that we can get information from them.

*See* 1/4/19 Transcript from *U.S. v. Guzman Loera, 09-CR 466* (J. Cogan, E.D.N.Y.) at 4107:10-4108:15.[3] In sum, by the defendant's own admissions under oath, his offenses involved conduct of the utmost seriousness, and that seriousness needs to be reflected in defendant's sentence as well.

### *Need to Promote Deterrence*

The need for individual deterrence in this case is significantly minimized in part because of the manner in which defendant's cooperation came to be. It was upon the defendant's initiative, and through his own efforts to leave the drug trafficking world, that he came to cooperate with the U.S. government. Moreover, the defendant would face serious personal risk in any attempt to return to the life he formerly led. Defendant is one of the most well-known cooperating witnesses in the world, and he and his family will live the rest of their lives in danger of being killed in retribution. They have left a world filled with actors who have shown no hesitation to use violence, particularly against cooperators. Having cooperated against not only the leadership of multiple cartels, but also their children, family members, close associates, and rivals, the defendant would in all likelihood be killed absent his protection by the U.S.

---

[3] A transcript of the defendant's complete testimony in the Guzman Loera trial, which totals over 500 pages, is available to the Court upon request.

government. These very real threats to him and his family make a return to drug trafficking next to impossible for the defendant.

The need for general deterrence must also be considered. In the ordinary course, this case, which has received (and undoubtedly will continue to receive) significant attention, would call for a substantial sentence in order to deter others from engaging in narcotics trafficking. And while that does, of course, remain an important factor, the need for general deterrence is mitigated by the legitimate interest in promoting cooperation by those engaged in similar criminal activity. Just prior to his arrest in Mexico, the defendant reached out to the U.S. government to discuss cooperation. And, as detailed above, once the defendant began cooperating, his cooperation was extraordinary and impactful. For this reason, an appropriate balance must be struck between achieving general deterrence and fostering the cooperation of similarly-situated individuals who seek a viable alternative to persisting in criminal activity.

### *Personal Danger and Risk*

The issue of personal safety and risk is also relevant in the analysis of an appropriate sentence under Section 3553(a). The defendant and his family are forever at risk due to his cooperation. The government will continue to protect the defendant and his family post-sentencing and post-incarceration, and remains confident in its ability to do so. However, they will forever live with the effects of the defendant's cooperation and the resulting threat imposed, including through limitations on their freedom of movement and association. And the fear of retribution will always exist,

14

regardless of the steps taken to ensure their protection. This fear often prevents others from cooperating with the government; that the defendant overcame this fear and cooperated with the government warrants significant consideration, as it serves to offset his criminal liability.

### *The Defendant's History and Characteristics*

For virtually all of the defendant's adult life prior to incarceration, he engaged in high-level criminal conduct in furtherance of the goals of a violent narcotics trafficking cartel. Defendant's actions at times included not only trafficking in thousands of kilograms of controlled substances, but also ordering that acts of violence, including murders and kidnappings, be committed against other narcotics traffickers and their associates. That conduct would normally justify a very lengthy prison sentence. And it is conduct that should not be excused. But such acts must be balanced against defendant's unique history and characteristics, and his cooperation.

Defendant grew up surrounded by a drug trafficking world that he initially showed no interest in, and then tried to leave behind multiple times without success. As a young adult, he relocated to Spain and then to Canada with his family in an attempt to escape the world into which he had been born and the violence that flowed from it, including threats upon his own life. Each time, fear of the infliction of violence upon him and his family, even in places far from Mexico, drew him back to the protection provided by his father's organization.

Since his incarceration, the defendant has been a model prisoner. He has no prison disciplinary history; rather, from all accounts, he appears to have applied

15

himself productively while incarcerated. And as discussed above, since 2011 he has cooperated with the government, without incident and over a lengthy time period. The defendant has represented that he will continue to cooperate with the government, including by testifying at future trials if called upon. The length of defendant's cooperation, its depth, and defendant's commitment to continue his cooperation, in and of itself reflects his commitment to change.

### Need to Provide Just Punishment

Under Section 3553(a), the Court must consider the need for just punishment. And there is a definite need here: punishment not only for the tons of illegal drugs imported into the United States for which the defendant is responsible, but also for the acts of violence defendant ordered, including murders and kidnappings of rival cartel members and their associates. But in considering this factor, the Court may also want to consider some of the uncommon conditions of the defendant's confinement, including the approximately 20 months that the defendant spent in the MCC's Special Housing Unit (SHU), under heightened restrictions, for security reasons. *See United States v. Pressley*, 345 F.3d 1205, 1218 (7th Cir. 2003) (finding pre-*Booker* that "conditions of confinement could provide a basis for a departure" as "the factor was apparently not taken into account by the Sentencing Commission;" *see also United States v. Bautista*, 258 F.3d 602, 606 (7th Cir. 2001) (noting that the Seventh Circuit has held "that a departure could be warranted to offset unusually harsh conditions of confinement").

16

### Need to Avoid Unwarranted Sentencing Disparities

Finally, this Court must also consider the need to avoid unwarranted sentencing disparities among similarly situated defendants. Of course, in many ways, the defendant is truly unique, both with respect to his criminal culpability and in his efforts to rectify that culpability through cooperation, making any comparison difficult. But a review of other sentences imposed by this Court and within this district is instructive, and supports the government's recommendation of 17 years.

With respect to the Chicago case and related in-district cases, multiple high-level narcotics trafficking defendants have been sentenced, only a portion of whom have fully cooperated and thus warranted a § 5K1.1 motion by the government. For example, this Court has sentenced Edgar Manuel Valencia (8 years), Tomas Arevalo Renteria (19 years), and Alfredo Vasquez Hernandez (22 years), all of whom operated within the upper ranks of the Sinaloa Cartel and none of whom earned a § 5K1.1 motion through cooperation. Similarly, in a related matter in which the government did not make a § 5K1.1 motion, Judge Guzman sentenced high-level Sinaloa Cartel trafficker Manuel Fernandez Valencia to 27 years' imprisonment.

With respect to similarly situated cooperating defendants in this district, the closest analogous cooperating defendants are Pedro and Margarito Flores, twins that had close ties to multiple cartel leaders, including Guzman Loera, Zambada Garcia, and the defendant, and who led a Chicago-based distribution cell that pumped massive amounts of cocaine and heroin into this city and others around the nation. As this Court is well aware, they are also brothers who provided an unprecedented

level of cooperation to the U.S. government, including cooperation against cartel leaders, their families, and their close associates. In fashioning the Flores brothers' sentence, this Court acknowledged the devastating effect that the massive amount of drugs brought into this and other U.S. cities by the Flores brothers, but also reasoned:

> [The range of 10-16 years provided for in their Rule 11(c)(1)(C) plea agreement] is fair because I've never seen anyone just stop in the middle of a conspiracy . . . and decide to cooperate.

> I wish your cooperation had been perfect. It is not perfect. It is valuable, timely, and the fact that you've recorded conversations is very significant and might turn out to be even more significant in upcoming trials that may or may not take place in this city or in this country, but I understand what you've done. You've take a great deal of risk, and I am certainly going to consider that because in a very real way . . . you are going to leave here with a life sentence.

> *****

> I've also considered very carefully what the government said about your actual use of violence and the fact that they cannot prove that you have either ordered someone to have their life taken or were involved in the actual taking of a life, and that is significant to me.

> *****

> If your cooperation had been perfect, you would leave here today with 12 year sentences . . . [b]ut you fail[ed] to report to the government the arrival of 276 kilograms of cocaine in that transaction with Mr. Vasquez-Hernandez.

R. 406 at 25-27. As a result of their failure to the report, this Court found a 14 year sentence, and not a 12 year sentence, to be just.

18

Obviously there are similarities and differences between the Flores brothers and the defendant. All three were at the height of the drug trafficking world at the time they decided to stop their illegal activity and cooperate with the government. Prior to their cooperation, all three caused an extraordinary amount of damage to this country as a result of their drug trafficking. When they made the decision to cooperate, all three did so at an extraordinary and unprecedented level. But there are also differences. Most notably, the defendant has admitted to having ordered acts of violence that were carried out against rival cartel members. That fact cannot be ignored. But the defendant's cooperation has also been model and truly without incident; there was no 276 kilogram cocaine load hidden from the government and smuggled into the city of Chicago. When the defendant stopped, he stopped. He appears to have done so for the right reasons. And he has done everything asked of him by the government, even when his cooperation came at a great personal cost.

But for the 276 kilogram cocaine load, the Flores brothers would have received a 12 year sentence from this Court. Because of defendant's ordering acts of violence, there is a need here for a longer sentence than that. But given all of the Section 3553(a) factors discussed above, and the defendant's truly extraordinary cooperation, the government believes a 17 year sentence is just and warranted in this case.

## VII.  **<u>Government's Sentencing Recommendation</u>**

The government recommends that the Court impose sentence of 17 years' imprisonment. That sentence balances the defendant's culpability with his extraordinary cooperation, and accomplishes the goals set forth in Section 3553(a).

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    <u>*s/Erika L. Csicsila*</u>
CHRISTOPHER P. HOTALING
ERIKA L. CSICSILA
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5370

Dated: May 20, 2019